# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYMBOL TECHNOLOGIES, INC.,<br>a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. _____ |
| v. | ) ) | |
| JANAM TECHNOLOGIES LLC,<br>a Delaware limited liability company, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Symbol Technologies, Inc. ("Symbol"), by its counsel, as and for its

Complaint against Defendant Janam Technologies LLC ("Janam"), alleges as follows:

### SYMBOL'S RECORD OF INNOVATION

1.      Symbol is a Delaware corporation having its principal place of business at

One Motorola Plaza, Holtsville, New York 11742-1300.   Symbol develops and markets

innovative, high-performance products, including a wide range of handheld mobile computers

with wireless network and bar code scanning capabilities ("handheld mobile computers").

2.      For more than two decades, Symbol and its subsidiaries have been leading

innovators in handheld mobile computers, holding basic patents in the field.  Early on, Symbol

recognized the need for devices to communicate and transfer data wirelessly to a host computer

or network, and Symbol directed its innovative efforts to the field of wireless communication.

Today, much of Symbol's work is reflected in the most popular wireless standards including, for

example, the ubiquitous WiFi.

3.      In 2000, Symbol was awarded the National Medal of Technology, the

nation's highest honor for technological innovation.  At the time, Symbol was only the 11th

corporate recipient in the 20-year history of the Award. The Award was granted to Symbol "[f]or creating the global market for laser bar code scanning and for technology innovation and practical application of mobile computing and wireless local area network technologies." Such technical innovations are implicated by Janam's misappropriation of Symbol's patented technology at issue in this case.

4.    Symbol's handheld mobile computers are primarily designed for, and sold to, commercial users, such as retailers, transportation and logistics companies (*e.g.*, Federal Express) and warehouse applications. In addition to bar code scanning and wireless capabilities, Symbol's handheld mobile computers include other design features. Many devices are "ruggedized", meaning that they are especially adapted for use in work environments requiring devices that are highly resistant to breaking if dropped. Such devices are especially attractive for warehousing and inventory applications.

5.    The commercial success of Symbol's handheld mobile computers is substantial and undeniable. Since 2001 alone, Symbol has generated billions of dollars in sales of such devices.

6.    In keeping with its commitment to innovation, Symbol was one of the first manufacturers to adopt a Palm operating system (Palm OS) in its handheld mobile computers. When the Windows operating system (Windows OS) became available for mobile devices, Symbol incorporated that operating system in a series of highly successful handheld mobile computers.

7.    As the handheld market began to evolve, more and more of Symbol's customers preferred the Windows OS over the Palm OS. In light of its customers' preferences,

2

in 2006, Symbol announced that it would phase out its Palm OS based devices and concentrate on its Windows OS based devices instead.

## JANAM IS FORMED TO FILL A NICHE

8.    Upon information and belief, Janam is a Delaware limited liability company having its principal place of business at 100 Crossways Park West, Suite 105, Woodbury, NY 11797-1322. Janam sells in the United States Palm OS and Windows OS based handheld mobile computers with wireless network and bar code scanning capabilities.

9.    Janam was founded in or about 2006 by Ronald Goldman and Harry Lerner, two former long-time executives in Symbol's mobile computing division. During their many years with Symbol, Janam's founders witnessed first-hand Symbol's innovation in the field. Janam's founders thereby gained extensive and intimate knowledge of Symbol's products, patents, suppliers, distributors, customers, and marketing of handheld mobile computers.

10.    In or about September 2006, Symbol announced to the trade that it would exit from the Palm OS based part of the handheld mobile computer business. This announcement presented a business opportunity for Janam's founders. They informed Symbol that they wanted to fill the void created by Symbol's marketing decision and intended to start a business (Janam) that would supply Palm OS-based handheld mobile computers. In view of Symbol's business decision to exit from the Palm OS-based part of the handheld mobile computer business, Symbol did not object to this new venture, so that existing Palm OS users could have a source of supply should they choose to continue using such devices.

11.    Over the next two years, Janam introduced two series of Palm OS based handheld mobile computers: the XP-20 and XP-30. Those devices are not accused in this action.

12.     In early 2008, however, Janam apparently shifted its business focus and announced the introduction of a Windows OS based handheld integrated terminal, the XM-60, to its product line. That product incorporates Symbol's patented technology and competes directly with Symbol's current lines of Windows OS based handheld mobile computers that Messrs. Goldman and Lerner had previously promoted as Symbol employees.

13.     Most importantly, Janam took Symbol's patented technology without license or authorization from Symbol and incorporated it into its Windows OS devices.

14.     Capitalizing on the knowledge of Symbol's sales and distribution channels that Janam's founders acquired while at Symbol, Janam was able to quickly and effectively approach distributors of Symbol products and sign them on to distribute Janam products as well.

15.     Given Janam's free-riding on the substantial investments by Symbol in research, development and marketing, it is hardly surprising that Janam is now undercutting Symbol's prices and offering the XM-60 to Symbol's distributors at a substantial discount compared to Symbol's competing devices. Symbol has been forced to lower the prices of its own Windows OS-based handheld mobile computer devices that compete with Janam XP-60. This price erosion is irreparable. If Janam is permitted to continue to free ride on Symbol's patented technology, Symbol will likely experience continued decreased market share, revenues and margins in its held mobile computers.

16.     Moreover, Janam's misappropriation of Symbol's patented technology should have been avoided. Mr. Goldman was a patent attorney at Symbol before moving over to the business side and is well aware of Symbol's patents in the field. As indicated earlier herein, Symbol was willing to permit Janam to serve the niche Palm OS market, given Symbol's decision to exit that business and Symbol's decision to have its Palm OS customers afforded the

continued availability of devices employing that operating system. However, Symbol was not and is not willing to license Janam to utilize Symbol's patent rights to compete with Symbol with respect to Windows OS handheld mobile computers.

17.    Symbol has thus been left with no choice. It must assert its patents to prevent Janam's misappropriation of its patented technology.

## JURISDICTION AND VENUE

18.    This is an action arising under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq.* This Court has subject matter jurisdiction pursuant to 35 U.S.C. § 271 *et seq.* and 28 U.S.C. §§ 1331 and 1338.

19.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400.

20.    This Court has personal jurisdiction over Janam. Janam is a Delaware limited liability company, and maintains National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, DE 19904, as its registered agent for the service of process in Delaware. Upon information and belief, Janam also places its infringing products in the stream of commerce, and that stream is directed to this district.

## THE SYMBOL PATENTS

21.    Symbol is the owner by assignment of United States Letters Patent No. 5,835,366 ("the '366 Patent"), entitled "Secondary Battery Boost Circuit." The '366 Patent duly and legally issued November 10, 1998. A copy of the '366 Patent is attached to this Complaint as Exhibit A. The '366 Patent claims, *inter alia,* secondary battery boost systems and portable computing devices with a secondary battery boost, as well as methods for providing power to computer devices by way of a secondary power source with a boost circuit. This invention is an important feature in handheld mobile computers because it provides a safeguard against losing

valuable data when the primary battery runs out of power and a handheld mobile computer shuts down.

22.    Symbol is the owner by assignment of United States Letters Patent No. 5,334,821 ("the '821 Patent"), entitled "Portable Point of Sale Terminal." The '821 Patent duly and legally issued August 2, 1994. A copy of the '821 Patent is attached to this Complaint as Exhibit B.    The '821 Patent claims, *inter alia*, portable point of sale terminals with two transceivers for transmitting and receiving data wirelessly.    This invention is an important feature in handheld mobile computers because it provides for the exchange of data by way of two distinct wireless networks (*e.g.,* via WiFi local area networks and Bluetooth personal area networks).

23.    Symbol is the owner by assignment of United States Letters Patent No. 6,714,969 ("the '969 Patent"), entitled "Mobile Terminal With Integrated Host Application Software." The '969 Patent duly and legally issued March 30, 2004. A copy of the '969 Patent is attached to this Complaint as Exhibit C. The '969 Patent claims, *inter alia*, wireless user-held network terminals that parse software available remotely on a network in order to generate user interfaces and methods for remotely browsing and accessing network files on a user-held wireless computer device. This invention is an important feature in handheld mobile computers because the internet web browser generates a user interface for remote software applications without the need for such software to be installed on the handheld; in this way, the time and expense of continually updating software stored on handheld mobile computers can be avoided.

## FIRST CLAIM FOR RELIEF
### (INFRINGEMENT OF THE '366 PATENT)

24.    Plaintiff repeats and realleges the allegations in paragraphs 1-23 as if fully set forth herein.

25.    Janam has imported into the United States, made, used, sold and/or offered for sale in the United States, Windows OS based handheld integrated terminals covered by the '366 Patent and/or products that, when used in accordance with their instructions, practice the methods covered by the '366 Patent.  Such products include the Janam XM series mobile computers (e.g., the XM-60).

26.    Janam has infringed and/or induced the infringement of and/or contributed to the infringement of the '366 Patent by importing, making, using, offering for sale, or selling in the United States, or by intending that others import, make, use, offer for sale, or sell in the United States, Windows OS based handheld integrated terminals that are covered by the '366 Patent and/or products that, when used in accordance with their instructions, practice the methods covered by the '366 Patent.

27.    On information and belief, Janam's infringement of the '366 Patent is willful.  The continued infringement of the '366 Patent by Janam has damaged and will continue to damage Symbol.

28.    The infringement of the '366 Patent by Janam has caused and will continue to cause Symbol irreparable harm unless preliminarily and permanently enjoined by the Court.  Symbol has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### (INFRINGEMENT OF THE '821 PATENT)

29.    Plaintiff repeats and realleges the allegations in paragraphs 1-28 as if fully set forth herein.

30.    Janam has imported into the United States, made, used, sold and/or offered for sale in the United States, Windows OS based handheld integrated terminals covered by the '821 Patent. Such products include the Janam XM series mobile computers (e.g., the XM-60).

31.    Janam has infringed and/or induced the infringement of and/or contributed to the infringement of the '821 Patent by importing, making, using, offering for sale, or selling in the United States, or by intending that others import, make, use, offer for sale, or sell in the United States, Windows OS based handheld integrated terminals that are covered by the '821 Patent.

32.    On information and belief, Janam's infringement of the '821 Patent is willful. The continued infringement of the '821 Patent by Janam has damaged and will continue to damage Symbol.

33.    The infringement of the '821 Patent by Janam has caused and will continue to cause Symbol irreparable harm unless preliminarily and permanently enjoined by the Court. Symbol has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
### (INFRINGEMENT OF THE '969 PATENT)

34.    Plaintiff repeats and realleges the allegations in paragraphs 1-33 as if fully set forth herein.

35.    Janam has imported into the United States, made, used, sold and/or offered for sale in the United States Windows OS based handheld integrated terminals covered by the '969 Patent and/or products that, when used in accordance with their instructions, practice the methods covered by the '969 Patent. Such products include the Janam XM series mobile computers (e.g., the XM-60).

36.     Janam has infringed and/or induced the infringement of and/or contributed to the infringement of the '969 Patent by importing, making, using, offering for sale, or selling in the United States, or by intending that others import, make, use, offer for sale, or sell in the United States, Windows OS based handheld integrated terminals that are covered by the '969 Patent and/or products that, when used in accordance with their instructions, practice the methods covered by the '969 Patent.

37.     On information and belief, Janam's infringement of the '969 Patent is willful.  The continued infringement of the '969 Patent by Janam has damaged and will continue to damage Symbol.

38.     The infringement of the '969 Patent by Janam has caused and will continue to cause Symbol irreparable harm unless preliminarily and permanently enjoined by the Court.  Symbol has no adequate remedy at law.

WHEREFORE, Symbol prays for a relief and judgment against Janam as follows:

A.     Adjudging that Janam is infringing the Symbol Patents;

B.     Adjudging that the infringement by Janam of the Symbol Patents was willful, and that the continued infringement by Janam is willful;

C.     Entering an order preliminarily and permanently enjoining Janam from any further acts of infringement of the Symbol Patents;

D.     Awarding Symbol damages in an amount adequate to compensate for the infringement by Janam of the Symbol Patents, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

E.    Entering an order trebling any and all damages awarded to by reason of the willful infringement by Janam of the Symbol Patents, pursuant to 35 U.S.C. § 284;

F.    Entering an order awarding Symbol interest on the damages awarded and their costs pursuant to 35 U.S.C. § 284;

G.    Declaring this an exceptional case and awarding Symbol its costs, expenses, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285 and all other applicable statutes, rules, and common law; and

H.    Awarding Symbol such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Symbol hereby demands trial by jury on all issues in its Complaint so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL

Eric J. Lobenfeld
Ira J. Schaefer
Arlene L. Chow
Mitchell S. Feller
HOGAN & HARTSON L.L.P.
875 Third Avenue
New York, New York 10022
(212) 918-3000

Dated June 9, 2008
868091 / 33146

By: _Richard L. Horwitz_

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, Delaware 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Plaintiff*
*Symbol Technologies, Inc.*

# EXHIBIT A

US005835366A

# United States Patent [19]

## Pleso et al.

[11] **Patent Number:** 5,835,366

[45] **Date of Patent:** Nov. 10, 1998

[54] **SECONDARY BATTERY BOOST CIRCUIT**

[75] Inventors: **Mark F. Pleso**, Sharon, Pa.; **Lee E. Leppo**, Tallmadge, Ohio

[73] Assignee: **Telxon Corporation**, Akron, Ohio

[21] Appl. No.: **881,773**

[22] Filed: **Jun. 24, 1997**

[51] Int. Cl.$^6$ ................................................. **H02M 3/18**

[52] U.S. Cl. .............................. **363/59;** 323/222; 307/66

[58] Field of Search ...................... 323/21, 222; 363/59; 307/64, 66

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,816,768 | 6/1974 | Stein | 307/64 |
| 4,209,710 | 6/1980 | Quarton | 307/66 |
| 4,214,827 | 7/1980 | Tominaga et al. . | |
| 4,355,619 | 10/1982 | Wilkinson . | |
| 4,488,057 | 12/1984 | Clarke | 307/66 |
| 4,719,550 | 1/1988 | Powell et al. | 363/37 |
| 4,847,545 | 7/1989 | Reid . | |
| 5,399,956 | 3/1995 | DeLuca et al. | 363/59 |
| 5,515,024 | 5/1996 | Ghia et al. . | |
| 5,517,153 | 5/1996 | Yin et al. | 327/546 |
| 5,526,253 | 6/1996 | Duley . | |
| 5,528,087 | 6/1996 | Sibata et al. . | |
| 5,560,023 | 9/1996 | Crump et al. . | |

*Primary Examiner*—Stuart N. Hecker
*Attorney, Agent, or Firm*—Renner, Otto, Boisselle & Sklar P.L.L.

[57] **ABSTRACT**

A secondary battery boost system which includes a primary power supply for a computing device, and a secondary power supply for the computing device. The boost system also includes a boost circuit operative to increase the power output of the secondary power supply applied to the computing device. Upon the output of the primary power supply falling below a level suitable for properly powering the computing device, the boost circuit feeds the computing device power from the secondary power supply. The boost circuit also boosts the power output of the secondary power supply so that the secondary power supply can be smaller and more light weight.

**24 Claims, 3 Drawing Sheets**





Fig. 1c

Fig. 1b

Fig. 1a



**Fig. 2**



**Fig. 3**

5,835,366

**1**

## SECONDARY BATTERY BOOST CIRCUIT

### TECHNICAL FIELD

The present invention relates in general to a battery boost circuit, and in particular to a secondary battery boost circuit for a portable computing device.

### BACKGROUND OF THE INVENTION

In recent years, the use of wireless mobile terminals has become increasingly popular to help automate and expedite processes in retail, manufacturing, warehousing and other industries. For instance, in a retail environment the wireless mobile terminal may take the form of a wireless bar code reading device for use in tracking inventory and checking prices. In the warehousing industry, the same device may be used to keep accurate accounts of incoming and outgoing shipments. In the healthcare, transportation and other industries, the mobile terminal may take the form of a wireless pen based computer to aid in on-site document control procedures. The mobile terminals may operate independently by storing all information until later downloaded or may include a radio which allows it to communicate in real time to a host computer connected to a LAN, for example.

In order to allow for wireless operations, a power supply such as a battery pack is included in each mobile terminal. Typically, each battery pack will be made of rechargeable type batteries, such as Nickel-Cadmium (Ni-Cd) or Nickel-Metal-Hydride (NMH), which can supply several hours of uninterrupted operating time to a user before requiring recharging. However, due to the large amount of processing power needed to run most of today's standard wireless equipment, it is not uncommon for power to run out before a user has sufficient time to finish his/her current task. Therefore, in order to avoid loss of information in connection with currently active or unsaved files several safeguards exist.

One known safeguard against losing valuable information prior to a forced shutdown of a mobile terminal is to implement the Advanced Power Management (APM) shutdown protocol. The APM shutdown protocol is specially designed to operate in conjunction with a device running a Windows® based operating system. Upon a processor in the mobile terminal detecting that the main battery is running low, the APM shutdown protocol implements a series of steps which ensures for a save power down routine wherein no data is lost.

