## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Symbol Technologies, Inc., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 08-340-JJF-LPS |
| | : | |
| Janam Technologies LLC, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION REGARDING MOTION
## FOR PRELIMINARY INJUNCTION AND CLAIM CONSTRUCTION

This action was filed by Plaintiff Symbol Technologies, Inc. ("Symbol") against

Defendant Janam Technologies LLC ("Janam") alleging infringement of U.S. Patent Nos.

5,334,821 ("the '821 Patent"), 5,835,366 ("the '366 Patent"), and 6,714,969 ("the '969 Patent").

A hearing on Symbol's Motion for Preliminary Injunction ("Motion") is scheduled before Judge

Farnan for December 18, 2008.  (*See* June 25, 2008 oral order, D.I. 31, 123)  The matter has been

referred to me for certain purposes, including to make a recommendation regarding claim

construction in relation to the Motion.  *See* July 18, 2008 Hearing Transcript (D.I. 122) at 14-16,

25-26, 32-33 (parties requesting preliminary claim construction in advance of preliminary

injunction hearing).  This Report and Recommendation provides my recommended construction

of the disputed claim terms.[1]

---

[1]The constructions recommended here are intended to be preliminary and tentative, not
final or conclusive. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed.
Cir. 2002) (approving "district court's discretionary decision to issue only a tentative claim
construction and to base its resolution of a preliminary injunction motion upon that tentative
claim construction," and observing "all findings of fact and conclusions of law at the preliminary
injunction stage are subject to change upon the ultimate trial on the merits") (internal quotation
marks omitted).

## I.    BACKGROUND

### A.    Procedure

Pursuant to the Preliminary Injunction Scheduling Order (D.I. 31), on September 29,

2008 the parties filed a Joint Claim Chart identifying the claim terms needing construction (D.I.

68). The parties have briefed their positions on claim construction and, on October 30, 2008, I

conducted a Markman hearing. *See* October 30, 2008 Hearing Transcript (D.I. 120 ) ("Tr.").

The parties have been able to agree that most of the terms of the claims at issue do not need

construction. Those terms still in dispute and requiring construction are discussed below.[2]

### B.    Disputed Claim Terms

In its Motion, Symbol asserts infringement by Janam of four claims of the three patents-

in-suit.

#### 1.    The '821 Patent - Claim 9 (depending from Claim 1)

The '821 Patent is entitled "Portable Point of Sale Terminal" and was issued on August 2,

1994. In Symbol's view, the '821 Patent generally discloses:

> a portable device that has a touch screen display and that can handle all the
> functions of a sales transaction by transmitting data related to the transaction on
> two radios that can make two distinct wireless connections. This gives the device
> all the necessary functionality to wirelessly handle a sales transaction by being

---

[2]Several of the formerly disputed claim terms, on which briefing was submitted, are no longer in dispute. Following the Markman hearing, the parties reached agreement with respect to construction of three claim terms in the '821 Patent. (D.I. 112) Specifically, the parties now agree: (i) "data" is to be construed as "information associated with a sales transaction;" (ii) "remote input-output device" is to be construed as "a remote device through which information associated with a sales transaction is input or output;" and (iii) "host computer" is to be construed as "a remotely located computer which provides information associated with a sales transaction to the portable point of sale terminal and processes information associated with a sales transaction from the portable point of sale terminal." I recommend that these now agreed-upon constructions be adopted for purposes of resolving the Motion.

> able to remotely connect both to a host computer and to a remote peripheral
> device, such as a printer or a barcode scanner and yet still be small enough to be
> portable.

(D.I. 78 at 2)

### 2. The '366 Patent - Claim 7

The invention disclosed in the '366 Patent, entitled "Secondary Battery Boost Circuit"

and issued on November 10, 1998, provides, generally:

> a method for providing a backup power sufficient to automatically save data in a
> handheld mobile computer if the main battery suddenly runs out. . . . Although
> backup systems were known before the invention of the '366 Patent, none could
> deliver the function with a small and light-weight low voltage secondary battery.
> Th[is] invention . . . [added] a circuit to boost the output of the secondary battery,
> thereby making the devices small and economical.

