IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYMBOL TECHNOLOGIES, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 08-340-JJF |
| | : | |
| JANAM TECHNOLOGIES LLC, | : | |
| | : | |
| Defendant. | : | |

Arlene L. Chow, Esquire and Eric J. Lobenfeld, Esquire of HOGAN & HARTSON, New York, New York.
Richard L. Horwitz, Esquire and David Ellis Moore, Esquire of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.

Attorneys for Plaintiff.

Richard L. DeLucia, Esquire and John R. Kenny, Esquire of KENYON & KENYON, LLP, New York, New York.
Steven J. Balick, Esquire; John G. Day, Esquire and Lauren E. Maguire, Esquire of ASHBY & GEDDES, Wilmington, Delaware.

Attorneys for Defendant.

**MEMORANDUM OPINION**

July **20**, 2010
Wilmington, Delaware

Farnan, District Judge.

Presently before the Court is a Motion For Preliminary
Injunction (D.I. 6) filed by Plaintiff Symbol Technologies, Inc.,
and a Motion To Preclude Evidence of Symbol's Profits (D.I. 149)
filed by Defendant Janam Technologies LLC.  For the reasons to be
discussed, both Motions will be denied.

## BACKGROUND

On June 9, 2008, Plaintiff Symbol Technologies, Inc.
("Symbol") filed this patent infringement action, alleging
infringement of U.S. Patent Nos. 5,334,821 (the "'821 patent"),
5,835,366 (the "'366 patent"), and 6,714,969 (the "'969 patent") by
Defendant Janam Technologies LLC ("Janam").  (D.I. 1.)  Symbol
designs and sells handheld mobile computers to commercial users.
(Id. ¶ 4.)

In brief, Symbol alleges that in 2006 it phased out the Palm
operating system ("Palm OS") in favor of exclusively using the
Windows operating system ("Windows OS") in its handheld mobile
computers.  (Id. ¶¶ 6-7.)  Symbol alleges that in or around the
same period, two long-time Symbol executives formed Janam in order
to supply Palm OS-based handheld mobile computers.  (Id. ¶ 10.)  In
2008, Janam introduced the XM-60, the accused device in this
action, which is a Windows-OS based handheld computing device.
(Id. ¶ 12.)  Symbol alleges not only that the XM-60 infringes the
patents-in-suit, but that Janam's founders capitalized on their
knowledge of Symbol's research, development, and marketing in order

to undercut Symbol's pricing and offer the XM-60 at substantially discounted prices.  (Id. ¶¶ 13-15.)  The XM-60 competes with Symbol's current Windows-OS based handheld mobile computers, including Symbol's MC50, MC70, MC3000, MC 9000, and PPT8800 product lines.  (D.I. 8.)

On June 18, 2008, Symbol filed a Motion For Preliminary Injunction (D.I. 6), and the Court heard arguments on December 18, 2008.  Also on December 18, 2008, Janam filed a Motion To Preclude Evidence Of Symbol's Profits (D.I. 149).  The tentative claim constructions applied by the Court for the purposes of resolving the present Motion For Preliminary Injunction are set forth in the Court's Order of March 31, 2009.[1]  (D.I. 208.)

## MOTION TO PRECLUDE EVIDENCE OF SYMBOL'S PROFITS (D.I. 149)

### I.    Legal Standard

In pertinent part, Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to support evidence on a motion, at a

---

[1] In deciding a motion for preliminary injunction in a patent infringement case, a court may issue tentative claim constructions and may base its resolution of the preliminary injunction upon those tentative constructions.  See Jack Guttman, Inc. v. Kopykake Enters., Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002).  "[A]ll findings of fact and conclusions of law at the preliminary injunction stage are subject to change upon the ultimate trial on the merits."  Id. (quotations omitted).

hearing, or at a trial, unless the failure was substantially
justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The Third Circuit and this Court have focused on a series of
factors in evaluating harmlessness and substantial justification:

> (1) the importance of the information withheld; (2) the
> prejudice or surprise to the party against whom the evidence
> is offered; (3) the likelihood of disruption of the trial; (4)
> the possibility of curing the prejudice; (5) the explanation
> for the failure to disclose; and (6) the presence of bad faith
> or willfulness in not disclosing the evidence [].

Boehringer Ingelheim Int'l GmbH v. Barr Labs. Inc., Civ. No. 05-
700-JJF, 2008 U.S. Dist. LEXIS 53475, at *4-5 (D. Del. July 15,
2008)(citing Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719
(3d Cir. 1997)). Lastly, "the exclusion of critical evidence is
an 'extreme' sanction, not normally to be imposed absent a showing
of willful deception or 'flagrant disregard' of a court order by
the proponent of the evidence." Konstantopoulos, 112 F.3d at 719
(quoting Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d
894, 905 (3d Cir. 1977)). The determination of whether to exclude
evidence is committed to the discretion of the Court. In re Paoli
R.R. Yard PCB Litig., 35 F.3d 717, 749 (3d Cir. 1994).

## II. Parties' Contentions

By its Motion, Janam seeks to prevent Symbol from relying on
any evidence of Symbol's profits or alleged lost profits in support
of its Motion For Preliminary Injunction. (D.I. 149, at 1.)
Further, Janam asks the Court to strike paragraphs 74 and 75 of the

4

Declaration of Allyn Strickland (D.I. 130-132), and the related argument at page 18 of Symbol's Reply Brief (D.I. 124) in support of its Motion For Preliminary Injunction. Janam contends that it sought discovery on Symbol's profits on its handheld mobile computers, but that Symbol objected that such information was irrelevant to the Motion For Preliminary Injunction. (D.I. 149, at 2.) Specifically, Janam contends that, in a teleconference with Magistrate Judge Stark, Symbol represented that lost profits only related to the collection of damages and not to a preliminary injunction. (Id. at 2-3.) According to Janam, Symbol now relies on its profits and alleged lost profits to argue that it will be irreparably harmed if a preliminary injunction is not entered. (Id. at 3-4.) Janam contends that Symbol should be precluded from relying on such information now since it previously represented to the Court that lost profits were irrelevant to the Motion For Preliminary Injunction. (Id. at 4.)

In response, Symbol contends that Janam mischaracterizes the position Symbol took before Magistrate Judge Stark, and that Symbol did produce profit-related information to Janam. (D.I. 170, at 1-2.) Further, Symbol contends that it used lost profits figures solely in an exemplary manner (i.e., to demonstrate Janam's inability to pay damages). (Id. at 2-3.) Finally, Symbol contends that Janam could have followed up on Symbol's profit-related productions by deposing Dr. Strickland and Brian Viscount about the

profit-related points in their declarations, but that Janam failed
to do so.   (Id. at 4.)