In order to accommodate reliable implementation of an APM shutdown protocol or other similar low power shutdown routine, there needs to be enough power remaining in the mobile terminal's power supply to ensure the full routine can be implemented. Unfortunately, with the power level of the main power supply already running low, there will oftentimes not be a sufficient amount of power to reliably run the full safe guard mechanisms in place. Thus, several manufactures of mobile terminals include a back up battery to handle the final power down stages if necessary.

As the reduced size and weight of a mobile terminal play significant factors in providing for an ergonomically marketable device, these factors are critical to the overall success of such products. Unfortunately, the back-up batteries needed to supply sufficient power to accommodate operating safeguard routines such as those described above require the use of valuable space inside the mobile terminal and add to the overall weight of the device.

Thus, there is a strong need for a method and/or apparatus for minimizing the size and weight of the secondary battery

**2**

while still providing sufficient back-up power to accommodate any necessary routine(s).

### SUMMARY OF THE INVENTION

The present invention provides for a boost circuit which engages a secondary "bridge" or back-up power supply upon an output of a primary power supply falling below suitable level. The boost circuit is coupled to a secondary power supplies, and feeds the output of the secondary power supply to a computing device. A monitoring circuit (e.g., using OR connection) monitors the output level of both the primary and secondary power supplies. Upon the output of the primary power supply falling below a level suitable for properly powering the computing device, the monitoring circuit feeds the computing device power from the secondary power supply via the boost circuit. The boost circuit boosts the power output of the secondary power supply so that the secondary power supply can be smaller and more light weight than a typical power supply providing a power level comparable to that output via the boost circuit.

The computing device according to a preferred aspect of the present invention is a wireless, portable computing device. Such wireless, portable computing devices are desired to be relatively small in size and light in weight in order to facilitate their portable nature. The boost circuit provides for sustaining proper operation of the computing device and also facilitating the portability of the computing device by affording for the use of a less expensive, small and lightweight secondary power supply. As a result, the present invention provides for sustaining the proper operation of the device and facilitating the portable nature of a wireless, portable computing device.

In accordance with one aspect of the present invention, a secondary battery boost system is provided, including: a primary battery, the primary battery operative as a primary portable power supply for a computing device; a secondary battery, the secondary battery operative as a backup portable power supply for the computing device; and a boost circuit operative to increase the power output of the secondary battery applied to the computing device.

According to another aspect of the present invention, a method for facilitating power shutdown protocol of a computing device is provided, including the steps of: using a first cell as a primary portable power supply for the computing device; using a secondary cell as a backup portable power supply for the computing device; and using a boost circuit to increase the power of the secondary cell applied to the computing device; wherein the secondary cell supplies power to the computing device upon a voltage of the first cell dropping below a predetermined value.

In accordance with still another aspect of the present invention, a portable computing device is provided, including: a housing; a first battery supported by the housing, the first battery operative to supply power via a power supply to the portable computing device; a battery boost circuit disposed within the housing; a secondary battery coupled to the battery boost circuit, the secondary battery operative to supply power via the power supply to the portable computing device upon a voltage of the first battery falling below a predetermined value; wherein the battery boost circuit increases a power output of the secondary battery and provides the portable computing device with power from the secondary battery upon the voltage of the first battery falling below the predetermined value.

Another aspect of the present invention affords for a method of providing power to a computing device, including

5,835,366

**3**

the steps of: providing power to the computing device via a primary power source; determining when an output power associated with the primary power source is below a threshold power level; and providing power to the computing device via a secondary power source when the output power associated with the primary power source is determined to be below the threshold power level, the secondary power source providing power through a power boost circuit.

To the accomplishment of the foregoing and related ends, the invention, then, comprises the features hereinafter fully described and particularly pointed out in the claims. The following description and the annexed drawings set forth in detail certain illustrative embodiments of the invention. These embodiments are indicative, however, of but a few of the various ways in which the principles of the invention may be employed. Other objects, advantages and novel features of the invention will become apparent from the following detailed description of the invention when considered in conjunction with the drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**a is a perspective view of the front side of a portable computing device in accordance with the present invention;

FIG. **1**b is a perspective view of the back side of the portable computing device of FIG. **1**a in accordance with the present invention;

FIG. **1**c is a bottom view of the portable computing device of FIG. **1**a in accordance with the present invention;

FIG. **2** is a block diagram of a portable computing device in accordance with the present invention; and

FIG. **3** is a flowchart illustration a process for engaging a secondary power supply according to one aspect of the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention will now be described with reference to the drawings, wherein like reference numerals are used to refer to like elements throughout. In the following description, numerous specific details are set forth such as electronic components, devices, etc. in order to provide a thorough understanding of the present invention. However, it will be apparent to one skilled in the art that the present invention may be practiced without these specific details. In other instances, well known circuits and structures are not described in detail in order not to obscure the present invention unnecessarily.

Referring initially to FIGS. **1**a and **1**b there is shown pictorial views of front and back views, respectively, of a portable electronic device in accordance with the present invention and is generally designated **10**. The present invention relates to a programmable mobile terminal (e.g., a portable teletransaction computing device (PTC)) in which a boost circuit (FIG. **2**) is used to boost the power output of a secondary power source of the mobile terminal **10**, and to contribute to sustaining the operation of the mobile terminal **10** by providing a suitable amount of power to the mobile terminal **10** to sustain operations described herein.

In the exemplary embodiments described hereinafter, the mobile terminal **10** is a hand held inventory control device used to communicate data such as inventory or the like within a cellular, narrow band or other radio communication system including multiple mobile terminals and base sta-

**4**

tions. However, it is recognized that the present invention contemplates other types of programmable mobile terminals or devices and portable computers and is not intended to be limited necessarily to hand held inventory control devices or devices which must wirelessly communicate information. The portable device **10** could also be any other device that is portable in nature and having electronic circuitry therein in accordance with the present invention. For example, the portable device **10** could be a laptop computer or notebook computer, a PDA, or even a cellular telephone or pager, which employs batteries or a charged cell.

According to one aspect of the invention as shown in FIGS. **1**a and **1**b, the portable device is a mobile terminal **10** used in a wireless communication network for tracking inventory, storing data, etc. The user may input and/or process data via a keypad, bar code scanner, etc. independent of the mobile terminal **10** being connected to a LAN, for example. When the mobile terminal **10** does not include a radio to provide for real time communications of data to a LAN, the data is stored in memory (FIG. **2**) within the mobile terminal **10**. In such circumstances, when the mobile terminal **10** is eventually connected to a LAN, the data can be transmitted to a host computer (not shown).

In this particular embodiment, the mobile terminal **10** includes a housing **16**, a display **20** for displaying information to a user, a set of user interface keys **24** for allowing the user to input information and/or operational commands and a bar code scanner **26**. The described components **20**, **24** and **26** are located in the housing **16** which is an elongated enclosure of a size and including such contours as to conveniently fit into the open palm of the user. The housing **16** is preferably made of metal, high strength plastic, or the like. The housing **16** may be comprised of a number of shell portions such as for example front and rear shells **30** and **32** as well as a battery pack lid **34**. The user interface keys **24** may include a full alpha-numeric keypad, function keys, enter keys, etc.

The display **20** may be a liquid crystal display (LCD) or the like. In the preferred embodiment, the display **20** is a fine pitch liquid crystal display operated as a standard CGA display with a resolution of 640×200 pixels. As is conventional, the display **20** functions to display data or other information relating to ordinary operation of the mobile terminal **10** in a cellular communication system. For example, the display **20** may display inventory information, pricing detail, etc. which is to be transmitted to or is received from a system backbone. Additionally, the display **20** may display a variety of functions that are executable by the mobile terminal **10**. The display **20** is capable of displaying both alphanumeric and graphical characters.

The mobile terminal **10** also includes a window through which a bar code reader **26** is able to read a bar code label presented to the mobile terminal **10**. Also included in the mobile terminal **10** is an ON/OFF power switch **40** for turning the device on and off. Furthermore, the mobile terminal **10** includes status lights **42** for indicating to the user such things as operation of a memory hard drive, low battery power, low power consumption, etc. The mobile terminal **10** also includes an antenna **50** which allows the mobile terminal **10** to transmit and receive data via an RF link to a network backbone such as a LAN (not shown). In the exemplary embodiment, the antenna **50** is an omnidirectional antenna but other types of antennas may equally be used. A speaker **52** is integral to the housing **16** and provides an audial output for the user. Additionally, the mobile terminal **10** includes a PCMCIA card slot **54** for receiving a PCMCIA card. As mentioned above, the mobile terminal **10**

5,835,366

**5**

is user programmable and thus a user can input commercially available or user created software to tailor the mobile terminal **10** to execute desired functions.

The mobile terminal **10** further includes three electrical contacts **60**, **62** and **64** exposed at the back side of the housing **16**. Contacts **60** and **62** are employed to provide power from an external source (i.e., a cradle (not shown)) to the mobile terminal **10** and status contact **64** is used to provide a status signal to the external power source so that the status (i.e., docked, undocked, on or off) of the mobile terminal **10** can be determined. Furthermore, the status signal provided via status contact **64** may be used to determine the type of battery being used by the mobile terminal **10** so that the battery can be charged according to its particular charge characteristics. Referring now to FIG. 1C, the mobile terminal **10** also includes a set of four electrical contacts **66** located at the bottom of the housing **16**. The four electrical contacts **66** are used for communications between the electronic circuitry within the mobile terminal **10** and a LAN system backbone (not shown). Preferably, all the contacts **60**, **62**, **64** and **66** are made of a highly conductive metal that is resistant to corrosion such as for example Nickel Plated Beryllium Copper.

Turning back to FIGS. 1a and 1b, a battery pack **66** is located on the back side of the mobile terminal **10**. The battery pack **66** is dimensioned to receive and hold a rechargeable battery (or batteries) **68** which provides a total nominal voltage of about 7.2 volts. This voltage corresponds to the preferred supply voltage of the mobile terminal **10**. The battery **68** serves as the primary portable power supply for the mobile terminal **10**. The battery pack **66** is adapted to be easily removable and installable. Accordingly, the user can carry a spare battery pack preloaded with primary battery **68** to replace a battery pack with dead batteries. The battery pack **68** is designed to prevent being inserted in the mobile terminal **10** in the wrong direction so as to avoid possible damage to the mobile terminal **10**.

Also located on the back side of the mobile terminal **10** is a secondary battery pack **70**. The secondary battery pack **70** is dimensioned to receive and hold a secondary battery **72** (i.e., secondary portable power supply) which outputs a total nominal voltage of approximately 3.6 volts. As will be discussed in greater detail below, the secondary battery **72** serves to provide power to the mobile terminal **10** upon the output of the primary battery **68** (i.e., primary portable power supply) falling below a predetermined level. As a result, the secondary battery **72** affords for sustaining the operations of the mobile terminal **10** for a period of time sufficient to shut down properly and avoid the loss of valuable data.

FIG. 2 is a block diagram representing the basic structure of the mobile terminal **10** in accordance with an exemplary embodiment of the present invention. The mobile terminal **10** includes a processor **100** which can be programmed to control and to operate the various components within the mobile terminal **10** in order to carry out the various functions described herein. The processor **100** can be any of a plurality of processors, such as the 486DX/33, 486DX2/66, 486DX4/50-100, 486DX4/33-100, 486DX4/33-83, p24T, Pentium 50/75, Pentium 60/90, and Pentium 66/100, and other similar and compatible processors. The processor **100** functions to perform various operations described herein as well as for carrying out other operations related to the mobile terminal **10**. The manner in which the processor **100** can be programmed to carry out the functions relating to the present invention will be readily apparent to those having ordinary skill in the art based on the description provided herein.

**6**

The processor **100** is coupled to a user input device **24** which allows an operator to input data to be communicated to a Local Area Network (LAN) such as inventory data, patient information, etc. This information may be sent to a host computer (not shown) which serves as a central data location, for example, or to a cash register connected to a system backbone, etc. The input device **24** can include such items as a keypad, touch sensitive display, etc. The mobile terminal **10** also may include a bar code reader **26** coupled to the processor **100** for providing another form of data input. The bar code reader **26** and the aforementioned input device **24** may be coupled to the processor **100** via a user input interface circuitry (not shown). The user input interface circuitry could perform any conventional conditioning of the output signals from the bar code reader **26** and input device **24** as may be appropriate so that they may be received by the processor **100**.

The display **20** is also connected to and controlled by the processor **100** via a display driver circuit **110**. The display **20** serves as a means for displaying information stored within the mobile terminal **10** and/or received over a system backbone, for example. As mentioned above, the display **20** can be a flat panel liquid crystal display with alphanumeric capabilities, for example, or any type of display suitable for the present invention as will be appreciated.

A memory **120** is included in the mobile terminal **10** for storing information such as program code executed by the processor **100** for carrying out the functions described herein. The actual code for performing such functions could be easily programmed by a person having ordinary skill in the art for computer programming in any of a number of conventional programming languages based on the disclosure herein. Consequently, further detail as to the particular code has been omitted for sake of brevity. The memory **120** also serves as a storage medium for storing information input by the user and/or received from or transmitted by a transceiver such as RF section **130**. The memory **120** may include both volatile and non-volatile memory, and may include a hard drive or other high density storage medium. For example, the memory **120** may include a Random Access Memory (RAM) and a Read Only Memory (ROM). The RAM would provide program instruction storage and working memory for the processor **100**. The ROM would contain software instructions known as the Basic Input/Output System (BIOS) for performing interface operations with input/output (I/O) devices.

The RF section **130** is also connected to the processor **100**. The RF section **130** includes an RF receiver **132** which receives RF transmissions from a base station (not shown), for example, via the antenna **50** and demodulates the signal to obtain digital information modulated therein.

The RF section **130** also includes an RF transmitter **138**. In the event the mobile terminal **10** is to transmit information in response to an operator input at the input device **24**, for example, the processor **100** forms within the memory **120** an information packet (not shown) including data together with a source address (i.e.,the address of the particular mobile terminal **10** sending the information) and a destination address (e.g., a host computer (not shown)). The information packet is then delivered to the RF transmitter **138** which transmits an RF signal with the information packet modulated thereon via the antenna **50** to the destination device. An example of a suitable RF section **130** for use in the mobile terminal **10** is the Model 025 Direct Sequence Spread Spectrum Radio Module, which is commercially available from Aironet Wireless Communications, Inc. of Akron, Ohio.

5,835,366

7

8

The mobile terminal **10** further includes a unit power supply **170** which provides power to the mobile terminal **10**. The unit power supply **170** is coupled to contacts **60** and **62** and also to the primary portable power supply (i.e., main battery) **68**. The unit power supply **170** is also tied via a boost circuit **180** to the secondary portable power supply (i.e., secondary battery) **70**. Thus, when the mobile terminal **10** is in a mobile state, the unit power supply **170** provides power to the mobile terminal **10** via either the primary battery **68** or the secondary battery **70**. When the mobile terminal **10** is docked in a cradle (not shown), for example, the unit power supply **170** can receive power externally via contacts **60** and **62** in order to operate the mobile terminal **10** as well as charge the primary battery **68** and/or the secondary battery **70**. It is to be appreciated that the scope of the present invention is intended to include any suitable battery types or charge storing cells for use in the mobile terminal **10** according to the present invention.

As mentioned above, the main battery **68** provides primary power to the mobile terminal **10**. The unit power supply **170** includes both a 5 volt power supply circuit **190** and 3 volt power supply circuit **192**. The main battery **68** is tied to both the 5 volt power supply circuit **190** and 3 volt power supply circuit **192** via diode **200**. The purpose of diode **200** is to ensure power from the main battery **68** flows in only a desired direction. The diode **200** has a 0.2 volt drop associated therewith. Thus the voltage input to the diode **200** by the primary battery **68** will be output at 0.2 volts less than what was input. The 5 volt power supply circuitry **190** converts power it receives to a steady 5 volt DC power for system components which operate at this level and the 3 volt power supply circuitry **192** similarly converts power it receives to a steady 3 volt DC power level for system components which operate at the 3 volt level.

Also tied to the 5 volt and 3 volt power supply circuits **190**, **192** through boost circuit **180** is the secondary battery **70**. The secondary battery **70** of the present invention is made up of three Ni-Cd type batteries which output a total nominal voltage of approximately 3.6 volts. In the preferred embodiment, the boost circuit **180** is a MAZ1771 boost circuit manufactured by Maxim. However, it will be appreciated that any suitable boost circuit or means for boosting the power output of the secondary battery **70** may be employed to carry out the present invention.

According to one specific aspect of the present invention, the boost circuit **180** operates by winding current through a conductive coil (not shown). The coil is very rapidly connected and disconnected from ground. The act of disconnecting the coil from ground produces an electro-magnetic field current (EMF) at a desired voltage level which is greater than the nominal voltage output by the secondary battery **70** itself. In the present invention, the higher desired voltage level (e.g., approximately 5.2 volts) can be produced for approximately 90 seconds. It typically only takes 15 seconds to complete an APM shutdown as discussed in greater detail below.

The mobile terminal **10** has four power management states: a normal operating state, a standby state, a suspend state, and an off state. One switch **40** is used to change between the off state, the normal operating state, and the suspend state.