(*Id.* at 2)

### 3. The '969 Patent - Claims 22 and 25 (both depending from Claim 16)

The '969 Patent is entitled "Mobile Terminal With Integrated Host Application

Software." It issued on March 30, 2004, based on an application filed in 1996. In general, the

'969 Patent:

> discloses a bar code reading handheld mobile computer that can remotely connect
> to a network, and can generate multiple user interfaces, such as for inventory and
> sale applications, without the user having to add additional software, because the
> user interfaces are generated by the web browser. This frees up memory because
> the user does not need to install software to present the various user interfaces and
> so only a small amount of software actually needs to be provided on the mobile
> computer . . . mak[ing] the mobile computer extremely flexible as it can access all
> of a compan[y's] applications on the go.

(*Id.* at 3)

## II.    STANDARD OF REVIEW

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Construing the claims of a patent is a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

4

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

Occasionally, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It also bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would

5

otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Thus, if possible, claims should be construed to uphold validity. *See In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984).

6

## III.    CONSTRUCTION OF THE DISPUTED TERMS

### A.    The '821 Patent

Symbol asserts Claim 9 of the '821 Patent, which depends from Claim 1. Below is

the text of Claims 1 and 9, with the disputed terms in boldface type:

**Claim 1.**

**A portable point of sale terminal** comprising:[3]

a hand carryable housing having . . . a first **electromagnetic transceiver** located
within the housing for transmitting and receiving data over the air to and from a
host computer; and

a second **electromagnetic transceiver** located within the housing, for
transmitting and receiving data over the air to and from a remote input-output
device.

(D.I. 78 at Ex. A, Col. 5, 67-68 & Col. 6, 1-10)

**Claim 9.**

**A portable point of sale terminal** as defined in Claim 1, wherein the display is adapted to sense the
terminal.

*(Id.* at Col. 6, 57-59)

### 1.    "A portable point of sale terminal"

Symbol construes "a portable point of sale terminal" to mean "a portable computer

terminal that is capable of handling a sales transaction." (D.I. 68 at Ex. A; D.I. 112) Janam

instead construes the term to mean "a portable terminal for performing usual point of sale

functions, and including a printer for printing a paper receipt for delivery to the customer." (*Id.*)

Two issues are in dispute: first, whether to construe "portable point of sale terminal" as "a

---

[3]The parties are in agreement that this preamble to Claim 1 to the '821 Patent is a
limitation.

7

portable computer terminal that is capable of a sales transaction" or as "a portable terminal for
performing usual point of sale functions;" and, second, whether to include Janam's limitation
that the "portable point of sale terminal" must include a printer.  I recommend adopting Symbol's
proposed construction on both points.

With respect to the first issue, as Symbol points out, the parties' constructions are
essentially compatible.  *See* Tr. at 18-19.  To the extent they differ, Symbol's construction is
slightly preferable.  Three other formerly-disputed terms in Claim 1 – "data," "remote input-
output device," and "host computer" – now have agreed-upon constructions that include the
phrase "information associated with a sales transaction."  *See supra* n.2.  Symbol's "capable of
handling a sales transaction" is more easily harmonized with these agreed-upon formulations
than is Janam's "performing usual point of sale functions."  Also, while the term "usual point of
sale functions" does appear in the patent Summary (D.I. 78 at Ex. A, Col. 1, 41), it is not defined
there or elsewhere in the patent, so to adopt Janam's construction might require further
construction of "usual point of sale functions."

On the second issue, whether Claim 1 contains a limitation that the portable point of sale
terminal include a printer, I agree with Symbol that it does not.  The language of Claim 1 itself
nowhere mentions a "printer" or "printing."  (D.I. 78 at Ex. A, Col. 5, 66 to Col. 6, 10; Tr. at 21)
The same is true for the Abstract of the '821 Patent.  (D.I. 78 at Ex. A; Tr. at 22-23)

The Summary of the Invention is consistent.  At the start it states that "[this] invention is
embodied in a point of sale terminal that provides the usual point of sale functions . . . .  The
terminal includes a hand-carryable housing having a . . . keyboard and display . . . .  A power
source is located within the housing, and first and second electromagnetic transceivers also are

8

located within the housing. . . ." (D.I. 78 at Ex. A, Col. 1, 40-49) There is no mention of a printer until several paragraphs later when the Summary begins to identify other "features" of the invention, which I read to mean features that correlate with limitations contained in claims other than Claim 1. (*See* D.I. 78 at Ex. A, Col. 1, 67 to Col. 2, 10; *see also infra*.)