## III. Discussion

The Court concludes that an order precluding Symbol from
relying on evidence of its profits or alleged lost profits in
support of its Motion For Preliminary Injunction, and striking
portions of the Strickland Declaration and Symbol's Reply Brief, is
not warranted.

A short summary of the parties' disputes over the production
of Symbol's profit information is helpful in framing the Court's
consideration of the present Motion.  On September 10, 2008,
Magistrate Judge Stark conducted a teleconference to deal with
several discovery disputes, among them, Janam's request that Symbol
produce a "[d]ocument sufficient to show Symbol's monthly,
quarterly and yearly gross and net profit margins in United States
dollars, for each of its handheld mobile computers from January 1,
2000 to the present."  (D.I. 149, Ex. A.)  In relevant part, the
teleconference went as follows:

> MS. CHOW [Symbol's counsel]:  Your Honor, we're not – – we
> have made no claim of lost profits in this situation.  Lost
> profits relates to the collection of damages.  And so we
> believe that process is irrelevant to the PI phase of the
> litigation . . .
>
>     *    *    *
>
> THE COURT:  With respect to Interrogatories 55 and 57, Ms.
> Chow, I'm going to order Symbol to provide the sales data
> going back to the first sales of those products . . .  I'm not
> asking you to create new things . . .

6

MS. CHOW: So, okay.  So we'll run the reports from 2000.
We'll run the reports for sales off of the database, Your
Honor.

    \*   \*   \*

THE COURT: But this doesn't – – right.  This goes to price
erosion and it doesn't – – I understand the argument that
profits are not what's at issue in the preliminary injunction
phase.  So I'm just looking for more sales data of the type
that you've already created.

    \*   \*   \*
MR. KENNEY [Janam's counsel]: Okay.  Your Honor, but I mean,
the argument that the profits are irrelevant to irreparable
harm, we lost on that point?

THE COURT: Yes.  You lost on that point.  Exactly.

(Id., Ex. C; D.I. 170, Ex. A.)  On October 14, 2008, Symbol

produced PPX 363 (Symbol's 2008 Business Plan for NALA (North

America/ Latin America))(D.I. 132, Strickland Decl., Vol. III, Ex.

50).[2]  On October 16, 2008, in response to emergency letters filed

by the parties, Magistrate Judge Stark permitted Janam to resume

deposing Brian Viscount, and ordered that the resumed deposition

take place before October 21, 2008 and "shall be [] limited to

issues directly relating to Symbol's recent production of a

spreadsheet (2008 Business Plan), [] and the impact of this

spreadsheet on Mr. Viscount's testimony and/or opinions."  (D.I. 82

(quotations omitted).)  Janam filed its Answering Brief (D.I. 91)

in opposition in Symbol's Motion For Preliminary Injunction on

---

[2] It is unclear from the parties' submissions when Symbol
produced PPX 357 (Symbol MCD Shipments, Revenue and ASP for Q1
2007 – Q2 2008).

October 27, 2008.

Turning to the actual arguments advanced in Symbol's briefing on the Motion For Preliminary Injunction, the Court concludes that Symbol's primary argument in support of irreparable harm is a theory of price erosion, not lost profits.[3] In its Opening Brief, Symbol argued that if the preliminary injunction is not entered, it will suffer "irreparable harm due to price erosion, lost market share, lost revenues, and lost profits." (D.I. 8, at 24.) Symbol's discussion of lost revenues and lost profits is limited to estimates of how Symbol would be impacted if it is forced to drop its prices to compete with Janam. (Id. at 25-27.) Essentially, Symbol contends that "price erosion, once granted to customers and distributors, cannot be recaptured and, based on conservative estimates, easily amounts to millions of dollars in lost Symbol revenue and profits." (Id. at 24.) Contrary to Janam's contention that Symbol waited until after Janam filed its Answer to the Motion For Preliminary Injunction to announce a new theory based on profits (i.e., Janam's alleged inability to pay Symbol's lost profits), this argument was raised in Symbol's Opening Brief: "since Janam is a small start-up company, Symbol may not be able to recover damages from it for patent infringement." (Id.) Page 18 of Symbol's Reply Brief- which Janam seeks to have stricken-

---

[3] The Court will consider Symbol's irreparable harm contentions within the Motion For Preliminary Injunction with this understanding.

elaborates on this contention, stating that "Janam's financial documents make crystal clear that it is highly unlikely to possess sufficient financial resources to pay damages to Symbol due to price erosion." (D.I. 124, at 18.)

Further, to the extent Symbol does reference lost profits as a basis for finding irreparable harm, Symbol's failure to produce certain information concerning profits during discovery is harmless. Janam was provided with Symbol's sales information, which was the most critical information for rebutting Symbol's primary irreparable harm contention- price erosion. Moreover, Janam will suffer little prejudice as a result of the Court's previous discovery ruling regarding profit information, and its ruling on this Motion. As previously discussed, the Court does not understand Symbol's irreparable harm contentions as being based on evidence of profits. The documents Symbol produced complied with Judge Stark's ruling on the matter, and Judge Stark cured any prejudice Janam might have suffered from Symbol's untimely production by permitting Janam to resume deposing Mr. Viscount prior to answering the Motion For Preliminary Injunction. With regard to the Strickland Declaration, paragraphs 74 and 75 rely on Symbol's 2008 Business Plan for NALA, which was produced to Janam before Janam filed its Answer. In addition, the Court finds no evidence that Symbol willfully withheld, or in bad faith sought to withhold, discovery on its profits. Rather, it has consistently

argued price erosion as the basis for a finding of irreparable
harm, both in its briefing and in the teleconference hearing before
Judge Stark.

Accordingly, the Court concludes there is no basis for
precluding evidence of Symbol's profits under Rule 37(c)(1), and
Janam's Motion will be denied.


**MOTION FOR PRELIMINARY INJUNCTION (D.I. 6)**

## I.   Legal Standard

The Patent Act provides that injunctions "may" issue "in
accordance with the principles of equity." 35 U.S.C. § 283.  "The
decision to grant or deny . . . injunctive relief is an act of
equitable discretion by the district court." eBay Inc. v.
MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  The grant of a
preliminary injunction is considered "extraordinary relief."
Helifix Ltd. V. Blok-Lok, Ltd., 208 F.3d 1339, 1350 (Fed. Cir.
2000).