The normal operating state of the mobile terminal **10** of the present invention is virtually identical to the normal operating state of any typical desktop or laptop computer. Users may use applications and basically treat the computer as any other. One difference is the presence of a power

management driver, which runs in the background (in the BIOS and the operating system), transparent to the user. The portion of the power management driver in the operating system (OS) is the Advanced Power Management (APM) advanced programming interface written by Intel and Microsoft, which is now present in most operating systems written to operate on Intel's 80X86 family of processors. The portion of the power management driver in BIOS (APM BIOS) communicates with an APM OS driver. The APM OS driver and APM BIOS routines together control the transition of the mobile terminal **10** to and from the other three states.

The second state, the standby state, uses less power than the normal operating state, yet leaves any applications executing as they would otherwise execute. In general, power is conserved in the standby state by placing devices in their respective low-power modes.

The third state is the suspend state. In the suspend state, mobile terminal **10** consumes an extremely small amount of power. The suspended mobile terminal **10** consumes very little power from the main battery **68**. The only power consumed is small amount of power to maintain the circuitry that monitors the switch **40**. This small use of power is accomplished by saving the state of the mobile terminal to the fixed disk storage device (the hard drive of the memory **120**) before the power supply is turned "off". To enter the suspend state, the processor **100** interrupts any executing code and transfers control to its power management driver. The power management driver ascertains the state of the mobile terminal **10** and writes the state of the mobile terminal **10** to the fixed disk storage device **120**. The state of the CPU registers, the CPU cache, the system memory, and the other devices'registers are all written to the fixed disk **120**. The entire state of the mobile terminal **10** is saved in such a way that it can be restored without the code applications being adversely affected by the interruption. The processor **100** then writes data to the non-volatile CMOS memory indicating that the system was suspended. Lastly, the processor **100** causes the unit power supply **170** to stop supplying full power. The entire state of the mobile terminal **10** is safely saved to the fixed disk storage device, system power is now "off," and the mobile terminal **10** is now only receiving a small amount of regulated power from the unit power supply **170** to power the circuitry that monitors the switch **40**.

The fourth and final state is the off state. In this state, the unit power supply **170** ceases providing regulated power to the mobile terminal **10**, but the state of the mobile terminal **10** has not been saved to the fixed disk **120**. The off state is virtually identical to typical desktop computers being turned off in the usual manner.

Switching from state to state is handled by the power management driver and is typically based on closure events of a single switch, a flag, and two timers; an inactivity standby timer and an inactivity suspend timer. The mobile terminal **10** has a single power switch **40**. This switch **40** can be used to turn on the mobile terminal **10**, suspend the state of the mobile terminal **10**, restore the state of the mobile terminal **10**, and turn off the mobile terminal **10**.

The mobile terminal **10** uses advanced power management (APM) to facilitate the state transitions and system maintenance associated with the state transitions. As mentioned above, APM is an industry standard advanced programming interface that was developed to provide a way for operating systems and system BIOS in desk top and notebook computer systems to cooperatively manage power.

5,835,366

9

APM provides an excellent tool that facilitates suspending and resuming the system because it involves the operating system in the suspend process and allows the operating system to prepare the system before the suspend process occurs.

The present invention employs the boost circuit 180 to boost the voltage of the secondary battery 70 for a period of time sufficient to complete the APM protocol so that the loss of data is minimized. In other words, the present invention uses the secondary battery 70 as a backup to the primary battery 68 so that operations (e.g., APM protocol) of the mobile terminal 10 can be sustained for a period of time sufficient for saving valuable data that might otherwise be lost in the event of rapid degradation of the power supply from the primary battery 68.

The main battery 68 and secondary battery 70 are wired "OR" ed together at the wired OR connection 210. The wired or connection 210 provides for a unique switching technique between the main battery 68 and secondary battery 70 which eliminates the need to provide for intricate switching circuitry as is currently known and done in the art. Furthermore, the wired OR connection 210 provides an added benefit of automatically switching to the secondary battery 70 in the event the main battery 68 is accidently or purposefully removed from the mobile terminal 10. Wired OR connections are known in the art and therefore detailed discussions thereto is omitted in order not to cloud an understanding of the present invention. It is to be understood that any suitable wired OR connection may be employed to carry out the present invention. Furthermore, it will be appreciated that any suitable circuit and/or device for switching between the primary battery 68 and secondary battery 70 as power supplies for the mobile terminal 10 may be used to carry out the present invention.

As was mentioned above, the main battery 68 outputs a higher voltage level of approximately 7.2 volts, and will typically be the primary supplier of power to the 5 v and 3 v power supply circuits 190, 192. However, upon the power output level of the main battery 68 dropping below a predetermined level, the 5 v and 3 v power supply circuits 190, 192 will automatically be fed from the secondary battery 70 via the boost circuit 180 and the wired OR connection 210.

A low voltage detection circuit 220 is also tied to the primary battery 68. The low voltage detection circuit 220 serves to detect when the primary battery 68 drops below 5.4 volts and then initiates an APM shutdown routine by sending a signal to the processor 100. Even after the low voltage detection circuit 220 begins the shutdown routine, the main battery will continue to provide power unless and until the voltage of the main battery 68 drops below the voltage level output from the secondary battery 70 via the boost circuit 180. The present invention provides that the voltage level triggering the shutdown routine by the low voltage detector 220 is to be greater than the voltage level asserted from the boost circuit 180 in order to ensure the secondary battery 70 is not prematurely drained prior to the APM shutdown protocol being initiated.

Turning now to FIG. 3, the details of the process carried out by the present invention in which the secondary battery output is boosted and is employed to sustain the operations of the mobile terminal 10 upon the output of the primary battery 68 falling below a predetermined level is described.

Beginning in step 300, the processor 100 starts power-on and general initializations as part of the overall initializations of the processor 100. Such initializations are conven-

10

tionally known and are not further discussed for sake of brevity. In step 310, the main battery 68 is supplying power to the mobile terminal 10 in a conventional manner. In step 320, the voltage detector 220 is monitoring the output of the primary battery 68 to determine if its output has fallen below a predetermined level (i.e., LEVEL 1). In the preferred embodiment, the voltage detector 220 monitors for the output voltage of the primary battery 68 falling below 5.4 volts. If yes, the output voltage has fallen below 5.4 volts, the voltage detector 220 sends a signal to the processor 100 in step 322. The processor 100 in step 324 in response to the signal initiates the APM protocol. In step 330, the wired OR connection is continuously monitoring the output power of both the primary battery 68 and the secondary battery 70 (via the boost circuit 180). The wired OR connection 170 provides for using the output of the primary battery 68 first and in the event the output of the primary battery falls below a predetermined level (i.e., LEVEL 2) (e.g., 5.2 volts; a voltage level below that output by the boost circuit 180), the wired OR connection 210 will switch to the output of the secondary battery 70. If in step 330, it is determined that the output power of the primary battery 68 has not fallen below predetermined LEVEL 1, the mobile terminal 10 will continue normal operations in step 326.

Thus, in step 330, the wired OR connection 210 monitors the voltage output of the primary battery 68—the output is typically above 5.2 volts. If the voltage output of the primary battery 68 is equal to or above the predetermined threshold (LEVEL 2) (e.g., 5.2 volts), the wired OR connection 210 will continue using the primary battery 68 as a power source for the unit power supply 170. If in step 336, the output power of the primary battery 68 falls below the predetermined threshold LEVEL 2, the wired OR connection 210 in step 340 will switch to the secondary battery 70 as the source for the unit power supply 170. As mentioned above, the boost circuit 180 boosts the output of the secondary battery to a point that is equal to or above the predetermined threshold LEVEL 2. The secondary battery outputs a total nominal voltage of 3.6 volts which is boosted to 5.2 volts or above by the boost circuit 180. The boost circuit 180 is able to maintain boosting the output of the secondary battery for a period of time (e.g., 90 seconds) sufficient for the APM protocol to be completed. Typically, the APM protocol under Windows® takes approximately 15 seconds to complete. Thus, in step 350, the processor 100 will complete the APM protocol and shut down the mobile terminal 10 in a suitable manner so that valuable data is not lost.

Although the present invention was described in connection with a mobile terminal 10, it will be appreciated that the present invention may be applied to almost any type of computing device (e.g., laptop computer, cellular telephone, portable computing devices used in the medical arena, etc.) that employs a primary battery and a secondary backup battery.

The employment of a boost circuit to boost the voltage of a secondary battery affords for employing a lighter weight and smaller secondary battery. Manufacturers of batteries oftentimes produce batteries with power outputs proportional to the size and weight of the battery. Thus, larger, heavier batteries sold in the marketplace generally provide a higher power output as compared to smaller, lighter batteries. Although, smaller, lighter batteries with relatively high power output are available, they tend to be significantly more expensive than batteries of comparable size and weight having less power output. By employing the boost circuit to boost the output of the secondary battery to a desired level, a less expensive secondary battery of smaller size and lighter

5,835,366

11

weight can be used. As a result, the reduction in size and weight of the secondary battery directly relates to a smaller and lighter computing device (e.g., mobile terminal **10**), and furthermore allows for the use of a less expensive secondary battery.

The description herein with reference to the figures will be understood to describe the present invention in sufficient detail to enable one skilled in the art to utilize the present invention in a variety of applications and devices. The present invention includes all such equivalents and modifications, and is limited only by the scope of the following claims.

What is claimed is:

**1**. A secondary battery boost system, comprising:

a primary battery, the primary battery operative as a primary portable power supply for a computing device;

a secondary battery, the secondary battery operative as a backup portable power supply for the computing device; and

a boost circuit operative to increase the power output of the secondary battery applied to the computing device.

**2**. The secondary battery boost system of claim **1**, wherein the boost circuit is adapted to provide power to the computing device from the secondary battery when a voltage of the primary battery falls below a predetermined threshold.

**3**. The secondary battery boost system of claim **2**, further including a low voltage detection circuit for monitoring the voltage level of the primary battery.

**4**. The secondary battery boost system of claim **3**, wherein the secondary battery supplies power to the computing device in order to sustain an advanced power management protocol when the power output of the primary battery falls below a predetermined threshold.

**5**. The secondary battery boost system of claim **4**, wherein the boost circuit increases the power output of the secondary battery for a time period sufficient to complete the advanced power management protocol.

**6**. The secondary battery boost system of claim **1**, wherein the computing device is a wireless mobile terminal.

**7**. A method for facilitating power shutdown protocol of a computing device, comprising the steps of:

using a first cell as a primary portable power supply for the computing device;

using a secondary cell as a backup portable power supply for the computing device; and

using a boost circuit to increase the power of the secondary cell applied to the computing device;

wherein the secondary cell supplies power to the computing device upon a voltage of the first cell dropping below a predetermined value.

**8**. The method for facilitating power shutdown protocol of a computing device of claim **7**, wherein the step of the boost circuit increasing the voltage of the secondary cell applied to the computing device includes the step of the boost circuit providing power to the computing device from the secondary cell when a voltage of the primary cell falls below a predetermined threshold.

**9**. The method for facilitating power shutdown protocol of a computing device of claim **8**, further including the step of using a low voltage detection circuit to monitor the voltage level of the primary cell.

**10**. The method for facilitating power shutdown protocol of a computing device of claim **7**, further including the step

12

of coupling the primary cell and the secondary cell to the boost circuit via a wired OR connection.

**11**. The method for facilitating power shutdown protocol of a computing device of claim **7**, further including the step of using the secondary cell to supply power to the computing device in order to sustain an advanced power management protocol.

**12**. The method for facilitating power shutdown protocol of a computing device of claim **7**, further including the step of using the boost circuit to increase the voltage output of the secondary cell for a time period sufficient to complete the advanced power management protocol.

**13**. A portable computing device, comprising:

a housing;

a first battery supported by the housing, the first battery operative to supply power via a power supply to the portable computing device;

a battery boost circuit disposed within the housing;

a secondary battery coupled to the battery boost circuit, the secondary battery operative to supply power via the power supply to the portable computing device upon a voltage of the first battery falling below a predetermined value;

wherein the battery boost circuit increases a power output of the secondary battery and provides the portable computing device with power from the secondary battery upon the voltage of the first battery falling below the predetermined value.

**14**. The portable computing device of claim **13**, wherein the boost circuit is adapted to provide power to the portable computing device from the secondary battery when a power output of the primary battery falls below a predetermined threshold.

**15**. The portable computing device of claim **14**, further including a low voltage detection circuit for monitoring the voltage level of the primary battery.

**16**. The portable computing device of claim **14**, wherein the secondary battery supplies power to the computing device in order to sustain an advanced power management protocol when the power output of the primary battery falls below the predetermined threshold.

**17**. The portable computing device of claim **13**, wherein the first battery and the secondary battery are coupled together via a wired OR connection.

**18**. The portable computing device of claim **13**, wherein the portable computing device is a wireless mobile terminal.

**19**. The portable computing device of claim **13**, wherein the portable computing device is a laptop computer.

**20**. A method of providing power to a computing device, comprising the steps of:

providing power to the computing device via a primary power source;

determining when an output power associated with the primary power source is below a threshold power level;

sensing the primary power source to determine if the output power associated with the primary power source falls below a predetermined power level;

providing power to the computing device via a secondary power source when the output power associated with the primary power source is determined to be below the threshold power level, the secondary power source providing power through a power boost circuit; and

triggering an advanced power management shutdown protocol upon determining that the output power is below the predetermined power level.

5,835,366

**13**

**21**. The method of claim **20**, wherein the primary power source and the secondary power source are coupled together via a wired OR connection.

**22**. The method of claim **21**, wherein the predetermined power level is greater then the threshold power level.

**23**. The method of claim **22**, wherein the step of triggering an advanced power management shutdown protocol upon determining that the output power is below the predeter-

**14**

mined power level, includes the step of using a low voltage detection circuit to monitor the voltage level of the primary power source.

**24**. The method of claim **23**, wherein the computing device is a portable computing device capable of wireless communication.

* * * * *

EXHIBIT B

US005334821A

# United States Patent [19]

## Campo et al.

[11] **Patent Number:** 5,334,821

[45] **Date of Patent:** Aug. 2, 1994

[54] **PORTABLE POINT OF SALE TERMFINAL**

[75] Inventors: **James A. Campo**, Brunswick; **Fred J. Anderson**, Wooster; **Donald M. Embree**, Uniontown; **Charles J. Hofstetter**, Aurora; **Donald I. Sloan**, Stow, all of Ohio

[73] Assignee: **Telxon Corporation**, Akron, Ohio

[21] Appl. No.: **915,470**

[22] Filed: **Jul. 16, 1992**

[51] Int. Cl.⁵ ............................................. G06K 5/00
[52] U.S. Cl. .................................... 235/380; 235/375; 235/381
[58] Field of Search ......................... 235/375, 381, 380

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,947,028 | 8/1990 | Gorog | 235/381 |
| 5,189,287 | 2/1993 | Parienti | 235/375 |

*Primary Examiner*—Harold Ritts

*Attorney, Agent, or Firm*—Pretty, Schroeder, Brueggemann & Clark

[57] **ABSTRACT**

A point of sale terminal is disclosed that provides all of the usual point of sale terminal functions, but that is entirely field portable. Data pertinent to each purchase can be input to the terminal via a keyboard assembly, a touch-screen display or a signature-capture screen assembly, or via an antenna and radio link from an associated bar code scanner. Data may be communicated at any time to a remote host computer, also via a separate antenna and radio link. The communication links with the host computer and the bar code scanner operate independently and simultaneously, using mutually compatible modulation schemes such as a spread spectrum scheme for the host computer link and a narrowband or spread spectrum scheme for the bar code scanner link. The terminal thereby functions as a portable repeater or node in a data communications network.

**10 Claims, 3 Drawing Sheets**







*FIG.1*

*FIG.2*



**FIG.3**



**FIG.6**



**FIG.7**



**FIG.8**

FREQ. ⟶



*FIG. 4*

*FIG. 5*

1

# PORTABLE POINT OF SALE TERMFINAL

## BACKGROUND OF THE INVENTION

This invention relates generally to point of sale terminals and, more particularly, to point of sale terminals adapted for portable use.

Point of sale terminals are commonly used in retail stores to record information relating to sales transactions. In its most basic form, the terminal includes a keyboard for the manual entry of data and a printer for printing a paper tape receipt for delivery to the customer. Many point of sale terminals are now associated with bar code scanners for reading the bar codes printed on the items being purchased. Most commonly, the bar code scanners take the form of fixed laser scanners built into a counter top at the point of sale. Other bar code scanners include portable wands and handheld scanners having scanning lasers or charge-coupled device detectors for scanning the bar codes.

Conventional point of sale terminals also commonly include magnetic readers for reading the data recorded on the customers' credit cards. The customers' credit is then verified by electronically accessing an appropriate database over a telephone line.

Although the point of sale terminals described generally above have proven to be extremely effective in facilitating sales transactions, they have not proven to be entirely satisfactory in all applications. Because the terminals are essentially immobile, they are not adapted for use in situations where merchandise is sold at remote locations, away from a retail store environment, or at movable locations within such a retail store environment. It should therefore be appreciated that there is a need for a point of sale terminal that provides the usual point of sale terminal functions, but that is portable. The present invention fulfills this need.