Also Claim 7, which depends from Claim 1, specifically recites "a portable point of sale terminal *as defined in claim 1*, *and further including: a printer located within the housing* for printing information on a strip of paper and discharging the paper from the housing; and a screen mounted on the front face of the housing, for sensing the manual writing of information thereon . . . ." (D.I. 78 at Ex. A, Col. 6, 45-52 (emphasis added); *see also* D.I. 78 at 5-6; Tr. at 21-37) (emphasis added) While Janam's proposed construction does not violate the doctrine of claim differentiation – reading a printer limitation into Claim 1 would not render it indistinct from Claim 7, since Claim 1 would still not require a screen mounted for sensing manual writing – the absence of the word "printer" in Claim 1 and its presence in Claim 7 supports Symbol's construction of Claim 1.[4]

None of Janam's arguments in favor of its construction are persuasive. Janam focuses on the preferred embodiment's inclusion of a printer, as illustrated in the patent's figures. (D.I. 87 at 2-5) But a patent is not limited to its preferred embodiment, *see Liebel-Flarsheim*, 358 F.3d at 906, so a limitation contained in the preferred embodiment does not thereby become a limitation contained in every claim of the patent.

_____

[4]The prosecution file history is consistent with this interpretation. When Symbol differentiated Claim 1 over the prior art, it made no mention of a printer as part of the terminal. When Symbol differentiated Claim 7 over the prior art, however, it characterized Claim 7 as having an integral printer. (Tr. at 32-35; D.I. 86 at Ex. B)

9

Janam also emphasizes language in the Background of the Invention, which states: "In its most basic form, the [point of sale] terminal includes . . . a printer for printing a paper tape receipt for delivery to the customer." (D.I. 78 at Ex. A, Col. 1, 10-13) However, in context, it is clear that this reference to the "most basic form" of "terminal" relates to the prior art. That is, this portion of the Background "describes non-portable point of sale terminals that existed *before* the invention." (D.I. 86 at 2) This is plain when one views in its full context the language Janam highlights:

> Point of sale terminals are commonly used [i.e., currently] in retail stores to record information relating to sales transactions. In its most basic form, the [currently-available] terminal includes a keyboard for the manual entry of data and a printer for printing a paper tape receipt for delivery to the customer. Many point of sale terminals are now [i.e., currently] associated with bar code scanners . . . .
>
> . . . .
>
> Although the point of sale terminals described generally above [i.e., currently-available terminals] have proven to be extremely effective in facilitating sales transactions, they have not proven to be entirely satisfactory in all applications. . . . [T]he terminals are essentially immobile . . . . The present invention fulfills this need.

(D.I. 78 at Ex. A, Col. 1, 7-37)

Finally, Janam points to a phrase in the Summary of the Invention, providing: "In another feature of the invention, a printer is located within the housing, for printing information on a strip of paper and discharging the printed paper from the housing . . . ." (D.I. 78 at Ex. A, Col. 1, 66-67, Col. 2, 1-2) But again, a review of the full context of the language on which Janam relies weighs against its argument. The cited portion of the specification does not relate to Claim 1 but rather to Claims 7 and 8, both of which require a printer, and the latter of which also requires a "signature-capture screen" to permit a customer to sign on the receipt being printed on the

10

portable terminal. (D.I. 78 at Ex. A, Col. 1, 67 to Col. 2, 10)  Moreover, the Summary of the Invention uses the same language to introduce still other features – for example, it states "[i]n another feature of the invention, the point of sale terminal includes a plurality of keyboards" (D.I. 78 at Ex. A, Col. 1, 60-61) – that Janam does not argue are part of the disputed claim, undermining the logic of Janam's contention.