A party seeking a preliminary injunction pursuant to 35 U.S.C.
§ 283 must establish: "(1) a reasonable likelihood of success on
the merits; (2) irreparable harm if an injunction is not granted;
(3) a balance of hardships tipping in its favor; and (4) the
injunction's favorable impact on the public interest." Amazon.com,
Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir.
2001).  "These factors, taken individually, are not dispositive;

10

rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988).  Thus, the district court may grant a preliminary injunction where "the weakness of the showing regarding one factor [is] overborne by the strength of the others." Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 953 (Fed. Cir. 1990).  However, "a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm." Amazon.com, 239 F.3d at 1350.

## II.  Discussion

By its Motion, Symbol seeks a preliminary injunction enjoining Janam from "importing, making, using, offering for sale, or selling in the United States . . . Windows OS-based handheld integrated terminals that are covered by the patents-in-suit, including, but not limited to, Janam's XM-60 handheld terminal and/or products that, when used in accordance with their instructions, practice the methods covered by the patents-in-suit."  (D.I. 7.)[4]

---

[4] By letter dated March 6, 2009, Symbol informed the Court that Janam launched a new mobile computing device called the XG100, which also "appears to have all of the essential features which infringe Symbol's patents."  (D.I. 202, at 1.)  Symbol contends the XG100 undercuts the price of some of Symbol's most successful products, causing irreparable harm, and asks the Court to consider this new development in deciding the Motion For Preliminary Injunction.  (Id. at 1-2.)  Janam responds that the XG100 does not infringe the asserted patents, and that Symbol's

## A. Likelihood Of Success On The Merits

With regard to the requirement of likelihood of success on the merits, the moving party must show, consistent with the burdens of proof required at trial, that (1) its patent was infringed, and (2) any challenges to the validity and enforceability of its patent "lack substantial merit." Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1363 (Fed. Cir. 2001). If the alleged infringer raises a substantial question concerning validity, enforceability or infringement that the patentee is unable to prove "lacks substantial merit," then the preliminary injunction will not issue. Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997). "As to the burden regarding invalidity allegations, validity challenges during preliminary injunction proceedings can be successful, that is, they may raise substantial questions of invalidity, on evidence that would not suffice to support a judgment of invalidity at trial." Abbott Labs. v. Andrx Pharm., Inc., 452 F.3d 1331, 1335 (Fed. Cir. 2006)(citing Genentech, 108 F.3d at 1358) (quotations omitted). "Thus, the patent challenger retains the burden of establishing invalidity, and the applicant for preliminary injunctive relief retains the burden of showing a reasonable likelihood that the

---

price erosion contentions with regard to the XG100 are unsupported. (D.I. 203, at 1-2.) Because the Court lacks sufficient information about the XG100, and the Motion For Preliminary Inunction is otherwise fully briefed and argued, the Court will not consider the XG100 in deciding the Motion.

attack on the validity of the patent would fail." Impax Labs.,

Inc. v. Aventis Pharms., Inc., 235 F. Supp. 2d 390, 392 (D. Del.

2002) (citing Robert L. Harmon, Patents and the Federal Circuit §

13.2(b) (5th ed.2001)).

### 1. The '821 Patent

The '821 patent is directed to a portable point of sale

terminal with at least two communication links. '821 patent, col.

1: 47-59. Asserted claim 9 depends on independent claim 1. These

claims recite, in relevant part:

1. A portable point of sale terminal comprising . . .
a first electromagnetic transceiver located within the
housing for transmitting and receiving data over the air to
and from a host computer; and
a second electromagnetic transceiver located within
the housing, for transmitting and receiving data over the
air to and from a remote input-output device.

9. A portable point of sale terminal as defined in claim
1, wherein the display is adapted to sense the manual
selection of information by an operator of the terminal.

Id. at col. 5:67 - col. 6:59. For purposes of this Motion, the

Court has tentatively construed the terms "a portable point of

sale terminal," "electromagnetic transceiver," "data," "remote

input-output device," and "host computer." (D.I. 208.)

### a. *Infringement*

There are two steps to a court's analysis of literal

infringement for the purpose of a preliminary injunction: first,

the court must determine the scope of the patent claim; second,

the court must decide whether the claim, as interpreted,

encompasses the defendant's device. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1581-82 (Fed. Cir. 1996); Hybritech, 849 F.2d at 1455. "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly." Cole v. Kimberly-Clark Corp., 102 F.3d 524, 532 (Fed. Cir. 1996).

Symbol alleges that Janam's XM-60 device literally infringes at least claim 1 of the '821 patent because: (1) the XM-60 is a portable point of sale terminal with a hand-carryable housing that includes a keyboard and display mounted on the front face of the housing; (2) the XM-60 has a power source located within the housing; and (3) the XM-60 has two separate transceivers within the housing. (D.I. 8, at 15-17.) Janam contends that the XM-60 is not a "portable point of sale terminal" because it does not have a printer, cannot provide a paper receipt, and is not capable of performing or handling sales transactions. (D.I. 91, at 25.) Janam further contends that the XM-60 does not include a "first electromagnetic transceiver located within the housing for transmitting and receiving data over the air to and from a host computer" because the XM-60's electromagnetic transceivers do not transmit signals or data, and the XM-60 communicates with communications computers and access points, rather than with host computers. (Id. at 27-28.) In addition, Janam contends that the

14

XM-60 does not have a "second electromagnetic transceiver, located within the housing, for transmitting and receiving data over the air to and from a remote input-output device," as required by the '821 patent.  (Id. at 28.)

The Court has tentatively construed the term "portable sale computer" to mean "a portable computer terminal that is capable of handling a sales transaction." (D.I. 208.)  Janam's expert, Dr. Ian Cullimore, opined that the XM-60 is not capable of handling a sales transaction (D.I. 95, Cullimore Decl., Vol. I ¶ 172), while Symbol's expert, Dr. David Allais, opined that the XM-60 does have such capability and is used as a portable point on sale terminal (D.I. 127, Allais Decl. ¶¶ 21-22).  However, the bulk of Dr. Cullimore's analysis of the "portable point of sale terminal" element is based on a construction of the term which was not adopted by the Court.  (See Cullimore Decl. ¶¶ 171-175.)  Symbol also references Janam marketing and training documents to support its position that the XM-60 is capable of handling a sales transaction.  (Allais Decl., Exs. H- J, L-M.)  For example, brochures from Janam's 2008 NRF exhibition promote the XM-60 along with MOBILeTY point of sale software.  (Id., Ex. J.)  Accordingly, it is reasonably likely that Symbol can prove that the XM-60 is a "portable sale computer."