## SUMMARY OF THE INVENTION

This invention is embodied in a point of sale terminal that provides the usual point of sale functions, but that is sized and configured to allow it to be moved conveniently to any desired location, from which it can communicate over the air with a remote host computer. The terminal includes a hand-carryable housing having a front face, and a keyboard and a display are mounted on that front face. A power source is located within the housing, and first and second electromagnetic transceivers also are located within the housing, for transmitting and receiving data over the air to and from the host computer and a remote input/output device, respectively. The first transceiver can transmit and receive data modulated on a first carrier, in a spread spectrum format, while the second transceiver can transmit and receive data modulated on a second carrier, in a narrow band format located in a null of the power spectrum of the modulated first carrier. In this fashion, the two transceivers can transmit and receive data simultaneously without interference.

In another feature of the invention, the point of sale terminal includes a plurality of keyboards, each sized to be removably received individually in a recess formed in the housing's front face. Each keyboard can be selectively installed or removed from the recess only if the power source, which includes one or more removable batteries, is removed from the housing.

In another feature of the invention, a printer is located within the housing, for printing information on a

2

strip of paper and discharging the printed paper from the housing, and a signature-capture screen is mounted on the front face of the housing, immediately adjacent to the paper path, for use in sensing the manual entry of information, such as signature. Conveniently, the printer discharges the paper directly across the top of the signature-capture screen, whereby the point of sale customer may sign his name on the paper while the screen automatically generates data representing that signature.

Other features and advantages should become apparent from the following description of the preferred embodiment, taken in conjunction with the accompanying drawings, which illustrate, by way of example, the principles of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a front perspective view of a portable point of sale terminal in accordance with a preferred embodiment of the invention.

FIG. 2 is a plan view of the front face of the point of sale terminal of FIG. 1.

FIG. 3 is a rear elevational view of the point of sale terminal of FIG. 1.

FIG. 4 is a plan view of the keyboard assembly portion of the point of sale terminal of FIG. 1.

FIG. 5 is a sectional view of the keyboard assembly, taken substantially in the direction of the arrows 5—5 in FIG. 4.

FIG. 6 is a sectional view of the point of sale terminal, taken substantially in the direction of the arrows 6—6 in FIG. 2.

FIG. 7 is a sectional view of the point of sale terminal, taken substantially in the direction of the arrows 7—7 in FIG. 2.

FIG. 8 is a plot of the power spectral densities of two rf data links used by the point of sale terminal of FIG. 1.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference now to the drawings, and particularly to FIGS. 1 and 2, there is shown a point of sale terminal 11 that performs the normal functions associated with a retail sales transaction, yet is entirely field portable. The terminal includes a plastic housing 13 having a generally flat front face 15 on which is located a keyboard assembly 17, a multi-line liquid-crystal display (LCD) with touch panel 19, a transverse slot 21 and magnetic card reader 23 for receiving and reading data from a plastic credit card, and a screen assembly 25 adapted to digitally capture a purchaser's signature or any other information manually entered onto the screen by a stylus or writing pen (not shown). The LCD 19 can be selectively used to provide a display of selected information that prompts the operator to select from various options. A printer 27 located within the housing prints on a strip of paper 29 received from a paper roll 31 (FIG. 6) and discharges the printed paper across the signature-capture screen assembly 25 on the housing's front face 15.

The point of sale terminal 11 has a size generally comparable to that of a standard notebook. It thereby can be conveniently carried by the operator to any selected site where a sales transaction might occur, either within a retail store environment or at a remote location. Via radio data links, the terminal functions as

5,334,821

**3**

a portable repeater or node in a data communications network.

Several input/output connectors are located in an upper side wall 33 of the housing 13, adjacent to the upper edge of the front face 15. One such connector 35 is adapted to receive a multi-wire cable connected to a remote bar code scanner or wand (not shown), for use in scanning bar codes printed on the products being sold, in a conventional fashion. Another connector 36 is adapted to receive a multi-wire cable connected to a host computer (not shown) with which the point of sale terminal 11 operates. Yet another connector 37 may be used to receive a multi-wire cable connected to a peripheral device (not shown) such as an external printer, an external display, a modem, or a laser slot scanner.

An antenna 39 projects upwardly from the upper side wall 33, for use in transmitting data to and from the remote host computer. The antenna and an associated radio module 41 located within the housing 13 provide a convenient alternative for the connector 36 and its associated cable. In some applications, this connector can be eliminated altogether.

An additional antenna is located on a printed circuit board (not shown) carried within the housing 13, for use in transmitting data to and from the remote bar code scanner. This provides a convenient alternative for the connector 35 and its associated cable.

The point of sale terminal 11 preferably is configured such that it can communicate with the remote bar code scanner and the host computer independently and simultaneously. This is accomplished by configuring the radio module 41 to use separate, compatible modulation schemes for the two data links. Preferably, communication occurs between the terminal and the host computer via a spread spectrum modulation scheme, while communication occurs between the terminal and the bar code scanner via a narrowband modulation scheme in which the carrier frequency 40 is selected to be aligned with a null in the frequency spectrum of the spread spectrum signal for the other data link. This is depicted in FIG. 8. The power level of the spread spectrum link can be as much as two orders of magnitude greater than that of the narrowband link, without excessive interference.

In an alternative to the two modulation schemes represented in FIG. 8, both data links can modulate the data in a spread spectrum format. In this case, interference between the two modulation signals is avoided by using different carrier frequencies and different pseudo-random code sequences in effecting the modulation. In yet another alternative, both data links can use narrowband modulation, over different frequency channels.

With reference again to FIG. 1, the front face 15 of the terminal 11 further includes three membrane switches 42, for use in switching the terminal on and off, controlling the contrast of the LCD 19, and controlling a backlight for the LCD. The front face also includes LED indicators 43, for indicating terminal conditions such as charge, external power, low battery, and status.

The various electrical components of the terminal 11, including the LCD 19, the printer 27, the signature-capture screen assembly 25, and the radio module 41, are powered by a battery pack 44 located in a recess 45 accessible via a pivotable door 47 on the underside of housing 13. The battery pack preferably includes batteries that are rechargeable, and the terminal further includes a conventional charging circuit (not shown) and

**4**

a charger jack 49 located in the housing's upper side wall 33.

It is recognized that many users will have special point of sale applications calling for different keyboard functions, layouts and key sizes. Rather than seek to accommodate all of those users with just a single keyboard assembly, the point of sale terminal 11 of the invention utilizes a plurality of keyboard assemblies, each having its own function, layout and key size. One such keyboard assembly 17 is depicted in the drawings.

As shown in FIGS. 4–7, the keyboard assembly 17 is received in a shallow recess 51 formed in the flat front face 15 of the housing 13. The keyboard assembly includes a planar support base 53 for providing rigidity, a membrane switch assembly 55 secured by an adhesive to the support base, an elastomeric keypad 57 overlying the switch assembly, and a plastic bezel 59 overlying the keypad. Actually, the keypad depicted in the drawings includes three side-by-side sections, including a left section 57a with 20 function keys, a middle section 57b with a set of standard numeric keys, and a right section 57c with 20 function keys, similar to the first section 57a. This modularity enables portions of the keypad to be changed at a lower cost than a single, large keypad.

The bezel 59 snaps into the support base 53, as best shown in FIG. 5. The entire assembly 17 is then held together as a unit using four screws 61, thereby providing the requisite rigidity to withstand shock impacts commonly experienced by portable equipment.

The bezel 59 includes horizontal and vertical crossbars that define a plurality of apertures aligned with the individual keys of the keypad 57. Manually depressing any selected key brings together two spaced-apart contacts in the membrane switch assembly, to close a predetermined circuit. A ribbon connector 63 connects the membrane switch assembly with associated electronic circuitry carried on a printed circuit board 65 located within the housing 13.

The keyboard assembly 17 is installed in the front face 15 of the housing 13 by inserting two tabs 67a and 67b projecting outwardly from the bezel 59 into mating apertures formed in the housing. The assembly then rests on a ledge 69 that defines the keyboard recess 51, and it is secured in place by three screws 71, which are accessible via the battery recess 45. The screws engage threaded bores formed in the underside of the support base 53. Unthreading the screws enables the keyboard assembly to be pivoted upwardly out the recess, for removal from the terminal 11.

This mode of securing the keyboard assembly 17 to the housing 13 ensures that the screws 71 for securing the keyboard assembly are accessible only if the batteries are first removed from the battery recess 45. This prevents removal of the keyboard assembly while the terminal 11 is powered, whereby inadvertent electrical hazards due to exposed electrical components are minimized.

The provision for readily interchangeable keyboard assemblies 17 allows the terminal 11 to use keyboard technologies other than elastomeric keyboards without requiring an expensive redesign of the terminal. Such other technologies include resistive touch panels, membrane matrices, full-travel QWERTY, capacitive panels, and electromagnetic panels.

To guard against the radiation of unwanted electromagnetic interference (EMI), the housing 13 and the underside of the keyboard assembly's support base 53 are plated with a metallic shield. The top side of the

5,334,821

5

membrane switch 55 and mounting bosses on the underside of the bezel 59 also are plated with a metallic shield. The plated shield on the membrane switch also provides a low impedance path for ESD discharges. Radiating keyboard logic signals thereby are completely surrounded by shielding, protected from ESD, while significantly reducing EMI emissions.

As previously mentioned, and with reference again to FIG. 1, the printer 27 discharges a paper tape 29 along a path directly over the signature-capture screen assembly 25. The paper is held flat against the screen assembly by portions of the housing's front face that overlie the paper's two side edges. This configuration allows the purchaser to sign his or her name directly onto the paper strip while the screen simultaneously senses the writing of that signature and generates corresponding digital data. The screen assembly is a conventional device that generates a series of 10-bit words representing the writing of information on it.

Positioning the paper strip 29 on top of the signature-capture screen assembly 25 provides two important benefits. First, the purchaser can be provided a written receipt for the purchase, and second, the interposition of the paper between the pen and the screen spreads out the pressure provided by the pen and thereby minimizes potential damage to the screen.

With reference now to FIG. 6, there are shown two slots and for receiving printed circuit boards 75a and 75b that carry non-volatile flash ROM or RAM memory circuits. A spring-biased eject lever 75 secures the boards in place when they are installed. The memories carried on these boards can be used to store data associated with the successive purchases, thus constituting an electronic journal that is the functional equivalent of the successive paper tape receipts. After a given period of time, e.g., one work shift, the memory boards can be removed and the stored data transferred to a host computer for further processing. This is an alternative or backup for the more real-time transmission of such data via the radio module 41 and antenna 39 or via the connector 36 and associated cable.

It should be appreciated from the foregoing description that the present invention provides an improved point of sale terminal that provides all of the usual point of sale terminal functions, but that is entirely field portable. Data pertinent to each purchase can be input to the terminal via a keyboard assembly, a touch-screen display, or a signature-capture screen assembly, or via an antenna and radio link from an associated bar code scanner. Data may be communicated at any time to a remote host computer, also via the antenna and radio link. The communication links with the host computer and the bar code scanner operate independently and simultaneously, using mutually compatible modulation schemes such as a spread spectrum scheme for the host computer link and a narrowband or spread spectrum scheme for the bar code scanner link.

Although the invention has been described in detail with reference only to the preferred embodiment, those of ordinary skill in art will appreciate that various modifications can be made without departing from the invention. Accordingly, the invention is defined with reference only to the following claims.

We claim:
1. A portable point of sale terminal comprising:
a hand-carryable housing having a front face;

6

a keyboard and a display mounted on the front face of the housing;
a power source located within the housing;
a first electromagnetic transceiver located within the housing for transmitting and receiving data over the air to and from a host computer; and
a second electromagnetic transceiver located within the housing, for transmitting and receiving data over the air to and from a remote input-output device.
2. A portable point of sale terminal as defined in claim 1, wherein:
the first electromagnetic transceiver transmits and receives data modulated on a first carrier, in a spread spectrum format; and
the second electromagnetic transceiver transmits and receives data modulated on a second carrier, in a narrowband format located at the frequency of a null of the power spectrum of the modulated first carrier.
3. A portable point of sale terminal as defined in claim 1, wherein the first and second electromagnetic transceivers operate simultaneously, each transmitting and receiving data over electromagnetic frequencies that do not interfere with the other.
4. A portable point of sale terminal as defined in claim 3, wherein one or both of the first and second electromagnetic transceivers transmit and receive data in a spread spectrum format.
5. A portable point of sale terminal as defined in claim 1, wherein:
the housing includes a recess in its front face; and
the point of sale terminal further includes a plurality of keyboards, each keyboard being sized to be removably received individually in the recess of the housing.
6. A portable point of sale terminal as defined in claim 5, wherein:
the power source includes one or more removable batteries; and
each of the plurality of keyboards can be mounted in the recess of the housing, and removed from the recess of the housing, only if the one or more batteries are removed from the housing.
7. A portable point of sale terminal as defined in claim 1, and further including:
a printer located within the housing, for printing information on a strip of paper and discharging the paper from the housing; and
a screen mounted on the front face of the housing, for sensing the manual writing of information thereon and generating corresponding data.
8. A portable point of sale terminal as defined in claim 7, wherein the printer is located adjacent to the screen and is arranged such that the discharged paper overlays the screen.
9. A portable point of sale terminal as defined in claim 1, wherein the display is adapted to sense the manual selection of information by an operator of the terminal.
10. A portable point of sale terminal as defined in claim 1, and further including:
means defining a slot in the front face of the housing, the slot being sized to receive one edge of a credit card; and
magnetic reader means located within the housing for reading data recorded in a magnet strip of a credit card being slid along the slot.

* * * * *

# EXHIBIT C

US006714969B1

(12) **United States Patent**

Klein et al.

(10) Patent No.: **US 6,714,969 B1**

(45) Date of Patent: **Mar. 30, 2004**

(54) **MOBILE TERMINAL WITH INTEGRATED HOST APPLICATION SOFTWARE**

(75) Inventors: **John Klein**, Morgan Hill, CA (US); **Allan Herrod**, Farmingville, NY (US)

(73) Assignee: **Symbol Technologies, Inc.**, Holtsville, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/570,961

(22) Filed: **May 15, 2000**

**Related U.S. Application Data**

(62) Division of application No. 09/520,929, filed on Mar. 8, 2000, now Pat. No. 6,507,864, which is a continuation of application No. 08/916,605, filed on Aug. 22, 1997, now abandoned, which is a continuation of application No. 08/691,263, filed on Aug. 2, 1996, now abandoned.

(60) Provisional application No. 60/006,872, filed on Nov. 17, 1995.

(51) Int. Cl.⁷ .......................... **G06F 15/16**; G06F 13/12

(52) U.S. Cl. .......................... **709/219**; 709/201; 710/73

(58) Field of Search ............................... 709/201, 219; 710/73, 5, 10; 345/168; 348/76

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,664,231 A | 9/1997 | Postman et al. | 395/893 |
| 5,717,737 A | 2/1998 | Doviak et al. | 379/58 |
| 5,821,512 A | 10/1998 | O'Hagan et al. | 235/383 |
| 5,905,248 A | * 5/1999 | Russell et al. | 235/462.15 |
| 5,978,773 A | 11/1999 | Hudetz et al. | 705/23 |
| 5,987,611 A | 11/1999 | Freund | 713/201 |
| 6,003,007 A | * 12/1999 | DiRienzo | 705/4 |
| 6,012,102 A | 1/2000 | Shachar | 710/5 |
| 6,041,374 A | 3/2000 | Postman et al. | 710/73 |
| 6,049,796 A | * 4/2000 | Siitonen et al. | 707/3 |
| 6,094,689 A | 7/2000 | Embry et al. | 710/5 |

| | | | |
|---|---|---|---|
| 6,119,935 A | 9/2000 | Jelen et al. | 235/383 |
| 6,129,276 A | 10/2000 | Jelen et al. | 235/383 |
| 6,134,406 A | 10/2000 | Moe et al. | 399/165 |
| 6,144,848 A | 11/2000 | Walsh et al. | 455/419 |
| 6,304,898 B1 | * 10/2001 | Shiigi | 709/206 |
| 6,308,205 B1 | * 10/2001 | Carcerano et al. | 709/221 |
| 6,321,992 B1 | * 11/2001 | Knowles et al. | 235/462.01 |
| 6,336,137 B1 | * 1/2002 | Lee et al. | 709/219 |
| 6,356,905 B1 | * 3/2002 | Gershman et al. | 707/10 |
| 6,430,624 B1 | * 8/2002 | Jamtgaard et al. | 709/246 |
| 6,453,361 B1 | * 9/2002 | Morris | 709/250 |
| 6,466,783 B2 | * 10/2002 | Dahm et al. | 455/414 |
| 6,535,913 B2 | * 3/2003 | Mittal et al. | 709/219 |

FOREIGN PATENT DOCUMENTS

EP        0744856        11/1996

* cited by examiner

*Primary Examiner*—Krisna Lim

(74) *Attorney, Agent, or Firm*—Amin & Turocy, LLP

(57) **ABSTRACT**

A method of integrating host application software with data collection devices (e.g., bar code scanners) located on remote, wireless terminals. A data collection object executes on the host computer, using a predetermined interface between the host application software and the data collection object. That interface, and the communications between the host application software and the data collection object, are configured so that to the host application software the data collection device appears to be local hardware on the host computer. The data collection object creates and executes threads of execution for controlling operation of the data collection device, with the threads communicating with the remote terminals via a host computer transport layer, the wireless link, and a remote computer transport layer at the remote terminals. A data collection device driver on the remote terminal receives communications from the data collection object, and returns information to the data collection object, over the remote computer transport layer, wireless link, and host computer transport layer.