Accordingly, I recommend that the court adopt Symbol's proposed construction of the term "portable point of sale terminal."

### 2.  "electromagnetic transceiver"

Symbol construes the term "electromagnetic transceiver" to mean "radio receiver and transmitter." (D.I. 68 at Ex. A)  Janam, by contrast, construes "electromagnetic transceiver" to mean an "electromagnetic transceiver." (*Id.*)  The issue is whether the term should be construed in a manner limited to use of radio waves, as Symbol contends, or more broadly to encompass other types of electromagnetic radiation (e.g., infrared light, x-rays, microwaves), as Janam argues.  I recommend adopting Janam's proposed construction.[5]

Symbol argues that "[t]he specification is clear that electromagnetic transceivers are radios. It describes 'radio data links' . . . and states that data can be transferred to and from the host computer and an associated barcode scanner via an 'antenna and radio link.'" (D.I. 86 at 5 (emphasis added); *see also* Tr. at 65-68, 71-73; D.I. 78 at Ex. A, Col. 1, 68 & Col. 5, 50-54.)  Janam observes that it is undisputed that the electromagnetic spectrum includes more than just radio waves; it further insists that the term "electromagnetic transceiver" would make no sense if

---

[5] I recommend adoption of Janam's construction with respect to a *first* "electromagnetic transceiver" as well as a *second* "electromagnetic transceiver."

"transceiver" was limited to radio transmitters and receivers. (Tr. at 75-78)

I agree with Janam. While portions of the specification do refer to radio waves (*see, e.g.*, D.I. 78 at Ex. A, Col. 2, 68 & Col. 5, 50-54), Claim 1 itself does not mention radio waves. Instead, it uses the broader term "electromagnetic" to describe the transceiver. To construe "electromagnetic" as narrowly limited to radio waves would impermissibly give the patentee something different than what is set forth in the patented claim. *See Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n,* 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.") (internal quotation marks omitted). Symbol offers no plausible explanation as to why the inventor would use the descriptive term "electromagnetic" to modify "transceiver" if the patentee meant the claim only to include a radio transceiver. (Tr. at 67-68) (Counsel: "Sometimes patent attorneys use terms that, you know, that they think are more appropriate than others. You know, slightly more generic.")) As Janam, rightly, asks: "[i]f transceivers are limited to radio waves, then what does the term electromagnetic refer to?" (Tr. at 69)

The extrinsic evidence submitted by the parties does not change the outcome. Although neither party provided a dictionary definition of "electromagnetic transceiver," the parties offered various definitions of the separate terms "electromagnetic" and "transceiver." (*See, e.g.*, D.I. 79 at 12 & Ex. D; D.I. 86 at Ex. C; D.I. 118) In the context of the full record before me, including, most importantly, the intrinsic evidence, none of these definitions alter my conclusion.

12

## B.   The '366 Patent

Symbol is asserting Claim 7 of the '366 Patent, the text of which, including the only

disputed term in boldface type, is set forth below:

### Claim 7.

A method for facilitating power shutdown protocol of a
computing device.  Comprising steps of:

using a first cell as a primary portable power supply . . .

using a secondary cell as a backup portable power
supply . . . and

using a boost circuit to increase the **power** of the secondary
cell applied to the computing device;

wherein the secondary cell supplies power to the computing
device upon a voltage of the first cell dropping below a
predetermined value.

(D.I. 78 at Ex. B, Col. 11, 42-53)

### 1.   "power"

Symbol construes the term "power" to mean "voltage."  (D.I. 68 at Ex. A)  Janam, on the

other hand, construes "power" to mean "the rate at which energy is transferred, calculated by

multiplying electric current times voltage."  (*Id.*)  I recommend adopting Symbol's proposed

construction.

Much in the specification supports Symbol's construction.  For instance, the specification

describes the function and operation of the secondary battery in a manner making clear that the

relevant output of the secondary battery is measured in voltage.  *See, e.g.*, D.I. 78 at Ex. B, Col.