The Court has tentatively construed the term "data" to mean "information associated with a sales transaction," and "host

computer" to mean "a remotely located computer which provides information associated with a sales transaction to the portable point of sale terminal and possesses information associated with a sales transaction from the portable point of sale terminal." (D.I. 208.) Dr. Cullimore recognized that the XM-60 contains two electromagnetic transceivers- a WiFi transceiver and a Bluetooth transceiver. (Cullimore Decl. ¶ 177.) Although Janam notes that the vast majority of XM-60's are sold without an accessory for scanning a credit card (D.I. 91, at 28), Dr. Allais stated that the XM-60 can transmit, for example, sales confirmations to and from a host computer (Allais Decl. ¶ 35). Further, Dr. Cullimore admitted that a portion of transmissions between the XM-60 and host computer are done "over the air" (D.I. 125, Ex. 1, Cullimore Dep. Tr. 190:17-191:12), but maintains that the claim limitation is not met because the "over the air" transmissions are to a wireless access point, rather than to a host computer (Cullimore Decl. ¶ 177). As Symbol contends, it is not clear the claim requires that a transmission be entirely over the air, thus excluding the use of a wireless access point to provide over the air access to a host computer. (D.I. 124, at 11-12.) Accordingly, it is reasonably likely that Symbol can prove that both the first and second electromagnetic transceivers required by the '821 patent are present in the XM-60.

In light of the tentative term constructions and foregoing

evidence, the Court concludes that Symbol has shown a likelihood of success on the merits as to literal infringement of the '821 patent.

b.  *Invalidity*

In pertinent part, 35 U.S.C. § 103 provides that a patent is invalid for obviousness "if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The underlying factual inquiries to be considered by the fact finder in its obviousness determination are: (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed subject matter; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations of non-obviousness, such as commercial success, long felt but unresolved need, failure of others, acquiescence of others in the industry that the patent is valid, and unexpected results. Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966); see also Perfect Web Tech., Inc. v. InfoUSA, Inc., 587 F.3d 1324, 1327 (Fed. Cir. 2009). "An obviousness determination [under § 103] is not the result of a rigid formula disassociated from the consideration of the facts of a case.  Indeed, the common sense of those skilled in the art demonstrates why some combinations would have been obvious where

17

others would not." Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1161 (Fed. Cir. 2007).

In its Post Hearing Brief, Janam contends that U.S. Patent No. 4,569,421 to Sandstedt (the "Sandstedt reference" or "Sandstedt")(Cullimore Decl., Ex. 32) anticipates claim 9, or alternatively, that the combination of Sandstedt with either U.S. Patent No. 4,547,851 to Kurland (the "Kurland reference" or "Kurland")(Cullimore Decl., Ex. 33) or U.S. Patent No. 4,916,441 to Peter Gombrich (the "Gombrich reference" or "Gombrich") (Cullimore Decl., Ex. 34) renders claim 9 invalid as obvious.[5] (D.I. 159, at 7.) With regard to obviousness, Janam contends that Sandstedt discloses a portable point of sale terminal which meets every element of claim 9 except for the use of a display "adapted to sense the manual selection of information" (e.g., a touch screen). (D.I. 91, at 23.) Janam contends that Kurland and

_____

[5] The Court notes several issues with Janam's anticipation contentions. First, in its Post Hearing Brief, Janam claims that Sandstedt "discloses every element of, and therefore anticipates, independent claim 7, from which claim 9 depends." (D.I. 159, at 7.) However, claim 9 depends on claim 1. '821 patent, col. 6: 57-58. Further, in its Opposition Brief to the Motion For Preliminary Injunction, Janam only made obviousness contentions and specifically stated that "Sandstedt . . . meets every element of claim 9 except for the use of a display 'adapted to sense the manual selection of information' (e.g., a touch screen)." (D.I. 91, at 23.) Janam's Post Hearing Brief similarly contends that "[a]sserted claim 9, which adds only a touch screen display, is obvious in light of Sandstedt because it is undisputed that by 1992 it would have been obvious to add a touch screen display to Sandstedt." (D.I. 159, at 7.) Therefore, the Court will focus on Janam's obviousness contentions.

18

Gombrich both disclose touch screen displays, and therefore, the combination of Sandstedt and Kurland, or Sandstedt and Gombrich, renders claim 9 of the '821 patent invalid as obvious. (Id. at 24.) Symbol responds that Janam fails to raise a substantial question of invalidity because the Sandstedt reference does not teach a second electromagnetic transceiver that transmits or receives information associated with a sales transaction. (D.I. 124, at 9-10; D.I. 158, at 18-19.)

Sandstedt discloses a "hand held portable order entry terminal" particularly adapted for a restaurant or retail sales outlet. '421 patent (Sandstedt), col. 1: 9-11, 42-43. A customer in a restaurant may, for example, use a customer order station to wirelessly page a waiter to come and take the customer's order. Id. at col. 13:18-42. The waiter then enters the order on his portable terminal and wirelessly passes the order to, e.g., the person assigned to fill the order and a central inventory system. Id. at col. 13:18-57.

The hand held portable entry terminal includes a "bi-directional communications link 66" which communicates with the "local processor 22 and/or the central processor 28." Id. at col. 5:6-8. The "energy medium of the communications link 66 can be either optical, audio, inductive or RF [radio frequency] in nature." Id. at col. 5:20-22. Thus, Janam contends that Sandstedt discloses the "first electromagnetic transceiver" of

claim 1, which transmits data to and from a "host computer."
(D.I. 91, at 23-24; Cullimore Decl., ¶¶ 189-190.)

Further, the hand held portable entry terminal disclosed by
Sandstedt includes a "wireless transceiver apparatus for bi-
directional communications, e.g., paging, with a plurality of
customer order stations." '821 patent, Abstract. Specifically, a
"transceiver 98 located in the casing 52 of the hand held
terminal" communicates with a "transmitter/receiver (transceiver)
apparatus 96" included in each customer station "by means of a bi-
directional input/output communications link 99 employing either
optical, RF, audio, or inductive energy." Id. at col. 6:5-12.
Janam contends that the "second electromagnetic transceiver" of
claim 1, which transmits data to and from a "remote input-output
device" is thus disclosed. (Cullimore Decl. ¶ 191.)  Symbol,
however, disputes that the second transceiver of Sandstedt meets
the "second electromagnetic transceiver" limitation of claim 1,
and contends that the information transmitted between the portable
terminal and the customer order station is not "data," as required
by the claim.  (D.I. 124, at 9; D.I. 158, at 19.)  Specifically,
Symbol contends that the information in Sandstedt is not
"information associated with a sales transaction," as required by
the Court's tentative claim construction.  (Id.)