**35 Claims, 14 Drawing Sheets**





Fig.1

Fig.3

Fig.2

Fig.4



**Fig.5**



**Fig.6**



**Fig.7**

**Fig.8**



**Fig.9**



**Fig.10**



**Fig.11**



**Fig.12**



Fig.13



Fig.14



Fig.15

Fig.16



Fig.17



Fig.18



**Fig.19**



Fig.20



1310  1310
1300  1300
1320  1330  1340

**Fig.21**



1350 — Start

1360 — Read barcode on product

1370 — Enter reason for return on keyboard

1380 — Barcode details & reasons added to database

1390 — Done ?   NO

YES

1400 — Press "done" key on keyboard

1410 — Database entries encoded for PDF printing

1420 — PDF barcode label printed out

**Fig.22**

**Fig.23**

HOST COMPUTER

CPU    Memory



**Fig.24**



Fig.25



Fig.26

US 6,714,969 B1

1

# MOBILE TERMINAL WITH INTEGRATED HOST APPLICATION SOFTWARE

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a divisional of appln Ser. No. 09/520, 929 filed Mar. 8, 2000, now U.S. Pat. No. 6,507,864 issued on Jan. 14, 2003, which is a continuation of U.S. application Ser. No. 08/916,605, filed Aug. 22, 1997 now abandoned (hereby incorporated by reference), which is a continuation of U.S. patent application Ser. No. 08/691,263, filed on Aug. 2, 1996, now abandoned, which was copending with U.S. Provisional Application No. 60/006,872 filed on Nov. 17, 1995. U.S. patent application Ser. No. 09/359,019, filed Jul. 22, 1999 is also a divisional of U.S. patent application Ser. No. 08/916,605.

## BACKGROUND OF THE INVENTION

The invention relates to integrating host application software with data collection devices (e.g., bar code scanners) located on remote, wireless terminals.

Various readers and optical scanning systems have been developed for reading printed indicia such as bar code symbols appearing on a label or the surface of an article and providing information concerning the article such as the price or nature of the article. The bar code symbol itself is a coded pattern of indicia comprised of, for example, a series of bars of various widths spaced apart from one another to form spaces of various widths, the bars and spaces having different light reflecting characteristics. The readers electro-optically transform the graphic indicia into electrical signals which are decoded into alpha-numeric characters that are intended to be descriptive of the article or a characteristic thereof. Such characters typically are represented in digital form, and utilized as an input to a data processing system for applications in point of sale processing, inventory control and the like.

Known scanning systems comprise a light source for generating a light beam incident on a bar code symbol and a light receiver for receiving the reflected light and decoding and information contained in the bar code symbol accordingly. The readers may comprise a flying spot scanning system wherein the light beam is scanned rapidly across a bar code symbol to be read or a fixed field of view reading system wherein the bar code symbol to be read is illuminated as a whole and a CCD (Charge Coupled Device) array is provided for detecting the light reflected from the bar code symbol.

Known hand-held optical readers are often in the shape of a gun having a handle portion and a barrel portion. The reading window through which the light beam passes is generally located at the end face of the barrel portion, and the reader is aimed at the indicia to be read by the operator holding the handle portion. A trigger is situated in the region of the junction between the handle portion and the barrel portion for operation by the user to actuate the optical reader.

In addition there are known portable hand-held computers for collecting data and down-loading the data to a central or peripheral device. The down-loaded data may be raw data or data that has been processed within the hand-held computer. Data collection can be carried out by entering information to the hand-held computer via a keypad, or by incorporating in the computer an optical reader for example for reading bar code symbols, or incorporating a reader for reading a magnetic card strip. For example when information about various products is required during inventorying, those

2

products may bear bar code symbols or magnetic strips, or have associated magnetic strip cards which are read by the hand-held computer. The data collected can be transferred from the hand-held computer to a central or peripheral device by known means such as radio frequency radio links, wired connections, infra-red communications or other known transmission arrangements.

Often, more than one data capture system is required for a given application. The manufacture of a customized system for a specific application is expensive and difficult to modify if it is subsequently desired to incorporate further data capture options than those originally provided in the customized device.

Further limitations are imposed because of the limited storage capability of hand-held computers (often known as personal digital assistants) as a result of which simple-store-and-forward, multi-user electronic message systems are generally impractical.

It has been previously proposed to implement a bar code scanner resident on a control machine running a COMPONENT OBJECT MODEL (COM) object. It is desired to increase the scope of such applications to be compatible with a wide range of models and in particular to introduce a bar code scanner remote from the machine and controlled through a wireless interface.

## SUMMARY OF THE INVENTION

In general, the invention features a new method of integrating host application software with data collection devices (e.g., bar code scanners) located on remote, wireless terminals. A data collection object executes on the host computer, using a predetermined interface between the host application software and the data collection object. That interface, and the communications between the host application software and the data collection object, are configured so that to the host application software the data collection device appears to be local hardware on the host computer. The data collection object creates and executes threads of execution for controlling operation of the data collection device, with the threads communicating with the remote terminals via a host computer transport layer, the wireless link, and a remote computer transport layer at the remote terminals. A data collection device driver on the remote terminal receives communications from the data collection object, and returns information to the data collection object, over the remote computer transport layer, wireless link, and host computer transport layer.

In preferred implementations of the invention, one or more of the following features may be included:

The data collection object may be implemented as a COM.

Communications between the remote terminal and the host computer may be over an Internet or Intranet network.

The data collection device may be a bar code scanner, and the data collection object may be a bar code scanning object.

There may be provided a portable computer device comprising a main body and at least one data collection/communications module connectable to the main body, the main body including an interface for connection with the module, a processor for processing information received from the module and a communication link for exchanging information with a host. Because of the modular arrangement the device may be easily adapted to different applications without the requirement to manufacture costly customized systems or to modify such systems which would prove expensive and complex.

US 6,714,969 B1

**3**

The main body may include a visual display, for example an LCD display. The main body may also comprise a keypad. The modules may comprise an image capture module, a laser scanner module and/or a multi-media module. The modules preferably include digital signal processing sub-systems which may be of a single design and programmable as appropriate. The modules may comprise pre-processors for pre-processing information prior to transfer to the main body to reduce the burden on the processor in the main body. The module may be movably mounted on or relative to the main body, and in particular to the display on the main body—for example it may be hinged pivotally or rotatably mounted.

The device may be configured for connection with the Internet.

According to the invention there is provided a communication system for a bar code scanner comprising a control host, a scanning control object working therein and a remote client associated with the bar code scanner wherein the scanning control object communicates with the remote client to control the bar code scanner and the scanning control object is implemented as an OLE control. Accordingly there is provided a system capable of seamless communication between the scanning control and the remote client.

The host and the scanning object control may communicate and integrate via interfaces. The scanning control object may create separate threads of execution for controlling communication with the remote client. The separate threads of execution may include send, receive and synchronize bar code scanner transaction commands.

The scanning control object may be arranged to communicate with the remote client over an Internet or Intranet link and/or by wireless communication.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing objects and advantages of the present invention may be more readily understood by one skilled in the art with reference being had to the following detailed description of several preferred embodiments thereof, taken in conjunction with the accompanying drawings wherein like elements are designated by identical reference numerals throughout several views, and in which:

FIG. 1 is a perspective view of an optical reader according to the present invention from above and the rear;

FIG. 2 is a perspective view of the optical reader of FIG. 1 from above and the front;

FIG. 3 is a perspective view of the optical reader from the front and tilted upwardly;

FIG. 4 is a view of the optical reader from the front;

FIG. 5 is a view of the optical reader from below;

FIG. 6 is a view of the optical reader from above showing hidden detail;

FIG. 7 is a side view of the optical reader showing hidden detail;

FIG. 8 is a sectional view of the optical reader along the line A—A shown in FIG. 7;

FIG. 9 shows a portable computer device according to another aspect of the invention;

FIG. 10 is a block diagram of an image capture module for the device of FIG. 9;

FIG. 11 is a block diagram of a multi-media module for the device of FIG. 9;

FIG. 12 is a perspective view of a variation of the device of FIG. 9;

**4**

FIG. 13 is a block diagram showing the components of a distributed mail delivery service according to another aspect of the invention;

FIG. 14 is a flow chart showing operation of a client portion of the service of FIG. 13;

FIG. 15 is a flow chart showing operation of a server portion of the service of FIG. 13;

FIG. 16 illustrates a block diagram of a conventional wireless communication system with a terminal emulation program installed on the mobile units;

FIG. 17 illustrates a flow chart illustrating an access point's action upon receiving a packet from a mobile unit according to the prior art;

FIG. 18 is a block diagram of a general purpose interface reader application according to another aspect of the invention;

FIG. 19 shows the interface between a scanning control and a control container according to a further aspect of the invention;

FIG. 20 shows multiple threads of execution maintained by the control of FIG. 18;

FIG. 21 shows schematically the packaging of the products for shipment according to an embodiment of the present invention;

FIG. 22 is a flow diagram illustrating the operation of the software within the scanner;

FIG. 23 is a sectional view of a hand-held scanner together with a host computer;

FIG. 24 is a perspective view of the arrangement of FIG. 23 in use;

FIG. 25 shows a printer/scanner assembly suitable for use with the present invention; and

FIG. 26 shows a further printer/scanner assembly.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Throughout the description of the optical reader the terms "front", "rear", "upper", "above", "lower" and "below" are used consistently. Referring, for example, to FIGS. 1 to 4 the optical reader has a rear end 4 and a generally planar front end 5, an upper face 2a and opposed to that a lower face 2b.

Referring to FIGS. 1 to 4 in more detail the optical reader includes a generally bar-shaped elongate housing indicated generally by the reference numeral 1, having two generally opposed long broad upper and lower faces 2a, 2b (see also FIG. 7), two generally opposed long, shallow side faces 3, a rear end 4 and a front end 5 (see also FIG. 6).

As can be seen from FIGS. 5 and 6, the upper and lower faces 2a, 2b of the reader comprise side edges having substantially straight front portions tapering inwardly towards the front edge which is of convex shape having a large radius of curvature. The rear portions of the side edges curve inwardly and meet so that the rear end 4 of the housing is generally elliptical in shape when viewed from above. The rear end is interrupted by a recessed connector 6 which is described in more detail below. The housing is configured to be held by a user with the rear end mounted in the palm of the user and it will be seen, therefore, that the curved end of the housing when viewed from above will facilitate holding by the user.

Referring to FIG. 7 the side faces 3 of the housing comprise substantially parallel downwardly curved long edges and a substantially straight front edge. A bulbous convex rear portion 7 extends from the rear end of the upper

US 6,714,969 B1

5

face to approximately the centre of the lower edge. A concave groove **8** is provided in the frontward part of the bulbous portion **7** extending around both sides of the bulbous portion **7** to approximately the mid point of the bulbous portion **7** on either side. As a result the reader is yet more suitable to be gripped towards the rearward end by the operator, the bulbous portion **7** fitting into the palm of the operator and the concave groove providing improved grip and fit with the operator's hand.

A reading arrangement is mounted within the housing. The reading arrangement may be any known conventional arrangement, for example a "flying spot" optical scanner or a "field of view" optical reader. Generally the arrangement will include a light generating source such as a laser diode, a beam focusing or directing arrangement and a light receiving device. Where the reading arrangement is an optical scanner a rapidly oscillatable scan component, such as a mirror is provided to scan the light beam across an indicia to be read. Alternatively, the laser diode itself can be oscillated. Where the reader is a field of view optical reader a charge coupled device (CCD) array, or a photodetector arrangement is provided to detect the reflected light beam.

In order to actuate the reading arrangement a scan trigger **9** is provided on the upper surface **2a** of the housing **1**. In the arrangement shown the trigger **9** comprises a cut-out strip extending transverse to the longitudinal axis of the housing **1** and across the whole of the upper face and part of each of the side faces **3** and is situated approximately half way along the upper face **2a**. The trigger **9** is activated by depression and is positioned along the housing **1** such that it is easily actuable by the operator when the reader is held in the operator's hand. The trigger mechanism itself may be of any known arrangement; for example the trigger may be spring-loaded and have contacts which form a circuit with contacts within the housing when the trigger is depressed to actuate the reading arrangement. Power may therefore be conserved as the reader will only be activated when the trigger is depressed enabling the operator to leave the reader idle when no indicia are to be read. Once again, as the trigger is positioned with ergonomic considerations in mind, the reader can be simply and quickly operated by the user with minimum discomfort.

A scanning window **10** is positioned on the front face **5** of the reader. Light generated by the reading arrangement passes through the window **10** and is reflected and scattered back through the window **10** by a bar code symbol **11**. Accordingly the reader can be easily and accurately aimed at the bar code symbol **11** to be read (as shown illustratively in FIG. **2**). As a result the bar code symbol **11** can be rapidly located by the user and read by the reader with a minimum amount of time wasted attempting to locate the bar code symbol **11**. Accordingly both operator time and usage time can be reduced which is of particular relevance in battery-powered hand-held readers.

As shown in FIGS. **6**, **7** and **8**, the batteries **12** for the hand-held reader are stored in the bulbous portion **7** towards the rear and aligned with the longitudinal axis of the reader. The batteries **12** are disposed along a curved surface matching the curvature of the bulbous portion. As a result, maximum use is made of the ergonomically design bulbous portion **7** of the reader and minimum space is occupied by the batteries **12**.

A strap **13** can be attached to the reader, for example towards the rear of the bulbous portion **7** for placing around the operator's wrist such that, in the event of the reader being inadvertently released from the grip of the user, it is still held to the user by the strap **13**.

6

Also provided on the upper face of the reader are a keypad **14** and a display **15**. (The keypad **14** is not shown in FIG. **6** for the purpose of clarity). The keypad **14** may be used to initialize the reading arrangement such that identification information concerning the user is entered into the system. Alternatively, the keypad **14** may be used to enter predetermined codes or information concerning modes of operation of the reader or to carry out cancellation or manipulation operations on information provided by the reader. The display **15** may display information relating to the mode of operation of the reader, or display check information relating to the item carrying the bar code symbol being read together with background information such as the time, date, and confirmation of the operator's identity. Preferably the display **15** is a liquid crystal display (LCD).

The reading arrangement can process information derived from the bar code symbols directly or can send raw data to an external processing device which can then process the information accordingly. In addition, information derived by the reader from bar code symbols can be transferred to a memory device in order that a database of information can be built up. For example where the reader is used at a point of sale, buying patterns can be stored and analyzed. Alternatively, if the reader is being used for inventorying purposes then the inventory information can be stored. The optical reader can transmit information in a variety of manners. In the embodiments shown various different transmitting devices are provided; in practice only one or more of the devices need be provided depending on the particular use to which the reader is to be put. For example the information may be transmitted by an acoustic modem **16**. In that case, information can be stored in a buffer memory within the reader and then down-loaded by the acoustic modem **16** at predetermined intervals. The display **15** could indicate when information was to be down-loaded. Alternatively an interface connector, for example an RS41 connector is designated by reference numeral **6** and provided at the rear of the reader. Suitable cabling can be inserted into the connector **6** to down-load information or alternatively to load data into the reader for example relating to the mode of operation. Once again, the display **15** could provide an indication of the functioning of the connector. The cable could be permanently connected to the reader as the connector **6** is provided at the rear of the reader and hence would not be obscured by the user's hand. Alternatively, the connector **6** could be connected to a cable for loading or down-loading of information when required and, for example, when indicated by display **15**. In addition, a radio **17** or other transmitting device can be provided within the housing **1** to allow real time data communication. An advantage of that arrangement is that the operator may use the reader in a "cordless" or "wireless" configuration allowing increased mobility. Once again the radio **17** could comprise a transmitter and a receiver in order that information can be sent to and from a remote processor. The radio link could be replaced by an infra-red communication link or other wireless link of known type. Because the reader is of ergonomic design, the transfer of information is easily carried out while the reader is actually in use, if required.

As a further option the reader may be configured for connection to a telecommunications network or computer network, for example the "Internet".

One example of where the reader may be of particular use is in relation to the worldwide web. When it is desired to access a web site it is necessary to enter the address of the site, known as the universal resource locator (URL). Often those URL's are long and complex, and are time consuming

US 6,714,969 B1

7

to enter and check manually. Furthermore the URL can, despite many checks, still give rise to error. The problem is exacerbated in the case of computer illiterate users. The proposed manner of overcoming this problem is to encode the URL address in a bar code symbol and read the bar code symbol with the reader for automatic access to the corresponding web site, which will be quick and accurate, giving rise to far less margin for error. The reader may be used to interface with a terminal for entry of the URL address or could be used independently.

In order to improve the operator's grip on the reader, one or more finger grips may be provided at locations where, in use, the operator's fingers or other parts of the operator's hand would contact the reader. The finger grip would comprise a molded rubber portion having raised elements to achieve traction on the finger or palm. Such finger grips could be provided, for example, on the bulbous portion 7 (as shown schematically in FIG. 5 by reference numeral 18) or the concave groove 8 therein, on or in the vicinity of the trigger portion or in areas of the upper surface 2a where the operator's thumb might rest.