13

9, 6-15 ("The present invention employs the boost circuit 180 to boost the <u>voltage</u> of the
secondary battery 70 for a period of time sufficient to complete the APM protocol so that the loss
of data is minimized.  In other words, the present invention uses the secondary battery 70 as a
backup to the primary battery 68 so that operations (e.g., APM protocol) of the mobile terminal
10 can be sustained for a period of time sufficient for saving valuable data that might otherwise
be lost in the event of rapid degradation of the power supply from the primary battery 68.")
(emphasis added); *see also id.* at Col. 10, 55-57 ("The employment of a boost circuit to boost the
<u>voltage</u> of a secondary battery affords for employing a lighter weight and smaller secondary
battery.") (emphasis added).

   Furthermore, there are places in the specification where "power" and "voltage" are
plainly used interchangeably.  This is true in the description of the output of the secondary
battery (D.I. 78 at Ex. B, Col. 7, 43-52 ("[A]ny suitable boost circuit or means for boosting the
<u>power output</u> of the secondary battery 70 may be employed to carry out the present invention. . . .
[For example,] . . . disconnecting the [conductive] coil from ground produces an electro-
magnetic field current (EMF) at a desired <u>voltage level</u> which is greater than the nominal <u>voltage
output</u> by the secondary battery 70 itself.") (emphasis added)), as well as the description of the
degradation of the primary battery (D.I. 78 at Ex. B, Col. 9, 36-41 ("As was mentioned above,
the main battery 68 <u>outputs a higher voltage</u> level of approximately 7.2 volts, and will typically
be the primary supplier of power to the 5v and 3v power supply circuits 190, 192.  However,
upon the <u>power output level</u> of the main battery 68 dropping below a predetermined level . . .")
(emphasis added)).

   In response, Janam emphasizes that "power" has a well-established, "classical" textbook

14

meaning. (Tr. at 105) It is not disputed that "power" does have such a meaning. Even Symbol's expert admitted that portions of the specification of the '366 Patent use "power" in its classic sense of "voltage times current." (D.I. 79 at Ex. C at 25) Yet Janam concedes that Symbol's expert (unsurprisingly) has not supported Janam's contention that "power" as used in the disputed claim should be construed as anything other than Symbol's proposed "voltage." (Tr. at 110) Because a patentee is free to be his own lexicographer, he may choose even to redefine a term with a well-settled scientific meaning. Here, this is just what has happened.

Additionally, it appears that the embodiment of the invention that is described in the patent would not work if Janam's proposed construction were adopted. The patent gives an example of a primary battery supplying 7.2 volts to power the terminal, with a secondary battery that supplies only 3.6 volts. (D.I. 78 at Ex. B, Col. 5, 24-28, 38-42) When necessary to activate the shutdown protocol, the voltage from the secondary battery is increased by a boost circuit. (*Id.* at Col. 7, 46-57) At least five volts are necessary to run the shutdown protocol; since the secondary battery only supplies 3.6 volts, the boost circuit must increase the secondary battery's *voltage* in order for it to work. But if "power" is construed to mean "voltage times current," then the claim language – "using a boost circuit to increase the power of the secondary cell" – would permit just current to be increased, while holding voltage constant. Doing so would satisfy the claim language but cause the invention not to work. In this way, Janam's construction does not align with the description of the invention.

## C.    The '969 Patent

Symbol is asserting Claims 22 and 25 of the '969 Patent, both of which depend from Claim 16, the text of which, including the disputed phrase in boldface type, appears below:

15

**Claim 16.**

A wireless user-held bar code scanning terminal for scanning bar code labels and accessing files on a computer network the terminal comprising:

a processor and associated memory;

a visual display;

a keypad;

a radio transmitter . . .

communications engine software . . .

parsing software for providing a user interface on the display by parsing script received from the network, whereby a multiplicity of different user interfaces may be provided **without installing new software on the wireless terminal**;

a bar code scanner; and

a bar code acquisition software.

(D.I. 78 at Ex. C, Col. 25, 22-43)

**Claim 22.**

The terminal of claim 16 wherein the computer network is the Internet.

(*Id.* at Col. 26, 5-6)

**Claim 25.**

The terminal of claim 16 further comprising a browser which comprises the parsing engine software.