Indeed, in the preferred embodiment Sandstedt discloses
customers using the customer order stations primarily to page

20

waiters, rather than using the stations to place their orders directly. '421 patent (Sandstedt), col. 13:18-57. Thus, the paging information transmitted between the terminal and the customer order station may be different than the order information transmitted between the terminal and the central processor. This does not mean, however, that the paging information is not "information associated with a sales transaction." To the contrary, Sandstedt teaches that the page contains information, such as the table number, that becomes part of the order information stored on the portable terminal. Id. at col. 2: 48-63; col. 13: 11-57. Therefore, one of ordinary skill in the art could reasonably conclude that the paging information contains "information associated with a sales transaction," and therefore conclude that Sandstedt discloses the "second electromagnetic transceiver" of the '821 patent. (See Cullimore Decl. ¶ 191.) More generally, the Court is persuaded that one of ordinary skill in the art could reasonably conclude that Sandstedt discloses all of the elements of claim 1, which asserted claim 9 incorporates through dependency.[6]

Sandstedt does not disclose, however, a display "adapted to sense the manual selection of information by an operator of the terminal," (in short, a "touch-screen display") which is an

---

[6] The parties do not dispute that Sandstedt discloses the elements of claim 1 not discussed here.

21

additional element required by claim 9. (Id. ¶ 193.) Janam
contends that touch-screen displays were well known in the art by
1992, when the '821 patent was filed, and that one of ordinary
skill in the art would have considered it an obvious variation to
use a touch-screen display with the portable order entry terminal
of Sandstedt. (Id. ¶¶ 193, 196, 197; D.I. 91, at 24.) Janam's
expert cites, inter alia, the Kurland and Gombrich references as
contemporary wireless terminals having touch-screen displays.
(Cullimore Decl. ¶¶ 194-195.) Symbol's expert does not rebut
this, relying instead on the position that Sandstedt lacks a
"second electromagnetic transceiver" transmitting "information
associated with a sales transaction," which the Court, as stated
above, does not find persuasive. (Allais Decl. ¶¶ 49-50.)

In sum, the Court concludes that Janam has raised a
substantial question of whether claim 9 of the '821 patent is
invalid for obviousness in view of either the Sandstedt/Kurland or
Sandstedt/Gombrich combinations, and that Symbol has failed to
prove that this invalidity defense lacks substantial merit or is
reasonably likely to fail.

### 2. The '366 Patent

The '366 patent is directed to a secondary battery supply
boost system for boosting the power of a secondary power supply
applied to a computing device. '366 patent, Abstract. Asserted
independent claim 7 recites:

7. A method for facilitating power shutdown protocol of
a computing device, comprising the steps of:
    using a first cell as a primary portable power supply
for the computing device;
    using a secondary cell as a backup portable power
supply for the computing device; and
    using a boost circuit to increase the power of the
secondary cell applied to the computing device;
    wherein the secondary cell supplies power to the
computing device upon a voltage of the first cell dropping
below a predetermined value.

Id. at col. 11: 42-53. For purposes of this Motion, the Court has

tentatively construed the term "power" to mean "the rate at which

energy is transferred, calculated by multiplying electric current

times voltage." (D.I. 208.)

             a.   Infringement

    Symbol alleges that Janam's XM-60 device literally infringes

claim 7 of the '366 patent because the boost circuit employed in

the XM-60 increases the power supplied by the secondary cell to

the computing device. (D.I. 124, at 8-9; D.I. 158, at 13.)

Symbol also alleges that even if Janam does not literally infringe

the '366 patent, it infringes under the doctrine of equivalents

because any differences between the XM-60 and the limitations in

the claim are insubstantial. (D.I. 8, at 20.) Janam responds

that the boost circuit employed in the XM-60 increases the voltage

of the secondary cell, but does not increase the rate of energy

transferred, nor, in turn, increase the power. (D.I. 91, at 20-

21.) Janam contends that the doctrine of equivalents is

inapplicable because "[i]t would vitiate the 'power' limitation to

23

permit the XM-60, which decreases power, to be equivalent to the claimed invention, which requires power to be increased." (Id. at 21.)

Dr. Cullimore opined for Janam that the XM-60 "increase[s] the voltage of the secondary battery," rather than "increas[ing] the power of the secondary battery." (Cullimore Decl. ¶ 212.) Moreover, according to Dr. Cullimore, "[b]y increasing the voltage supplied to the device from the secondary batteries, the Torex XC6367B [used by the boost circuit] decreases the power supplied by the secondary batteries" because "when the voltage is increased, the current is decreased by a greater percent because the efficiency of the Torex XC6367B is only 84%." (Id. ¶ 215.) Symbol's expert, Ken Clements, disagreed with Dr. Cullimore and stated that Dr. Cullimore erred in not considering the "applied to the computing device" language of the claim. (D.I. 129, Clements Second Decl. ¶ 8.) According to Mr. Clements, under Dr. Cullimore's theory for measuring power, "the boost circuit disclosed in the '366 patent could never 'increase the power of the secondary cell applied to the computing device,' as the claim requires." (Id. ¶ 9.) Mr. Clements opined that in order to measure power, "the power which is applied by the backup battery to the computing device in a circuit with a boost, such as in Fig. 2 of the '366 patent, must be compared to the power the backup battery would apply to the computing device if the boost circuit

were not used" (id. ¶ 11), and under this theory, the XM-60 literally infringes the '366 patent (id. ¶ 16).

In light of the tentative term constructions and conflicting expert opinions, the Court cannot conclude that Symbol is likely to prove, by a preponderance of the evidence, that the '366 patent is infringed under either literal infringement or doctrine of equivalents theories.

### b. *Invalidity*

A claim is anticipated under § 102(b) when a reference discloses each and every element of the claim, whether the reference does so explicitly or inherently. In re Gleave, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

Under a different construction of "power," originally suggested by Symbol, Janam contended that Linear Technology Application Note 51, authored by Robert Dobkin (the "Dobkin reference" or "Dobkin")(Cullimore Decl., Ex. 41) anticipates claim 7.[7] (D.I. 91, at 21- 22; Id. at ¶¶ 218-226.) Symbol contends that the Dobkin reference does not anticipate claim 7. (D.I. 124,

---

[7]After conducting a thorough claim construction hearing and analysis, Magistrate Judge Stark tentatively construed the term "power" to mean "voltage" for purposes of resolving this Motion. (D.I. 133.) Janam's expert therefore used that construction when citing the Dobkin reference and when rendering his opinion on invalidity. (D.I. 95 at ¶¶ 218-226.) The Court, however, after giving due consideration to the Magistrate Judge's opinion, overruled that opinion only with respect to this term. (D.I. 207.) The Court will still consider the Dobkin reference, however, in light of the tentative construction adopted by the Court.

25

at 9.) Specifically, Symbol contends that claim 7 discloses a method of "facilitating a power shutdown protocol of a computing device," '366 patent, col. 11:42-43, but that Dobkin provides back-up power after the battery is dead or removed. (Id.; D.I. 158, at 17.) Thus, Dobkin "kicks-in too late." (D.I. 158, at 17.)

As noted in the Court's prior opinion rendering tentative claim constructions, a person of ordinary skill in the art at the time of the patent would understand the textbook definition of "power" to be "voltage multiplied by current." (D.I. 207, at 4.) Dobkin discloses circuits for use in a "palmtop computer" in which backup power supply is drawn from a 3 volt lithium battery. Dobkin at 15, 17. The "backup function is implemented with another [Linear Technology part] LT1173 circuit . . . Power for the LT1173 comes from the main logic output . . . When the BACKUP/NORMAL input goes high, the feedback string is connected, but the converter does not cycle until the main logic supply voltage drops to 3.4V." Id. at 15, 18. The caption for Figure 24 discloses that the "Backup Converter Generates 3.4 volts when the Main Battery is Dead or Removed." Id. at 17. Thus, according to Janam, Dobkin discloses a "boost circuit to increase the power of the secondary cell applied to the computing device," as required by claim 7, in that Dobkin's circuit increases the voltage of the backup 3V lithium battery to 3.4V as applied to the computing

device.  (D.I. 91, at 22; Cullimore Decl. ¶¶ 220, 222-23.)

Symbol contends, however, that Dobkin's circuit does not allow the computer to function without interruption in that there is a loss of power before the battery backup is activated.  (D.I. 158, at 17.)  Claim 7 of the '366 patent discloses a method for "facilitating power shutdown protocol of a computing device."  '366 patent, col. 11:42-43.  Indeed, the specification of the '366 patent illustrates a multi-step power shutdown process, where the voltage of the secondary cell is boosted upon the voltage of the primary cell dropping below a predetermined value, thereby allowing the portable device to switch to the secondary cell without interruption and complete the shutdown protocol.  '366 patent, col. 9:60- 10:47; Fig. 3.  In Dobkin, the boost circuit is enabled "when the [main] battery [circuit] voltage falls below 2.5V (a very dead battery!) or the battery is removed."  Dobkin at 19.  Symbol's expert contends that this means that operation of the palmtop computer must be temporarily interrupted, for lack of a sufficient power supply, before the backup battery circuit is enabled. (D.I. 129 at ¶¶ 42.)  Janam's expert agrees that if the main battery is removed, there is no power to the computer, and a proper shutdown protocol cannot take place.  (D.I. 125, Cullimore Dep. Tr. 254:5-15.)

Dobkin, however, does not specifically state whether the palmtop computer switches to the backup circuit without

27

interruption.  Dobkin simply states that the switch happens
"automatically."  Dobkin at 18.  Further, the language in Dobkin
referenced by Symbol- "2.5V (a very dead battery!)"- is not
conclusive on the issue because Dobkin also states that "[t]he
[main] converter [circuit] delivers 200mA at 3.6V with as little
as 2.5V input."  Id.  Therefore, it is reasonable to believe that,
in the context of the entire reference, a person of ordinary skill
in the art could read Dobkin as disclosing a boost circuit which
is enabled automatically to supply power without interruption.

       The Court finds that Janam has raised a substantial
question of whether the Dobkin reference anticipates claim 7 of
the '366 patent and renders it invalid.  The Court further finds
that Plaintiff has not persuasively rebutted this invalidity
defense.

### 3.  The '969 Patent

     The '969 patent is directed to a wireless handheld terminal
with a data collection device (e.g., bar code scanner) and to the
software operating on the terminal.  '969 patent at col. 1: 19-21.

#### a.  *Infringement*

     Symbol alleges that Janam's XM-60 device literally infringes
claims 22 and 25 of the '969 patent, and that Janam has conceded
infringement.  Specifically, Symbol notes that Janam's expert, Dr.
Cullimore, does not provide a non-infringement opinion with regard

to the XM-60 and the '969 patent. (D.I. 125, Cullimore Dep. Tr. 46:25-47:12.) Further, in its Opposition brief to the Motion For Preliminary Injunction (D.I. 91), Janam does not respond to Symbol's infringement allegations.

Janam's sole contention on non-infringement came at oral argument, when counsel Janam argued:

> Where [the claim] doesn't talk about forbidding the installation of software at all, but rather talks about not doing it when there's a multiplicity of user interfaces. . . And the XM60 has installed software. Internet Explorer. Microsoft Wordpad. So if this is going to become the distinction, there's a real question of - there's certainly no proof of infringement and no expert from Symbol has ever addressed this.

(D.I. 152, Hearing Tr. 144:18-1458.)

In light of the tentative term constructions and the fact that Janam appears to have not yet taken an articulable non-infringement position, the Court concludes that Symbol has shown a likelihood of success on the merits as to literal infringement of the '969 patent.

### b. *Invalidity*

Janam contends that claims 22 and 25 are invalid for lack of a written description under 35 U.S.C. § 112. (D.I. 91, at 4.) Further, Janam contends that claims 22 and 25 are anticipated by U.S. Patent No. 5,804,803 to Cragun, assigned to IBM (the "Cragun reference" or "Cragun")(Cullimore Decl., Ex. 4), and that claims 22 is anticipated by and claim 25 rendered obvious by "The Application Programmer's Guide to the Series 3000 Symbol Terminal

Enabler Program (STEP)" ("STEP Manual")(Cullimore Decl., Ex. 5).
(D.I. 91, at 5-9; D.I. 159, at 9).  Janam additionally contends
that the '969 patent is unenforceable due to inequitable conduct
by Symbol.  (D.I. 91, at 11-19.)

The dispute concerning anticipation primarily centers on
whether the prior art references disclose a required element of
claims 22 and 25: "without installing new software on the wireless
terminal."[8]  (See D.I. 124, at 4-5; D.I. 158, at 15-17.)  Claim
16, on which claims 22 and 25 depend, provides as follows:

> 16. A wireless user-held bar code scanning terminal . . .
> comprising . . . parsing software for providing a user
> interface on the display by parsing script received from the
> network, whereby a multiplicity of different user interfaces
> may be provided without installing new software on the
> wireless terminal.

Id. at col. 25: 22-44 (emphasis added).  For purposes of this
Motion, the Court tentatively construed the term "without
installing new software on the wireless terminal" to mean "without
installing an application program, other than the parsing
software, to provide user interfaces."  (D.I. 208.)

The invention disclosed by Cragun "relates to an information
retrieval mechanism, for obtaining information related to an
object based on data encoded on the object."  '803 patent

---

[8] Although Janam explicitly contended that each element of
claims 22 and 25 of the '969 patent is disclosed by the Cragun
reference (D.I. 91, at 5-8), and that each element of claim 22 is
disclosed by the STEP Manual reference (id. at 8-9), Symbol
confined its opposition to the argument that this single element
is not met (see D.I. 124, at 4-5).

(Cragun), col. 1:6-8. More particularly, Cragun discloses a
handheld computer, termed a client computer, which is issued to
customers for use in a store. (Cullimore Decl. ¶ 37.)   The client
computer includes a bar code scanner which "scans the object of
interest to the customer and translates the code into a URL
(Uniform Resource Locator)." '803 patent (Cragun), col. 2:50-52.
The URL is transmitted from the client computer to the server
computer.  Id. at col. 2:54-55.  The client computer then receives
information related to the object from the server computer and
displays the information to the customer.  Id. at col. 2:55-57.
"In the preferred embodiment, the document is a HTML World Wide
Web page, which could contain other URLs of documents the customer
could request or a fill-in form for other customer information not
available in the customer data base."  Id. at col. 8:63 - col.
9:1.

Janam contends that Cragun's disclosure of software capable
of receiving and interacting with webpages through an HTML browser
anticipates the "parsing software for providing . . . a
multiplicity of different user interfaces [] provided without
installing new software on the wireless terminal," as recited in
claim 16.  (D.I. 159, at 10.)   Symbol contends that this browser
interface does not anticipate the claimed "parsing software"
because the browser interface of Cragun is part of a larger
Processing Program that also performs a variety of other

31

functions, such as providing the device's operating system.  (D.I. 158, at 17; Allais Decl. ¶¶ 65-67.)  Thus, Symbol contends that Cragun teaches installing application programs other than the parsing software, contrary to the Court's construction of the term "without installing new software on the wireless terminal."  (D.I. 158, at 17.)

Symbol's argument, however, appears inconsistent with its position on infringement.  Symbol's fundamental dispute with Janam arises from Janam's marketing of handheld computers with bar code scanners which utilize the Microsoft Windows OS, including the Internet Explorer web browser, instead of the Palm OS.  (See generally D.I. 152, Hearing Tr. 11:2- 12:13.)  In its infringement allegations, Symbol points to the Internet Explorer web browser application, on Janam's devices, as satisfying the "parsing software" element of claim 16.  (D.I. 9, Clements Decl. ¶ 38 ("By using parsing software, such as claimed in the '969 patent, the Internet web browser [of the XM-60] generates a user interface for remote software applications without the need for such software to be installed on the handheld computer."); Clements Decl. Ex. N at 9.)  This browser, however, is part of the larger Windows operating system of the accused devices.  Similarly, the HTML browser interface of Cragun is part of the larger Processing Program of the prior art device.  (Allais Decl. ¶¶ 66.)  If the Processing Program precluded Cragun from anticipating claim 16 for

the reasons suggested by Symbol, it would raise substantial questions about whether the Windows OS, with Internet Explorer, also precludes Janam's devices from infringing that same claim.

Accordingly, the Court finds that the Cragun reference raises substantial questions of anticipation as to claim 16 of the '969 patent, on which asserted claims 22 and 25 depend.[9]  At this stage, Symbol has failed to demonstrate that Janam's invalidity defense is reasonably likely to fail.

In summary, with regard to the '821 and '969 patents, the Court concludes that while Symbol has shown it is reasonably likely to succeed on its infringement claims, Symbol has nevertheless failed to prove that the substantial questions of invalidity raised by Janam lack merit, or are reasonably likely to fail.  With regard to the '366 patent, the Court concludes that Symbol has not shown a likelihood of success on either its infringement claims or Janam's invalidity challenges.  For purposes of this Motion, therefore, the Court cannot find that Symbol has demonstrated a likelihood of success on the merits as a whole.

_____

[9]In view the substantial questions of invalidity raised by Cragun alone, the Court need not examine the other potentially relevant prior art, the STEP Manual, or Janam's written description argument at this time.  For the same reason, the Court also declines to address the merits of Janam's assertion that the '969 patent is unenforceable due to inequitable conduct by Symbol.

## B.   Irreparable Harm

"The moving party must make a 'clear showing of immediate irreparable injury' or a 'presently existing threat,' but an injunction will not issue merely to assuage the fears of the movant."   Johnson & Johnson Orthopaedics, Inc. v. Minnesota Min. & Mfg. Co., 715 F. Supp. 110, 112 (D. Del. 1989)(citing Cont'l Group, Inc. v. Amoco Chem. Corp., 614 F.2d 351, 359 (3d Cir. 1980)).   Because there has not been a strong showing of a likelihood of success on the merits, Symbol is not entitled to a presumption of irreparable harm.[10]

Symbol contends that Janam, free from the costs of research and development that Symbol continues to bear, has disruptively priced the accused products to significantly undercut Symbol's sales in the marketplace, resulting in price erosion.   (D.I. 8, at 24.)   Specifically, Symbol contends price erosion is occurring because Symbol is being forced to drop its asking prices by at least twenty-five percent in order to stay competitive, and once such price concessions are made, they cannot be recaptured.   (Id.

---

[10]   In the wake of the Supreme Court's decision in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006), a number of courts, including this one, have been persuaded to the view that such a presumption no longer exists.   See Girafa.com, Inc. v. Amazon.com, Inc., No. 07-787-SLR, 2008 WL 5155622, at *1 (D. Del. Dec. 9, 2008); Sun Optics, Inc. v. FGX Int'l Inc., No. 07-137-SLR, 2007 WL 2228569, at *1 (D. Del. Aug.2, 2007). The Court need not examine this issue, however, because Symbol has not established a reasonable likelihood of success on the merits and would not be entitled to such a presumption if it indeed still exists.

at 25-26.) Symbol contends that the effect of price erosion is devastating- that conservative estimates indicate Symbol will lose approximately $30 million in revenue in the first year alone. (Id. at 26; D.I. 124, at 15-18.) Moreover, Symbol argues the harm is irreparable because Janam, as a young business, will not be able to pay the damages suffered by Symbol due to price erosion. (D.I. 8, at 24; D.I. 124, at 18.)

Janam responds that Symbol lacks evidence to support its price erosion contentions. Janam contends that Symbol has no evidence on how it prices the accused devices (and that in any event, the difference in price between Symbol's and Janam's devices is justified), that there is no evidence Symbol has lost any sales to Janam's accused devices, and that there is no evidence Symbol has had to lower its prices to compete with Janam. (D.I. 91, at 32-34.) Further, Janam contends that Symbol continues to enjoy a dominant market share, and that Janam is not even Symbol's main competitor. (Id. at 36.) Additionally, Janam argues that any lost market share and price erosion suffered by Symbol is not irreparable because it can be quantified and compensated by monetary damages. (Id. at 36-37.) With respect to Janam's alleged inability to pay damages, Janam contends that Symbol's damages claims are unsupported and overstated, and that an alleged inability to pay damages is insufficient to warrant the drastic remedy of injunctive relief. (D.I. 159. at 21-22.)

Price erosion can justify a finding of irreparable harm. <u>See</u> <u>Sanofi-Synthelabo v. Apotex, Inc.</u>, 470 F.3d 1368, 1382-83 (Fed. Cir. 2006)(affirming grant of preliminary injunction and concluding that district court did not err in its evaluation of price erosion evidence and subsequent finding of irreparable harm). Symbol directs the Court's attention to Janam's sales and marketing documents as evidence that Janam is pricing the accused devices below market levels. (D.I. 158, Ex. A Symbol Non-Pat. Pr. At 23, 36-38, 42, 43.) The Court agrees with Janam, however, that marketing puffery- touting, <u>inter alia</u>, that Janam is less expensive than comparable products- does not adequately evidence price erosion. Symbol does reference concrete pricing evidence, though. For example, Janam's forecasted average sales price for its XM-60 device in 2008 was $584. (D.I. 132, Strickland Decl., Vol. III, Ex. 43 at JAN0030003.) In contrast, Symbol's average sales price for its MC50 and MC70 devices in 2008 was $753 and $1267, respectively. (D.I. 130, Strickland Decl., Vol. I, Ex. C.) In addition, Symbol offered evidence that it reduced its price on the MC3090 device from almost $1200 to $620 in order to compete with Janam for an account with Goody's Family Clothing, but that Janam still underbid Symbol at $610 per XM-60 device. (<u>Id.</u>, Ex. A at 69-72.) In the Court's view, there is evidence that Symbol suffered, and continues to suffer, some degree of price erosion as a result of Janam's conduct. However, without more, the Court is

not persuaded that this evidence supports a finding that Symbol's price erosion damages are incapable of being quantified, or that Symbol could not be fully compensated by a monetary award.

The Court accordingly turns to Symbol's contention that price erosion amounts to irreparable harm because Janam is unable to pay a damages award. In some instances, a defendant's inability to satisfy a money judgment has been deemed sufficient to establish irreparable injury. See Eli Lilly & Co. v. Premo Pharm. Labs., Inc., 630 F.2d 120, 137 (3d Cir. 1980)(affirming district court's finding of irreparable harm where "damages could very conceivably run beyond [defendant]'s ability to pay them" in a pre-Federal Circuit patent case). But see Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp., 862 F. Supp 1070, 1075 (S.D.N.Y. 1994)(finding that plaintiff failed to convince the court that defendant's potential inability to pay monetary damages compelled issuance of injunction). Based on Janam's projected operations and expected financing, Symbol's expert estimated that Janam would only have about $3.7 million in available cash as of year-end 2009. (D.I. 132, Strickland Decl., Vol. III ¶ 70.) Symbol's expert further testified that for the Federated (Macy's) account alone, Janam would potentially owe Symbol $7.9 million in price erosion damages. (Id. ¶¶ 74-75.) Janam does not dispute this figure, and Janam's expert was not able to offer an opinion on Janam's ability to pay a damages award. (See D.I. 154, PPX131,

Stec Dep. Tr. 168:21-169:2, 170:8-21.)  Thus, there is some
evidence to suggest that Janam's young business is not
sufficiently capitalized to be able to pay Symbol's predicted
damages award, which weighs slightly in favor of finding
irreparable harm to Symbol.  On the whole, though, the weight of
this factor is not enough to outweigh the Court's findings
regarding the likelihood of success of Symbol's case.

## C.   Balance Of Hardships

In its assessment, the Court "must balance the harm that will
occur to the moving party from the denial of the preliminary
injunction with the harm that the non-moving party will incur if
the injunction is granted."  Hybritech, 849 F.2d at 1457.   Symbol
points to the same evidence regarding continuing irreparable
injury as further evidence that the balance of hardships tips in
favor of granting a preliminary injunction.  (D.I.8, at 28.)
Janam contends that instead of simply inflicting monetary losses,
a preliminary injunction would effectively destroy Defendant's
business, thereby causing the balance of hardships factor to tip
in favor of denying the injunction.  (D.I. 91, at 39.)   Janam
argues that Symbol will not be forced out of business if Janam is
not enjoined, nor will it stop developing products or stop its
research and development efforts.  (See D.I. 97, Ex. 17, Metlitsky
Dep. Tr. 38-40.)   In contrast, Janam's CEO testified that as a
small business, Janam will be destroyed if a preliminary

injunction is entered.  (D.I. 92, Lerner Decl. ¶¶ 5-6.)  In light
of these considerations, the Court concludes that the balance of
hardships weighs in favor of Janam, and against the granting of a
preliminary injunction.

## D.  **Public Interest**

"Typically, in a patent infringement case, although there
exists a public interest in protecting rights secured by valid
patents, the focus of the district court's public interest
analysis should be whether there exists some critical public
interest that would be injured by the grant of preliminary
relief."  Hybritech, 849 F.2d at 1457 (finding the public interest
in enforcing valid patents outweighed the adverse impact on the
market caused by the alleged infringer's absence).

Symbol contends that the public interest would best be served
by protecting and enforcing Symbol's patent rights.  (D.I. 8, at
29.)  Specifically, Symbol contends that enjoining Janam will not
impede the public from obtaining handheld portable computers, and
that any price savings the public might obtain as a result of
Janam's competition in the market should not be considered because
Janam only achieves its low-pricing through patent infringement.
(Id.)  Janam argues that the public's interest in vigorous
competition in the market weighs against the granting of a
preliminary injunction.  (D.I. 91, at 40.)  The Court concludes
that the public interest in protecting valid patent right is not

outweighed by any cited competing public interests.

In sum, the Court concludes that while irreparable harm and impact on the public interest support issuing an injunction, the balance of the hardships, and most significantly, Symbol's failure to demonstrate a likelihood of success on the merits, weighs against issuing one.  Balancing these factors against each other and considering the magnitude of the relief requested, the Court concludes that a preliminary injunction should not issue.

## CONCLUSION

For the reasons discussed, Plaintiff Symbol Technologies, Inc.'s Motion For Preliminary Injunction and Defendant Janam Technologies LLC's Motion To Preclude Evidence of Symbol's Profits will both be denied.

An appropriate Order will be entered.