Accordingly, it will be seen that the hand-held optical reader described herein is ergonomically shaped for maximum user ease and comfort, allowing increased efficiency and user-friendliness. Features such as the trigger 9 and finger grips 18 are positioned for optimum user operability. It will be appreciated that such features may be presented symmetrically in order to allow the terminal to be used by either left or right-handed users, or alternatively the handset may be produced in both left and right-handed versions. The reading window 10 is positioned for improved accuracy and ease of use, and features such as the key pad 14 and display 15 are positioned for ease of access and reference by the user. The device may be either wireless or connected to a central processor by a cord leading from the connector 6 provided at a convenient position on the terminal. The device can be powered by batteries 12 located conveniently along the curve of the bulbous grip portion 7 or could in the alternative be powered by a removable, rechargeable battery pack or via a cord into the above-mentioned interconnector or another connector.

According to another aspect there is shown in FIG. 9 a data collection device comprising an improvement over known arrangements. The device comprises a portable hand-held computer for collecting data and down-loading the raw processed data to a central or peripheral device. The device, designated generally as 20 comprises a main body 21 and interchangeable data collection modules 22a, 22b, 22c.

The main body 21 is provided internally with data processing means (not shown) and comprises a display screen 23, for example an LCD display screen capable of displaying video images, a data collection module interface 24, an optional input information keypad 25 and a communication link 26 which may comprise radio frequency or infra-red transmitting means or an interface for downloading information to a central or peripheral device via a physical cable. It will be appreciated that the LCD display 23 and input keypad 25 are optional features. Advantageously, however, they allow the user to configure operation of the device as a whole quickly and simply and monitor the operation. The main body is shown schematically in FIG. 9; in practice it could assume an ergonomic shape such as that shown in FIGS. 1 to 7, suitable interfaces etc. being positioned as appropriate, for example at respective ends of the module.

It will be appreciated that the device may transfer information to a host via any electronic data transfer scheme—for example the system could also use cellular-based telephone channels.

8

Alternatively the device could be configured for connection to a telecommunications network or computer network, for example the "Internet".

The data collection modules are interchangeable with one another and may be, for example, CCD (Charge Coupled Device) based image, video and bar code symbol data capture modules, audio transducers for collecting and receiving sound information, laser image scanners or combined multi-media data collection modules.

An image capture module using a CCD could be used for capturing images of objects for storage or use by a processor application carried out by the main body or by a host, such images including for example people, landscapes, homes and vehicles for reference applications. In addition the imager could be used for one dimensional or two dimensional bar code symbols for decoding data capture. A laser optical reader scanning module and decoder would be used generally for bar code data capture and decoding only.

A multi-media module 22 is shown in FIG. 11 and discussed in more detail with reference to that figure below. Such a module could contain a circuitry for image/video capture, audio capture and playback and a cellular telephony sub-system. Such a module would be of particular use in tele-conferencing and live video communications over cellular networks from the portable unit.

The desired data collection module 22a,b,c is connected to the main body 21 by the interface 24 on the main body which mates with an interface 27 on the module. Any suitable known interface components can be used but the components should be strong, relatively inflexible, durable and suitable for frequent disconnection and reconnection.

The modules are powered by a power supply within the main body of the portable computing device and may be partially or totally controlled by software drivers within the main body. In order to reduce the burden on the central processing unit of the main body, dedicated signal processing electronics within the modules can be arranged to perform up-front data processing as a result of which a common bus architecture to the main body is shared by all of the modules. As a result their interchangeability is enhanced.

A suitable architecture for an optical media capture module 28 (for example containing a CCD imager or laser scanner) is shown in FIG. 10. Each module may contain only the media capture electronics without any pre-processing capability or, as discussed above, preferably contains dedicated or programmable analog components 32 and digital signal processing (DSP) components 33 to ease the processing load placed on the central processing unit of the main body 21. The digital signal processing sub-system 32,33 in the module may be of a single electronic design common to different modules, and which is either programmed in the factory or customized on purchase or programmable by the user to perform the functions in processors if required by the particular media module. This function programmability is expected to be mainly through software, since the module processing electronics are flexible, and these software components may be one-time or dynamically loaded to the module via the main body central processing unit. Accordingly the range of components that require manufacture is decreased, appropriate dedicated parts of the components being selectable for a desired use, or a portion of the mode of operation being borne by software.

In operation, the module 28 collects information via the CCD imager or laser scanner in analog form which is transferred either serially or by conversion into a parallel

US 6,714,969 B1

**9**

format. The analog signal is then processed by the digital signal processing sub-system **32,33** and forwarded to an interface bus **34** from which the information is transferred to the main body of the portable computing device. As mentioned above, the signal processing electronics preferably perform up-front data processing such that a common bus architecture to the portable computing device **21** can be achieved.

Referring now to FIG. **11** the multi-media module **22** includes circuitry for image/video capture, audio capture and playback and a cellular telephony sub-system.

The module is arranged to receive and transmit video information independently of the main body of the portable computing device (although the video information may also be accessed by the main body of the portable computing device in order to monitor or review the information). Accordingly a radio frequency antenna **41** is provided in the module for reception and transmission of radio frequency information. A radio frequency front end processor **42** and codec **43** cooperate to perform digital to radio frequency/radio frequency to digital format conversions. Video information received via radio frequency is decompressed by an optional digital signal processing sub-system **44** for presentation, where appropriate, to the CPU of the main body **21** of the portable computing device. A further digital signal processing sub-system **45** is provided for other purposes (discussed in more detail below) and preferably performs partial video processing, the CPU of the personal computing device completing the process for displaying the results. The second digital signal processing sub-system **44** may also be required for the interface to the radio frequency codec **43** of the cellular sub-system; this depends on the amount of processing required for each function. Video information transferred to the main body **21** of the portable computing device is displayed on the LCD display **23**. The radio frequency receiving, transmitting and processing apparatus **41,42,43,44** discussed above can optionally reside in a separate component such as a PCMCIA or other type plug-in card for example of the type manufactured by Symbol Technologies, Inc. Preferably, however, the circuit forms an integral part of the multi-media module to provide a full wireless multi-media solution for the hand-held computing system. As will be appreciated, the wireless link may conform to any desired cellular standard (for example CDMA, GSM, AMPS) that is preferably selected to allow the widest application of the invention.

The multi-media module **22** further includes a microphone/speaker component **50** which receives and transfers input analog information to an analog to digital converter **51,45** comprising an up-front voice-band converter **51** which transfers information either serially or in parallel to the digital signal processing sub-system **45**. Similarly, information may be transmitted in the other direction, for example digital information from the main body of the portable computer device is converted to an analog audio signal at converter **45,51** and converted to sound by the speaker component **50**. Base-band digital audio data is processed by the digital signal processing sub-system **45** which can be reprogrammed as appropriate to perform appropriate audio codec processing. Voice-band (VB) signals are converted by the converter **45,51** as discussed above.

Video data is captured by a CCD imager **52** compressed by a digital signal processing sub-system **53** and forwarded to the radio frequency codec **43**. Once again the main body of the portable computing device need not be involved in this data transfer unless the user decides to monitor the

**10**

transfer. In that case, a software controlled process may be initiated whereby the video data is sent to the CPU of the main body **21** of the portable computing device for display before compression as well as to the radio frequency codec **43** for transmission allowing the captured image to be viewed while or before transmitting.

The multi-media module **22** is preferably mounted so as to be rotatable through at least 180° when connected with the main body of the portable computing device. This may be achieved by hinging or pivoting or otherwise arranging a portion of the main body or by similarly arranging a portion of the module. This positioning allows capture of the user's image while the user can simultaneously view the LCD screen display for received video data or images. The rotation of the image capture portion of the module permits capture of images of objects in front of the user while the user is looking at the screen.

The microphone and speaker combination may be arranged to face the user in a preferred, standard configuration of the device as a whole. The microphone may further be configured to swing or swivel away from the main body of the portable computer device and from the user holding the device if the desired audio data to be captured emanates from another direction.

An appropriate arrangement including a pivotable module head **22** and a swingable microphone boom **30** is shown in FIG. **12**. In the embodiment shown an upper portion **21a** of the main body **21** is hinged to the remainder of the main body and rotatable around an axis A as shown by arrow A'. The multi-media module **22** is connected to the upper portion and the upper portion has been swivelled such that a CCD image capture device **29** faces the user. The pivotable microphone boom **30** also extends from the multi-media module **22**. It will be appreciated that a number of pivoting orientating arrangements can be provided, for example a hinge or pivot could be provided within the structure of the module **22**, and the module could also be arranged to rotate through 180° about an axis transverse to axis A. Similarly, the microphone boom **30** can be pivotally mounted to the module **22** in any known manner.

Accordingly it will be seen that the invention can be used to provide modular programmable multi-media facilities in the hand-held form factor by portable computing devices such as hand-held terminals or "portable digital assistants". The invention can be used for CCD based bar code decoding (in one or two dimensions at least) by industrial and commercial users, for example for point of sale processing or inventorying; portable, cellular video conferences by travelling business users; and digital photography/image capture for insurance assessors, sales professionals among many other applications that will be apparent to those skilled in the art. It will be appreciated that the portable modules discussed above may be used in cordless scanning implementations for example in point of sale applications. Problems arise where such portable devices are not tethered in some manner as it is possible that they will be lost, removed from the store, or otherwise misappropriated.

To overcome this, it is possible to put surveillance tags of a known type into the scanner such that if the scanner is accidently taken by a customer an alarm will sound at the front of the store as it would if any other product carrying such a surveillance tag was carried out of the store.

Alternatively the scanner can have some form of internal alarm which sounds if the scanner is taken more than a predetermined distance from the base. Where the scanner communicates with the base by wireless communications

US 6,714,969 B1

11

such as radio communication, the software protocol managing the radio session could control the range finder and alarm.

In order to locate portable scanners that have been misplaced an alarm or "beeper" can be placed in the scanner and triggered by a signal from the base controlled by, for example, a button on the base pressed by the user. Accordingly when the user pressed a button the scanner could be located by following the noise of the sound.

A further use for portable computer devices is the electronic mail box or mail delivery service application. Referring to FIGS. **13** to **15** the invention provides an improved architecture for electronic mail box systems including portable computer devices. The improved system uses a distributed message delivery service architecture, based on cooperating processes. Within a network a particular machine is designated as a server and its address becomes public on the local network. The server is responsible for delivery of mail and reception of mail and also provides other machines on the local network with information regarding user message status, for example whether a message has been received for an identified user, in which case the message can be forwarded to the user. The remaining machines on the network are designated the client and carry out a corresponding process, in particular providing a user interface to the distributed mail delivery service. For example the client portion can present various options to the user for example the options of hearing audio messages or viewing text or still images. The options presented will, of course, be based on the resources available to a particular machine, for example whether it has a sound card and/or graphics capabilities.

Referring specifically to FIG. **13** there is provided a server **100** and a plurality (shown as **2** in the figure) of clients **101***a*,**101***b*. The server **100** includes an antenna **102** for communicating with remote clients **101***a*,**101***b* (for example portable computer devices), a transmission and reception module **103**, a message coder and decoder **104** (protocol stack) and a processing module **105** (query engine) for handling queries from clients **101**, for example regarding a particular user message status, accessing any such messages etc. Information is accessed from a memory **106** which may be a data base storage module. The processor **105** also communicates with a mail user agent (MUA) module **107** allowing user interface with the server **100**. The server **100** is further in communication via the mail user agent **107** with a local and/or wide area network designated generally as **108**.

The service may form part of, or be configured for connection with a telecommunications network, or a computer network, for example the "Internet".

Each client **101***a*,**101***b* includes various modules common with the server together with further modules specific to the needs of the client. The client **101** includes an antenna **109** for communication with the server and a transmitting/receiving module **110** communicating with a message coder and decoder **111**. The module **110** will include the hardware necessary for carrying out the transmitting/receiving steps but it will be recognized that at least some of the functions provided by the module will be capable of being provided in software. Indeed, generally, reference to modules need not be to dedicated hardware but extends to programmed or programmable software arranged to emulate hardware performance. The message coder and decoder **111** interacts with the mail user agent **112** providing user interface. In addition the mail user agent **112** communicates with a local data

12

storage device **113** and with optional modules such as a display driver **114** and/or a sound driver **115** (see client **101***a*).

Operation of the distributed mail delivery system may best be understood with reference to FIGS. **14** and **15**. FIG. **14** displays the steps carried out by the user in a typical "client process". On commencement of operation the client auto-configures itself based on the resources (for example sound or graphics) available on the machine [step **120**]. The user logs in and enters a password [**121**] and a connection is established between the client and the server [**122**] at which stage information entered during the log-in and password process is sent to the server for verification [**123**]. If, however, the server is not ready for communication then the procedure is exited [**124**] and must be recommended at step **120** or step **121**. After the user status is queried [**123**], if the user or password is unknown to the server the process returns to step [**121**] and the log-in and password procedure is re-initiated. Otherwise the options available to the user are retrieved [**125**] in steps discussed in more detail with reference to FIG. **15** and displayed as headers to the user [**126**]. The user then enters his selection [**127**] and the selection type is determined [**128**].

The client assesses whether the user wishes to view a message [**129**] and if so retrieves the selected message from the server [**130**] in a series of steps described in more detail below with reference to FIG. **15**. The client then determines the message type, for example audio or visual [**131**] and dependent on the message type either displays the text [**132**] or plays the sound [**133**]. The client then returns to step [**127**] and awaits a further user selection.

If at step [**129**] the user indicates that it is not desired to view a message then a message is created [**134**], recorded [**135**], the data of the message is packaged appropriately for transport [**136**], for example by the protocol stack **111** shown in FIG. **13**, and is sent to the server [**137**] by the transmitter **110** and antenna **109**. The client then returns to step [**127**] and awaits a further user selection.

The client machine includes suitable input means, for example a keypad and display means for example an LCD display for the entry of user selection choices, message information and for the display of messages. In addition a speaker and microphone may be provided for the recordal and playback of audio messages. A portable computer device such as that shown in FIG. **9** may, for example, be used as the client **101**. In that case, auto-configuration of the client is carried out partially in dependence on the type of module **22** inserted into the main body **21** of the portable computer device **20**.

Referring now to FIG. **15** the steps of a typical "server process" are shown. The server operates as a continuous process but, in order to save system resources is mostly in a stand-by mode where it simply listens to the local network. Accordingly in step [**140**], on initiation, an open end connection is established and the server monitors the connection [**141**]. If any queries are received [**142**] the server proceeds to the subsequent steps but otherwise continues to monitor the connection [**141**]. On reception of a query the server "wakes-up", interprets the query to establish which of the internal modules of the server is designated [**143**] (for example data base storage **106** or mail user agent **107**) and if the request is valid [**144**] the request type is determined [**145**]. The request may be a HEADER which is sent to the client to present user message headers (corresponding to steps [**125**] and [**126**] shown in FIG. **14**); accordingly at the request for a header [**146**] appropriate information is

13

retrieved [147], is packaged for transport [148] for example at modules 104,103 of the server and is sent to the client [149]. The server then returns to monitoring mode [141] listening to the connection with the remainder of the network.

If at step [146] the request is not for HEADER information then the server retrieves any user messages [147] that are stored in respect of the identified user (for example on the basis of the log-in or password information entered at the client) and the data is packaged and sent as described above in relation to steps [148,149]. The system then returns to monitoring mode [141].

It will be seen that steps [142–147] are carried out by the query engine 105 of the server, user message data being retrieved from the memory device 106 of the server.

Where, at step [144] the request is not valid then the user and request are logged and an error message is sent back to the client [151]. The system then returns to monitoring mode [141].

The system described above requires far less data storage on the client terminal/computer and thus is particularly (although not exclusively) suitable for hand-held computers with basic network capabilities. The system thus resolves the problem of mail box locations as well as releasing the hand-held host and the data storage and retrieval responsibility by treating the mail delivery service as two cooperative and independent processors that communicate with each other using basic network protocols.

In effect, unlike conventional mail delivery service systems, the distributed mail delivery service uses the underlying network to actively present enquiries to the server regarding the message status relating to a particular user, rather than using a directory structure and relying on a file system. Because all enquiries are directed to one server, multiple connections for a single user can be identified and refused, the server is the only point of connection to external entities, offering a more secure delivery system and the server offers a view of the mail delivery service to the end user which is independent of the actual matter stored by the server.

In addition clients are relieved of the responsibility of storing or directly retrieving any of the actual data. Messages are delivered via the network on a demand basis, that is when required by the user, and the client portion of the distributed mail delivery service simply translates user requests into a series of commands which are forwarded to the server in the form of queries. If the quieries are validated the server returns the necessary data to a client in response to the queries. By virtue of the separation of tasks the system designer gains the freedom to modify components of the system independently. For example it may be initially decided that the server should store messages using a simple mail box scheme, but if the capacity or speed or efficiency of the system subsequently needs to be enhanced as a result of the increased burden placed on it by an increasing number of users and messages, the server can revert to using a complete database management system. Any such modifications will, however, remain hidden from the client portion and the client portion can effectively remain unaware of the underlying structures of the server indefinitely.

Similarly, the client portion may be modified for example to move from a character-based user interface to a graphical-type interface in which case the server may remain unaware of the modifications as the basic data query and exchange mechanism is unchanged, the server remaining unconcerned about the manner of data presentation at the client portion.

14

Accordingly a voice mail delivery system is implemented. The client portion may run on a PC compatible platform although it could be ported very simply to other platforms. The server can operate on UNIX or DOS platforms. The client requires less than 256 bytes of local storage.

It will be seen, therefore, that the proposed delivery system offers multiple advantages over current mail box schemes, providing flexible and independent modules which are simpler to maintain and modify and which offers a generic mechanism by which data transfers can be implemented over data networks. As it is a distributed system it does not require the presence of a network file system and simply relies on local storage.

In particular, because a server is provided on each local network for dealing with the clients within a local network and also for communicating with other serves on other local networks the roaming capabilities of the system are enhanced. The distribution of mail processing between the various local networks is in contrast to the centralized hub system in conventional mail delivery systems and allows simplified and accelerated mail processing and transfer in combination with a roaming portable computer.

Further aspects of the present invention will be discussed in conjunction with Symbol Technologies Inc. spread spectrum wireless networks: Spectrum One (operating at a frequency range of 902 to 928 MHz) and Spectrum24 (operating at a frequency range of 2.4 to 2.5 GHz). However, the embodiments discussed are applicable to other wireless communications systems.

Part 1: "Symbol" Terminal Emulator Program (STEP) and pen-based mobile units/terminals.

Symbol (a Trade Mark) terminal emulator program (STEP) is a tool used to format applications for pen-based mobile units such as the mobile unit 21 shown in FIG. 9.

An example of the Spectrum24 system is shown in FIG. 16. The STEP resides in the mobile units 21 and works with an enabler development system 160 on a host computer 162 to execute a predefined set of commands set from the host computer 162. The enable development system 160 includes an enabler server 164, an enabler application program interface 166 and a timer 168. The enabler development system 160 receives input from the Spectrum24 access point unit 170. The host computer 162 is controlled by a terminal 172 to run host applications 174.

The STEP provides the mobile units 21 with the interface and logic functions necessary to communicate over the radio network, and controls all input, output and display functions at the mobile unit level, including keyboards, displays, scanners and peripherals, and printer support.

The STEP provides commands that allow the administrator to create a selection of data entry fields for the mobile unit operator. For example, these commands would permit the operator to: (a) enter data from a keyboard and scan bar codes; (b) send multiple messages to the host in the same transaction; and (c) control the type of data entered and validate entered data. Further, for display purposes STEP allows the administration to (a) display data at any location on the mobile unit screen; (b) clear the entire mobile unit screen or clear a single line; (c) save and restore the mobile unit screen; and (d) control the backlighting feature to view the screen in the dark.

The STEP acts as a power manager to reduce demands on the batteries in the mobile units 21, enabling them to operate longer between charges and extending their overall life.

By installing STEP on the mobile units 21, forms can be created and displayed on the display screen 23 (shown in FIG. 9). Forms can include messages, prompts and data

15

entry fields. This permits an operator to recall a stored form for execution on the mobile unit 21; repeat the execution of stored from for on-line batch processing; and erase all stored forms and determine the date and time of the last form definition.

The STEP enabled mobile units 21 allow the host computer 162 to read data files stored in the unit 21; sound the mobile unit's 21 alarm; interrupt mobile unit 21 input activity; and log off the mobile unit 21 from the host computer 162. This allows the operator to use the mobile unit 21 to collect data without being logged on to the host computer 162; set and save system parameters; download files from the host computer 162 to the memory in the mobile unit 21; and perform other maintenance tasks.

FIG. 17 illustrates a typical conventional flow chart of the actions taken by the access point 170 when it receives a packet of data from the mobile unit 21 on the wireless network. If the packet is a registration packet, determined at step 200, then the access point 170 processes the information carried by the packet at step 214. The type of association is determined by examining the IP address of the mobile unit's 21 home access point and does the control message exchanges accordingly at steps 216 and 226. If the packet is not a registration packet, as determined by step 200, then the packet is decapsulated at step 202.

If the short term address mapping tables (ST-AMT) of the access point 170 has an entry of the packet's source MAC address, determined at step 204, then the packet has originated from the mobile unit 21 that is away from its home stationary data link (SDL) network and processing passes to step 218. At step 218 the access point 170 encapsulated the packet within a UDP packet with the IP destination address set to that of the mobile unit's 21 home access point.

If the long term address mapping tables (LT-AMT) of the access point 170 has an entry for the packet's destination MAC address, determined at step 206 then the packet is meant for a mobile unit that is currently outside its home access point group (APG) and processing proceeds to step 220. At step 220 the access point 170 encapsulates the packet within an UDP packet with the IP destination address set to the destination mobile unit's local access point.

If the packet's destination MAC address is a broadcast address, determined at step 208, then the packet if forwarded at step 222 on its wired and wireless interfaces. If the destination MAC address in the packet appears in the access point's mobile host table (MHT), determined at step 210, then the packet is encapsulated within a wireless link layer packet and forwarded on the wireless interface at step 224. Otherwise, the packet is forwarded on its wired interface at step 212.

Part 2: Assigning domains and IP addresses to said pen-based mobile units 21.

The following embodiments of the present invention deal with assigning domains and IP addresses to the mobile units 21 to operate in a wireless LAN technology, such as the previously discussed Spectrum One and Spectrum24 systems.

According to an embodiment of the present invention the domains and IP addresses are hard coded. The hard coded embodiment involves setting the domain and IP address of the mobile unit 21 in the configuration files associated with the Spectrum24 drivers and protocol stacks.

The hard coded embodiment provides a relatively simple implementation of domain and IP address assignment for Spectrum24 network installations when only a few mobile units 21 are used that always use the same APG on the same network. In addition, a high degree of security is provided

16

since the ability to detect and assign domain and IP addresses are available only in the configuration area, not in the operational area.

The hard coded configuration of each mobile unit 21 ensures that the domain and IP address information are non-volatile. This insures that even cold booting the mobile unit 21 will not require configuration. All the access points 170 in the target APG can be configured to use the hard coded domain. The server can be set up to reserve permanently (without any timeout) the hard coded IP addresses for use by each hard coded mobile unit 21.

Another embodiment of the present invention involves the application-selection of domains and IP addresses. This embodiment is suitable for situations where a system administrator manually configures the mobile units 21 before their use by operators by setting the domain and IP address. In particular, when mobile units 21 are the only nodes on the network or when the system administrator set domains and IP addresses by referring to a master list maintained on a network server the application-selection system is advantageous.

For situations where the operator must identify the selections as he moves between APGs or networks a more sophisticated application is provided to allow the system administrator to establish logical names for domains and IP addresses so that operators can pick the appropriate settings by choosing a meaningful name such as truck, warehouse, depot, etc.

The application-selection method allows for the dynamic adjustment of domain and IP addresses under application control across APGs and networks.

A further embodiment of the present invention involves the access points-assignment of domains and server-assignment of IP addresses. This method is suitable when the manual assignment of domains and IP addresses is impractical due to many mobile units 21 or due to the complexity of the network.

AP-assignment of domains requires configuring access points 170 to allow for an automatic configuration. Using the access point 170 access control list (ACL) features, security can be enhanced by giving the access points 170 a list of the MAC-layer addresses of all the mobile units 21 allowed. This list can be larger than the number of mobile units 21 actually being serviced at any given time, allowing the timesharing of the capacity of the access point 170 among a large set of intermittent use mobile units 21.

Server-assignment of IP addresses requires the existence of a mechanism within the protocol stack, supported by services and utilities in both the server and the mobile unit 21, to allow dynamic allocation of IP addresses. BOOTP and DHCP are two common mechanisms for dynamic allocation.

BOOTP works by having a file on the server for each possible mobile unit 21, selected by the mobile's 21 unique MAC-layer address, that provides the IP address to be used for the mobile unit 21.

DHCP works by having a database on the server that records the IP addresses that are in use (by MAC-layer address) and the IP addresses that are available for dynamic assignment. When a mobile unit 21 requests an IP address, the database is searched for the MAC-layer address. If an IP address is already allocated to this mobile unit 21, the it is simply returned. If no IP address is allocated to the mobile unit 21, and one is available for dynamic assignment, it is allocated to the mobile unit 21, recorded in the database and assigned to the mobile's unit's MAC-layer address, and returned to the mobile unit 21. The DHCP server can set to timeout when a dynamically assigned IP address has not

17

been used for some time and return it to the available list or to keep IP addresses permanently assigned once allocated to a mobile unit **21**.

The domains and IP addresses can be stored in volatile storage, but would need to be reentered following a reboot. However, the necessary address information can be stored onboard the flash of the mobile unit **21**, or on the Spectrum24 adapter card, or on RAM disks or PCMCIA storage cards.

The AP/server-assignment methods provide the ability to program ACL information via a personal computer attached to the same hardwired router as the access point **170**. Further, the AP/server-assignment methods allow for automatic assignment of complying domain and IP addresses as needed, and allow mobility across APGs and networks.

According to another aspect the invention addresses the problem of the necessity of a specialized program for parsing and interpreting high density data records embedded in bar code labels. In accordance with the invention it is proposed to distribute not only the bar code data on a high density label, but also information describing how to create an interface capable of reading the data from the data record label.

Implementation of the invention will be familiar to the skilled man in the operation of the Internet Web Browser suitable for reading, for example, Hyper-Text-Markup-Language (HTML) files. Those files are used to describe an interface to be built by Web Browser. In the present invention the mobile unit includes a reader or Browser for scanning a high density bar code label that contains a program script such as HTML, VB script or a specialized compressed version of either. The script is parsed and interpreted by Browser which constructs a user interface at run time and presents it to the user. The user interacts with the interface by scanning data labels and interacting with any of the program's controls presented to the user to properly process the data. According to one aspect a new data or interface level may be printed by the user that can be applied to the object being processed. It will be appreciated that, as bar code label densities increase, the capability of storing the actual interface and the data record in a single bar code label will appear.

FIG. **18** shows the system of the invention in more detail. The system includes a Browser **300** to which bar code information **301** is input. An interface **302** is constructed at run time and an interface control **303** is provided. The Browser **300** further includes a bar code acquisition engine **304**, a parsing engine **305**, a printing engine **306** with a printed data interface **307** and a communications engine **308** with a communications input/output interface **309**. The user interacts with the interface via a further interface **310**.

It will be appreciated that the manner in which the information is encoded in the bar code label will be familiar to the skilled man, and that the software and hardware required will also be familiar to the skilled man.

This system is particularly advantageous with respect to transportation and identification of goods. The shipper of the goods can distribute a program script label with the goods that is read by the receiver's Browser. The program script label shipped with the goods contains the information required to allow the Browser to create an interface at run-time to read and process the data for the container of goods shipped.

Logistical systems benefit greatly from a system such as this, because unidentified materials in the field can quickly be identified and processed by any unit containing the Browser.

18

The administration of the hardware and software contained in these systems is greatly reduced, because the Browser contained in the Mobile Unit (MU) stays static. Only when new Browser features need to be distributed do the MUs need to be updated. All interfaces are distributed on high density barcode labels. This system of application program distribution truly makes the computer system general purpose. An infinite number of different interfaces can be read in and executed by the Browser. No longer are users limited by secondary storage on their MUs for storing application programs.

Using this new system, any computer system equipped with a general purpose interface reader application (Browser) can create an interface "on-the-fly" that is capable of reading processing information on the accompanying data record labels.

Systems deployed in the field no longer need their application programs updated when changes to the program file is required. Only the program script label need be replaced. The number of different data formats that can be processed by a particular computer system is limited only to the number of program script labels available to the user.

Different users of such a system can freely exchange information because the interface information needed to process the data files is distributed on a label along with the data files themselves. Each user no longer needs a copy of the specialized application program that was previously required to read the data label.

According to another aspect of the invention there is provided a bar code scanning OLE (Object Linking and Embedding) COM (Component Object Model) object for communicating commands and bar code data over a wireless link. As discussed in more detail below the object uses OLE automation to be a "plug-in" development OLE control extension. It thus becomes an in-process OLE automation object. The in-process OLE automation object controls a bar code scanning device over a wireless link on a remote client. The remote device enables a bar code reader and collects the bar code information, returning the data over the wireless link to the OLE automation object.

The general principles of OLE architecture will be well known to the skilled man. In the present embodiment, a scanning object is implemented as an OLE control. OLE controls are re-usable software components designed to work in containers that support OLE 2.0. OLE controls are more powerful and more flexible than previous systems such as VBX Custom Controls in particular as, unlike the VBX Custom Controls that they are replacing OLE controls support 32 bit environments and are not limited to Microsoft Visual Basic (Trade Marks).

OLE controls are designed to work in any container that supports OLE 2.0 including not only Visual Basic 4.0 and beyond but also OLE-enabled container applications such as Microsoft Office (Trade Mark). Additionally OLE controls work in third-party OLE-enabled applications in development tools.

OLE architecture enables different software objects to communicate to each other using a binary interface mechanism. This allows software objects to be developed separate from each other and bind very late at run time. The software interface is a contract between the container and the control on how the two software objects will interact and exchange information.

Under the OLE architecture, the scanning object can be placed and activated in any of a variety of containers that support the OLE container interface. FIG. **19** shows the general mechanism between a control **401** and its container

19

20

**402**. As can be seen the mechanism includes standard compound document interfaces **403** and additional control interfaces **404**, each comprising multiple interfaces.

In such a system the scanning control appears to become a seamless part of the container's environment. Through the exposed interfaces the two objects communicate and integrate with each other.

In addition, as shown in FIG. **20**, the scanning control **401** communicates over a wireless link **410** with a remote computing client **411** to control the bar code reading device **412**. The scanning control **401** sends commands over the wireless link **410** by creating separate threads of execution **413**a to **413**d that send, receive and synchronize bar code reader transactions over the wireless link. As shown in FIG. **20**, the OLE container **402** and control **401** communicate via lines **414**a to **414**f. The OLE control includes a main control thread **415** which communicates with the OLE container **401** via lines **414**a, **414**b and with a first transaction thread A **413**a via a line **416**. Each of the transaction threads **413**a to **413**d communicate along a respective line **414**c to **414**f with the OLE container **402**. Each of the threads also outputs through a respective first line **417**a to **417**d to a transaction start dispatch function **418** and receives an input via a respective second line **419**a to **419**d from a transaction complete dispatch function **420**. The transaction start dispatch function **418** communicates with a transport layer **421** in the remote client **411** via a line **422** and a transaction complete dispatch function **420** receives input from the transport layer **421** via a line **423**. The remote client **411** includes a corresponding transport layer **424** which outputs via a line **425** to a data arrival handler **426** and receives an input via line **427** from a command complete handler **428**. The data arrival handler **426** outputs via line **429** to a bar code device driver **430** and the command complete handler receives an input **431** from the bar code device driver **430**. The bar code device driver **430** communicates with the scanning hardware such as a bar code reader **412** via a line **432**.

As a result users can develop applications using OLE-enabled development tools like Visual Basic 4.0. The user simply inserts a new scanning object into their project, sets required properties, writes necessary code for event notification and the scanning control seamlessly talks to the remote client bar code scanning device over the wireless link. To the application program it appears as if the scanning device is resident on its local hardware. The invention comprises a significant development over previous architectures comprising implementation of a local bar code scanner resident on a machine running a COM object. In particular the architecture of the invention allows control of the scanner through the wireless interface.

By virtue of the present invention there is in addition the capability of supporting future versions to be distributed via the distributed component object model architecture (DCOM). The interfaces between the control container and the control itself are binary and can be implemented by the operating system as Remote Procedure Calls (RPC's). Accordingly the OLE control can be implemented as an Active-X control to control devices over an Internet or Intranet link. This technology allows Web authors and developers to create a new generation of interactive Web pager and applications, for example Microsoft Internet Explorer 3.0 (Trade Mark). This implementation is of particular benefit in proposed systems whereby users will wish to integrate bar code scanning capabilities into their Intranet/Internet-enabled applications.

The Intranet arises from the application of Internet technology to provide industrial strength mission critical applications to users within an organization on an isolated LAN (Local Area Network) rather than for external connection to the global internet. Single function handheld computing terminals can then be built that connects to the LAN and execute predetermined applications to reduce significantly the cost per client when installing a network system. In an Intranet system, mission critical applications reside on the server, eliminating the cost of application deployment and lowering the cost of terminal configuration. The data collected is transmitted and saved on the server so little or no local data storage is needed on the handheld terminal. It will be seen, therefore, that such a system provides an ideal forum for the OLE scanning control object discussed above.

Referring first to FIG. **21**, there is shown a collection of items **1300** which need to be returned to the vendor for a variety of reasons, for example incorrect shipment (wrong color, size item number) damage in transit, to be returned for credit etc. Each item **1300** carries a bar code symbol **1310**. The individual items **1300** are to be placed in a container or returns box **1340** in which they will be shipped back to the supplier or vendor.

To prepare the package for consignment back to the supplier, the retailer may make use of a bar code scanner having an attached host computer and printer as shown in FIGS. **23** and **24**. Alternatively, he may use one of the alternative work station arrangements shown in FIGS. **25** to **26**. All of these will be described in more detail below, but for the moment it suffices to note that each bar code scanner incorporates a printer **562**, a keyboard **562'**, **1116** for entering textural information, and a host computer **560** which incorporates a computer memory for storing details of the indicia that have been scanned, and the information entered via the keyboard. The host computer also incorporates a CPU having appropriate software.

Details of the method used to prepare the package of products for consignment may be seen from the flow chart of FIG. **22**. Starting at step **1350**, the retailer first (at step **1360**) uses the bar code reader to scan and read the bar code **1310** on the product **1300**. He then, at step **1370**, enters on the keyboard **562'**, **1116** the reason for the return, or alternatively as required by the supplier a returns number. At step **1380**, the bar code details and the reasons are automatically added to a database maintained within the memory of the host computer **560**. It will of course be appreciated that in an alternative embodiment (not shown) the user could be required to enter the details on the keyboard before, rather than after, scanning the bar code symbol. In either case, once the item **1300** has been scanned it is then placed into the large container **1340**.

The process continues at step **1390**, with steps **1360** to **1380** being repeated if further items are to be shipped. Once the retailer has finished, he presses a "done" key on the keyboard, at step **1400**, to advise the host computer that there are no additional items to be added. At step **1410** the host computer **560** than encodes the database entries for PDF printing, and at step **1420** prints out a PDF bar code label. The PDF label, **1320**, contains a listing of all the items in the container **1340** and the reasons for their return. The label is preferably self-adhesive, and the vendor merely secures it to the outside of the container before shipping. Alternatively, the printer **562** could print the PDF bar code directly onto the surface of the container **1340**. A further label **1330**, showing the address of the consignment, may be printed out automatically. The vendor also secures that to the outside of the container. The container can then be shipped.

On receipt of the container, the supplier simply reads the PDF label **1320** to determine which items are in the box, and

the reasons for their return. Where the bar code incorporates return codes, the supplier can simply and easily determine whether the retailer has authorization to return those particular products. The label may, in addition, contain encoded information identifying the particular retainer in question.

The bar code symbol **1320** is desirably a PDF symbol, which is automatically produced by the software contained within the host computer **560**. Details of the encoding method used by the software, which would enable a skilled man to deviate appropriate software, are described in the above-referenced US patent in common ownership with the present application.

Now that the conceptual aspects of the invention should be clear, reference may be made to FIGS. **23** to **26** which illustrate various exemplary embodiments of the scanner/printer assembly.

Referring first to FIG. **23** of the drawings, reference numeral **510** generally identifies a lightweight (less than 1 lb), narrow bodied, streamlined, hand-held, fully-portable, easy-to-manipulate, non-arm and wrist-fatiguing, scanning head supportable entirely by an operator for use in a scanning system operative for reading, scanning and/or analyzing symbols and aimable, both prior to and during reading thereof, by the operator at the symbol, each symbol in its turn. The term "symbol" as used herein is intended to cover indicia composed of parts having different light-reflective properties. The indicia may be industrial symbols, e.g. Code **30**, Codebar, Interleaved **2** or **5**, etc., or the omnipresent Universal Product Code (UPC) bar code symbol. The indicia may also be composed of alphabetic and/or numeric characters.

The head **510** includes a generally gun-shaped housing having a handle portion **512** or generally rectangular cross-section, and a generally horizontally-elongated narrow-bodies barrel or body portion **514**. The dimensions and overall size of the handle portion **512** are such that the head **510** can conveniently fit and be held in the operator's hand. The body and handle portions are constituted of a lightweight resilient, shock-resistant, self-supporting material such as a synthetic plastic material. The plastic housing is preferably injection-molded and forms a thin, hollow shell whose interior space measures less than a volume on the order of 50 cu.in.

As considered in an intended position of use, as shown in FIG. **24** the body portion **514** has a front wall **516**, a rear wall **518** spaced rearwardly of the front wall, a top wall **520**, a bottom wall **522** below the top wall, and a pair of opposed side walls **524,526** that lie in mutual parallelism between the top and bottom walls.

A manually-actuable, and preferably depressible, trigger **528** is mounted for pivoting movement about a pivot axis on the head in a forwardly-facing region where the handle and body portions meet and where the operator's forefinger normally lies when the operator grips the handle portion in the intended position of use.

A plurality of components are mounted in the head and, as explained below, at least some of them are actuated by the trigger **528**, either directly or indirectly, by means of a control microprocessor **530**. One of the head components is an actuable light source e.g. a semiconductor laser diode **532** or a light emitting diode, operative, when actuated by the trigger **528**, for propagating and generating an incident light beam. In the case of a laser, the light beam is highly divergent, is non-radially symmetrical, is generally oval in cross-section, and has a wavelength above 7000 Angstrom units. The laser diode **532** requires a low voltage, e.g. 12 volts DC or less, supplied by a battery **534** which may be

provided within the handle portion **512** or by a rechargeable battery pack accessory detachably mounted on the head, or by a power conductor in a cable connected to the head from an external power supply.

An optical assembly, including a half-silvered mirror **537** and an optical train **538**, is mounted in the head, and is adjustably positioned relative to the diode **532** for optically modifying and directing the incident laser beam along a first optical path toward a reference plane which is located exteriorly of the head forwardly of the front wall **516** and which lies generally perpendicular to the longitudinal direction along which the incident laser beam propagates. A symbol to be read is located at the vicinity of the reference plane, either at, or at one side, or at an opposite side, of the reference plane, that is, anywhere within the depth of focus or field of the optically-modified incident laser beam. The depth of focus or field is also known as the working distance in which the symbols can be read. The incident laser beam reflects off each symbol in many directions, and that portion of the reflected laser light which travels away from the symbol back toward the head is known herein as the returning portion.

The laser beam passing through the optical train **538** impinges on a generally planar portion of a scanning mirror **540** forwardly reflects the laser beam impinging thereon in the direction of an arrow **542** through a forwardly-facing light-transmissive window **544** mounted on the front wall **516** and to the symbol.

The scanning mirror **540** is mounted on a scanning component, preferably a high-spaced scanner motor **546** of the type shown and described in U.S. Pat. No. 4,387,297, the entire contents of which are incorporated herein by reference. For purposes of this application, it is sufficient to point out that the motor **546** has an output shaft on which a support bracket is fixedly mounted. The scanning mirror **540** is fixedly mounted on the bracket and is driven in alternate circumferential directions over art lengths of any desired size, typically less than 360°, and at a rate of speed on the order of a plurality of oscillations per second. In a preferred embodiment, the scanning mirror **540** and the shaft are reciprocally and repetitively oscillated so that the scanning mirror repetitively sweeps the incident laser beam impinging on the mirror through an angular distance or arc length at the reference plane of about 32° and at a rate of about 20 scans or 40 oscillations per second.

The returning portion of the reflected laser light has a variable light intensity due to the different light-reflective properties of the various parts that comprise the symbol over the symbol during the scan. The returning portion of the reflected laser light is collected in the direction of arrow **548** by a generally concave spherical portion of the mirror **540**. The generally planar mirror portion is integrally attached to the generally spherical mirror portion of the mirror **540**. The spherical portion reflects the collected light through the optical train **538**, the half-silvered mirror **537**, and to a sensor means, e.g. a photosensor **550**. The photosensor **550**, preferably a photodiode, detects the variable intensity of the collected laser light over a field of view which extends along, and preferably beyond, the scan and generates an electrical analog signal indicative of the detected variable light intensity.

Also mounted in the head is a signal processing means **552** mounted on a circuit board **554**, and operative for processing the analog electrical signal generated by the photodiode **550** into a digitized video signal. Data descriptive of the symbol can be derived from the video signal. Suitable signal processing circuitry for this purpose was

US 6,714,969 B1

23

described in U.S. Pat. No. 4,251,798. Other components within the head include drive circuitry for the motor **546**, an aiming light controller in the event that the laser diode **532** generates a laser beam which is not readily visible to the human eye, and a voltage converter for converting incoming voltage, e.g. from the battery **534**, to a regulated voltage suitable for energizing the laser diode **532**.

Also mounted on the circuit board **554** is a decode/control means **556** operative for decoding the digitized video signal to a digitized decoded signal from which the desired data descriptive of the symbol is obtained in accordance with an algorithm contained in a software control program in the microprocessor **530**. The decode-control means includes a PROM for holding the control program, and an RAM for temporary data storage. The decode/control means **556**, together with the micro-processor, determine when a successful decoding of the symbol has been obtained, and also terminates the reading of the symbol upon determination of the successful decoding thereof. The initiation of the reading is caused by depression of the trigger **528**. The decode/control means also includes control circuitry for controlling the actuation of the actuatable components in the head, namely, the laser diode **532**, the photodiode **550**, the motor **546**, and all the other electronic subcircuits therein, as initiated by the trigger, as well as for communicating with the user that the reading has been automatically terminated as, for example, by sending a control signal to an indicator lamp **558** to illuminate the same or by energizing a buzzer or beeper.

The decoded signal is either conducted along a conductor within a cable interconnected between the head and a remote host computer **560**, or is transmitted by radio wave from the head to the computer **560** by means of antenna **536**. The computer **560** serves essentially as a large data base, may be an in-store processor, stores the decoded signal, and provides information related to the decoded signal. It includes a CPU **560'** and a memory **560"**. For example, the host computer, in accordance with this invention, can provide retail price information on an updated basis corresponding to the products identified by their decoded symbols. The host computer can advantageously be incorporated in a portable terminal, or in a stationary terminal such as a cash register.

The data base can be incorporated in a portable housing held in one's other hand, or supported on the operator's person, for example, suspended from a belt or shoulder strap, in a field-portable application.

A keyboard **562'** may advantageously be provided on the head for entering data relating to the symbol and/or the product bearing the same. The keyboard includes a "done" key **562''** by which the user tells the host computer **60** that there are no more items to be scanned. A display **64** is also conveniently mounted adjacent the keyboard **562'** on the top wall **520** of the head, and is operative for displaying information relating to the symbol and/or the product bearing the same.

As described so far, each product **1300** bearing a label imprinted with a symbol **1310** is identified by scanning the symbol with the hand-held scanner head **510** in the manner depicted in FIG. **24**.

The printing of the PDF code symbol **1320** is performed by a printer **562** that is either incorporated in the hand-held head **510** (see FIG. **21**) or held in one's other hand, or worn on one's person (see FIG. **22**), or mounted on a nearby support surface such as a countertop, or incorporated in another component such as a scale or cash register, as described below. The printer includes a thermal printhead **561** operative for thermally imprinting graphical markings

24

on a journaled roll **563** of paper labels, each print label being torn off the roll by being urged against tear-off edge **565** at the front of the head **510**. The label preferably has a pressure-adhesive backing so that it can be applied directly on the container **340**.

FIG. **25** illustrates an alternative printer/scanner arrangement which can be used with the present invention. The assembly comprises a portable data terminal **1100** having a keyboard **1102** for data entry, and a screen **1104**. Attached to the portable data terminal are an integrated printer **1106** and a separate bar code reader **1108**.

An alternative printer/scanner arrangement is shown in FIG. **26**. As before, this comprises a portable data terminal **1100'**, having a keyboard **1102'**, and a screen **1104'**. However, in this case the terminal incorporates an integral scanner head **1110**. Attached to the terminal is a separate printer **1112**.

It will be appreciated that the various different aspects presented herein can be combined or interchanged as appropriate. For example the "return to vendor" method described above in relation to FIGS. **21** to **26** may be carried out using a suitably configured optical reader of the type described with reference to FIGS. **1** to **8**.

Many other embodiments of the invention are within the scope of the following claims:

What is claimed is:

**1**. A wireless user-held network terminal for accessing, displaying, and entering data on a computer network, the terminal comprising:

a processor and associated memory;

a visual display;

a keypad;

a radio transmitter and receiver configured to establish wireless communication between the terminal and the computer network;

communications engine software for controlling communication between the wireless terminal and the computer network; and

parsing software for providing a user interface on the display by parsing script received from the network, whereby a multiplicity of different user interfaces may be provided without installing new software on the wireless terminal.

**2**. The terminal of claim **1** wherein the terminal is configured to be hand-held.

**3**. The terminal of claim **1** wherein the terminal comprises a personal digital assistant.

**4**. The terminal of claim **1** wherein the computer network is the Internet.

**5**. The terminal of claim **1** wherein the script comprises markup language.

**6**. The terminal of claim **5** wherein the script comprises HTML.

**7**. The terminal of claim **1** further comprising a bar code scanner and bar code acquisition engine software for scanning and decoding bar code labels.

**8**. The terminal of claim **7** wherein the terminal is configured to obtain a script from a bar code label, wherein the user interface on the display of the terminal is prescribed by a bar code label scanned using the terminal.

**9**. The terminal of claim **8** wherein the bar code label provides the network address of the script.

**10**. The terminal of claim **8** wherein the bar code label provides the script.

**11**. The terminal of claim **1** further comprising a browser which comprises the parsing engine software.

25

**12**. The method of claim **1** wherein the wireless communication is across cellular telephone channels.

**13**. A wireless user-held network terminal for accessing markup language files on the Internet, the terminal comprising:

a processor and associated memory;

a visual display;

a keypad;

a radio transmitter and receiver configured to establish wireless communication between the terminal and the computer network;

communications engine software for controlling communication between the wireless terminal and the Internet; and

browsing software for accessing and parsing the markup language files.

**14**. The terminal of claim **13** wherein the markup language is HTML.

**15**. The terminal of claim **7** wherein the bar code scanner is configured to read high density bar code labels.

**16**. A wireless user-held bar code scanning terminal for scanning bar code labels and accessing files on a computer network, the terminal comprising:

a processor and associated memory;

a visual display;

a keypad;

a radio transmitter and receiver configured to establish wireless communication between the terminal and the computer network;

communications engine software for controlling communication between the wireless terminal and the computer network;

parsing software for providing a user interface on the display by parsing script received from the network, whereby a multiplicity of different user interfaces may be provided without installing new software on the wireless terminal;

a bar code scanner; and

a bar code acquisition engine software for scanning and decoding bar code labels scanned by the bar code scanner.

**17**. The terminal of claim **16** wherein the terminal is configured to obtain a script from a bar code label, wherein the user interface on the display of the terminal is prescribed by a bar code label scanned using the terminal.

**18**. The terminal of claim **17** wherein the bar code label provides the network address of the script.

**19**. The terminal of claim **17** wherein the bar code label provides the script.

26

**20**. The terminal of claim **16** wherein the terminal is configured to be hand-held.

**21**. The terminal of claim **16** wherein the terminal comprises a personal digital assistant.

**22**. The terminal of claim **16** wherein the computer network is the Internet.

**23**. The terminal of claim **16** wherein the script comprises markup language.

**24**. The terminal of claim **23** wherein the script comprises HTML.

**25**. The terminal of claim **16** further comprising a browser which comprises the parsing engine software.

**26**. A method of remotely browsing, on a user-held wireless computer device, and electronic document stored as a file having a file address on a computer network, the method comprising the steps of:

using a bar code scanner incorporated into the device to scan a bar code label containing information identifying the file address:

decoding the file address from the result of the scan;

accessing the network file by sending the file address over a wireless communication path connecting the device to the computer network; and

displaying the accessed file on a visual display incorporated into the device.

**27**. The method of claim **26** further comprising entering information at the wireless computer device using a keypad incorporated into the device.

**28**. The method of claim **26** wherein the filed accessed from the computer network contains script, and the method further comprises running parsing software at the computer device to parse the script received from the computer network.

**29**. The method of claim **26** wherein the computer device is configured to be hand held.

**30**. The method of claim **26** wherein the computer device comprises a personal digital assistant.

**31**. The method of claim **26** wherein the computer network is the Internet.

**32**. The method of claim **26** wherein the wireless communication is across cellular telephone channels.

**33**. The method of claim **28** wherein the script comprises a markup language.

**34**. The method of claim **33** wherein the script comprises HTML.

**35**. The method of claim **28** further comprising running browser software on the computer device, wherein the browser software comprises the parsing software.

\*   \*   \*   \*   \*

≈JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Symbol Technologies, Inc.

## DEFENDANTS

Janam Technologies, LLC

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Richard L. Horwitz (#2246)/David E. Moore (#3983)
Potter Anderson & Corroon LLP
1313 N. Market Street, Wilmington, Delaware  19801    (302) 984-6000

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1   U.S. Government
          Plaintiff
- ☒ 3   Federal Question
          (U.S. Government Not a Party)
- ☐ 2   U.S. Government
          Defendant
- ☐ 4   Diversity
          (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                     and One Box for Defendant)

|                          | PTF | DEF |                                                    | PTF | DEF |
|--------------------------|-----|-----|----------------------------------------------------|-----|-----|
| Citizen of This State    | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | ☐ 650 Airline Regs. | ☒ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | Actions | | |
| | **PRISONER PETITIONS** | | | |
| | ☐ 510 Motions to Vacate | | | |
| | Sentence | | | |
| | **Habeas Corpus:** | | | |
| | ☐ 530 General | | | |
| | ☐ 535 Death Penalty | | | |
| | ☐ 540 Mandamus & Other | | | |
| | ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |

**PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C § 101 et seq.
Brief description of cause:
Patent infringement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE
6/09/08

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**    **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**    **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**    Example:    U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 8 – ? 4 _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

____6 / 9 / 6 8____
(Date forms issued)

____Anthony Campanella____
(Signature of Party or their Representative)

____Anthony  Campanella____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action