(*Id.* at Col. 26, 11-12)

### 1. "without installing new software on the wireless terminal"

Symbol construes the phrase "without installing new software on the wireless terminal" to mean "without installing an application program, other than the parsing software, to provide user interfaces." (D.I. 68 at Ex. A) Janam proposes that the phrase be construed simply as "without installing new software on the wireless terminal." (*Id.*) I recommend adopting Symbol's proposed construction.

Claim 16 discloses, in relevant part, a "terminal comprising . . . parsing software for providing a user interface on the display by parsing script received from the network, whereby a multiplicity of different user interfaces may be provided without installing new software on the wireless terminal." (D.I. 78 at Ex. C, Col. 24, 29-44) As Symbol explains, this claim language clearly indicates that the parsing software itself must be installed on the device, in order to receive and parse script from the network to provide user interfaces; "[i]t is axiomatic that the parsing cannot be done without the parsing software present on the terminal (and so if this software is not present, the claim permits the user to install the parsing software)." (D.I. 78 at 13) Reading the claim as a whole, it is clear that the terminal must have the parsing software installed, so that it can parse script from the network, and eliminate the need for the installation of other software.[6]

To adopt Janam's position – that the phrase "without installing new software on the wireless terminal" does not require construction – would allow Janam to argue that if a user

---

[6]Another way to state the same concept is that because the claimed "terminal" includes parsing software, if one's terminal does not already have parsing software on it (or if the user does not install parsing software on it) then one does not have the "terminal" that is being claimed.

17

installs parsing software then the device the user is using is outside the patent's claims. But such a reading of the patent does not align with the purpose of the invention as disclosed in the specification: without parsing software, users would have to load every application program they used onto their terminals, which defeats the point of the invention. (*See, e.g.*, D.I. 78 at Ex. C, Col 18, 9-11 ("No longer are users limited by secondary storage on their MUs [mobile units] for storing application programs."); *id.* at 26-29 ("Each user no longer needs a copy of the specialized application program that was previously required to read the data label.")) A person of ordinary skill in the art would understand that the terminal must have the parsing software installed, so that it can parse script from the network, and eliminate the need for the installation of other software.

> Extrinsic evidence also supports Symbol's construction. Symbol's expert declares:

> The invention described in the '969 Patent . . . is directed to a wireless user-held network terminal that, among other features, has software for wirelessly receiving scripts from a network (such as HTML web pages from the Internet) and then parsing these scripts in order to present a user with various different user interfaces without the user having to install new software on the terminal. . . . By using parsing software, such as claimed in the '969 Patent, the Internet web browser generates a user interface for remote software applications without the need for such software to be installed on the handheld computer. In this way, the time and expense of continually updating software stored on handheld mobile computers can be avoided. . . . I am unaware [of] any hand-held terminals which predate August 2, 1996 and which provided wireless Internet browsing. More generally, I am unaware of any wireless hand-held terminal that existed prior to August 2, 1996 and which included parsing software that parsed scripts received over a wireless network to present different user interfaces as recited in the '969 Patent claims.

(D.I. 9 at ¶¶ 34, 38, 47)

## IV.    RECOMMENDED DISPOSITION

Based on the foregoing, I recommend that the Court preliminarily construe the disputed terms of the '821 Patent, the '366 Patent, and the '969 Patent as discussed herein and enter an Order consistent with this Report and Recommendation setting forth the meaning of the disputed terms as set forth below:

1.    The term "a portable point of sale terminal" as used in Claim 9 of the '821 Patent means "a portable computer terminal that is capable of handling a sales transaction."

2.    The term "electromagnetic transceiver" as used in Claim 9 of the '821 Patent means "electromagnetic transceiver."

3.    The term "power" as used in Claim 7 of the '366 Patent means "voltage."

4.    The term "without installing new software on the wireless terminal" as used in Claims 22 and 25 of the '969 Patent means "without installing an application program, other than the parsing software, to provide user interfaces."

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 Fed. Appx. 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order In Non-*Pro Se* Matters For

Objections Filed Under Fed. R. Civ. P. 72, dated April 7, 2008, a copy of which is available on

the Court's website, www.ded.uscourts.gov/StandingOrdersMain.htm.

Dated: December 1, 2008

Honorable Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE